**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| **VISTO CORPORATION**, | |
| Plaintiff**,** | |
| vs. | **Civil Action No.: 2:06-CV-39-TJW** |
| **GOOD TECHNOLOGY, INC.**, | **JURY DEMANDED** |
| Defendant. | |

## <u>VISTO CORPORATION'S OPENING CLAIM CONSTRUCTION BRIEF</u>

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     BACKGROUND OF THE INVENTIONS ......................................................... 1

III.    LEGAL STANDARDS FOR CLAIM CONSTRUCTION ................................. 3

        A.      Claim Terms Should Be Construed Consistently In Accordance With The
                Principles of Stare Decisis ........................................................................... 5

IV.     VISTO'S PROPOSED CONSTRUCTIONS OF TERMS AND PHRASES ................... 7

        A.      "order of the steps of method claims" ('192: 1, 2, 8 and 22)................................ 7

        B.      "the firewall / the firewall / the first firewall" ('192 patent claims 1, 2, 8,
                10, 11, 21 and 22) ........................................................................................ 9

        C.      "examination results / first examination results / second examination
                results" ('192 patent claims 1, 2, 8, 21 and 22) ..................................................... 10

        D.      "version information, version indicating information" ('192 patent claims
                1, 2, 8, 10, 17, 18, 21 and 22; '221 patent claims 13; '679 patent claims 1)....... 10

        E.      "independently modifiable copy / the copy" ('192 patent claims 1, 2, 8, 10,
                21 and 22) .................................................................................................... 11

        F.      "independently modifiable e-mail(s)" ('679 patent claim 1).............................. 12

        G.      "initiating … from within the firewall [through the communication
                channel] when predetermined criteria have been satisfied" ('192 patent
                claims 1, 2, 8, 10, 21 and 22) .............................................................................. 13

        H.      "storing" ('192 patent claims 1, 2, 8, 10 and 22).................................................. 15

        I.      "general synchronization module" ('679 patent claims 1, 12, 13 and 15)........... 16

        J.      "server" ('679 patent claims 4, 8, 12, and 16) .................................................... 17

        K.      "normally open LAN firewall port" ('679 patent claims 1 and 3)....................... 18

        L.      "a first Internet communication channel…" ('679 patent claim 1) .................... 20

        M.      "a plurality of second Internet communication channels, each coupling
                said global server to a respective one of said smartphone devices…" ('679
                patent claim 1).................................................................................................. 22

        N.      "workspace data manager" ('606 patent claims 10, 11 and 19-21) ..................... 22

        O.      "untrusted client site" ('606 patent claims 10, 20 and 21).................................. 23

        P.      "access data temporarily" ('606 patent claims 20 and 21) ................................. 25

        Q.      "automatically disabling" ('606 patent claims 10 and 21)................................... 26

        R.      "after a user has finished using the data" ('606 patent claims 10, 20 and
                21) ................................................................................................................. 27

        S.      "Instantiator" ('606 patent claim 11) ................................................................. 28

i

V. VISTO'S PROPOSED CONSTRUCTION OF MEANS-PLUS-FUNCTION ELEMENTS................................................................................................ 29

 A. "means for updating the first version information whenever the first workspace element is modified" ('192 patent claim 17) ..................................... 30

 B. "means for updating the first version information whenever the first workspace element is modified or updating the second version information whenever the copy is modified" ('192 patent claim 21)..................................... 31

 C. "first means for generating first examination results from first version information which indicates whether a first workspace element stored at a first store within a firewall has been modified" ('192 patent claim 21) .............. 32

 D. "second means for generating second examination results from second version information which indicates whether an independently modifiable copy of the first workspace element has been modified, the copy being stored at a second store on a smart phone outside the firewall" ('192 patent claim 21) ...................................................................................................... 34

 E. "means for initiating the first and second means from within the firewall when predetermined criteria have been satisfied" ('192 patent claim 21)........... 35

 F. "means for generating a preferred version from the first workspace element and from the copy based on the first and second examination results" ('192 patent claim 21 ................................................................................. 35

 G. "means for storing first workspace data on a first device" ('221 patent claim 8) .......................................................................................................... 37

 H. "means for storing second workspace data on a second device" ('221 patent claim 8)................................................................................................... 38

 I. "means for executing a workspace data manager on an untrusted client site" ('606 patent claim 20)................................................................................. 39

 J. "means for requesting the workspace data manager to access data temporarily from a remote site" ('606 patent claim 20) ..................................... 40

 K. "means for downloading data from the remote site" ('606 patent claim 20)....... 41

 L. "means for placing the data in temporary storage on the untrusted client site" ('606 patent claim 20)................................................................................. 42

 M. "means for using the workspace data manager to present the downloaded data" ('606 patent claim 20) ............................................................................. 43

I. CONCLUSION............................................................................................... 44

Austin 38967v7

# TABLE OF AUTHORITIES

## Cases

*Altiris, Inc. v. Symantec Corp.*,
  318 F.3d 1363 (Fed. Cir. 2003)..................................................................................8

*Amtel Corp. v. Silicon Storage Tech., Inc.*,
  2001 U.S. Dist. LEXIS 25641 (N.D. Cal. 2001) ..............................................6

*Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*,
  132 F.3d 701 (Fed. Cir. 1997)..................................................................................5

*Budde v. Harley-Davidson, Inc.*,
  250 F.3d 1369 (Fed. Cir. 2004)..............................................................................29

*CVI/Beta Ventures, Inc. v. Tura LP*,
  112 F.3d 1146 (Fed. Cir. 1997)................................................................................6

*Catalina Mktg. Int'l v. Coolsavings,com, Inc.*,
  289 F.3d 801 (Fed. Cir. 2002)........................................................................33, 35

*Dow Chem. Co. v. Sumitomo Chem. Co.*,
  257 F.3d 1364 (Fed. Cir. 2001)..............................................................................17

*E-Pass Techs., Inc. v. 3COM Corp.*,
  343 F.3d 1364 (Fed. Cir. 2003)........................................................................5, 29

*Electro Medical Sys., S.A. v. Cooper Life Sciences*,
  34 F.3d 1048 (Fed. Cir. 1994)..................................................................................7

*In re Graves*,
  69 F.3d 1147 (Fed. Cir. 1995)................................................................................23

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004)..................................................................4, 14, 15

*Interactive Gift Express., Inc. v. CompuServe, Inc.*,
  256 F.3d  1323 (Fed. Cir. 2001)........................................................................7, 8

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
  231 F.3d 859 (Fed. Cir. 2000)................................................................................30

*KX Indus., L.P., v. PUR Water Purification Prods., Inc.*,
  108 F. Supp. 2d 380 (D. Del. 2000)........................................................................6

*Kraft Foods, Inc. v. Int'l Trading Co.*,
    203 F.3d 1362 (Fed. Cir. 2000).................................................................16

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996).............................................................3, 4, 5, 6, 10, 11, 12

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
    133 F.3d 1473 (Fed. Cir. 1998)...........................................................16, 18

*Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*,
    357 F.3d 1319 (Fed. Cir. 2004)............................................................9, 27

*Natl. Instruments Corp. v. The Mathworks, Inc.*,
    2002 U.S. Dist. LEXIS 27577 (E.D. Tex. 2002) ........................................30, 39

*Nazomi Communications, Inc. v. ARM Holdings, PLC*,
    403 F.3d 1364 (Fed. Cir. 2005)....................................................................4

*Nystrom v. Trex Co.*,
    374 F.3d 1105 (Fed. Cir. 2004)....................................................................4

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)................................................................4, 17

*Phonometrics, Inc. v. Northern Telecom Inc.*,
    133 F.3d 1459 (Fed. Cir. 1998)....................................................................6

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
    182 F.3d 1298 (Fed. Cir. 1999)....................................................................5

*Rexnord Corp. v. Laitram Corp.*,
    274 F.3d 1336 (Fed. Cir. 2001)........................................................17, 18, 21

*Serrano v. Telular Corp.*,
    111 F.3d 1578 (Fed. Cir. 1997)..............................................................29, 40

*Southwall Techs., Inc. v. Cardinal IG Co.*,
    54 F.3d 1570 (Fed. Cir. 1995)......................................................................6

*Superguide Corp. v. DirecTV Enters.*,
    358 F.3d 870 (Fed. Cir. 2004).......................................................................5

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002)................................................................7, 28

*United States Surgical Corp. v. Ethicon, Inc.*,

iv

103 F.3d 1554 (Fed. Cir. 1997)................................................................................14

*Verizon Cal. Inc. v. Ronald A. Katz Tech. Licensing, L.P.*,
    326 F. Supp. 2d 1060 (C.D. Cal. 2003) ...........................................................5

*Vitronics v. Conceptrinic*,
    90 F.3d 1576 (Fed. Cir. 1996)..............................................................4, 9, 22

*WMS Gaming Inc. v. International Game Tech.*,
    184 F.3d 1339 (Fed. Cir. 1999)......................................................................39

*Zoltar Satellite Sys., Inc.*,
    402 F. Supp. 2d 731 (E.D. Tex. 2005)...........................................6, 10, 11, 12

## Federal Statutes

35 U.S.C. § 112 ¶ 6...............................................................................................29

v

## INDEX OF EXHIBITS

(Filed concurrently herewith)

Exh. A   U.S. Patent No. 6,085,192 (the "'192 patent")

Exh. B   U.S. Patent No. 6,151,606 (the "'606 patent")

Exh. C   U.S. Patent No. 6,708,221 (the "'221 patent")

Exh. D   U.S. Patent No. 7,039,679 (the "'679 patent")

Exh. E   Claim Construction Order dated April 20, 2005, Docket No. 145; *Visto Corporation v. Seven Networks, Inc.*, Eastern District of Texas Case No. 2:03-CV-333-TJW

Exh. F   Claim Construction Order dated April 18, 2006, Docket No. 340; *Visto Corporation v. Seven Networks, Inc.*, Eastern District of Texas Case No. 2:03-CV-333-TJW

Exh. G   Visto's Opening Claim Construction Brief dated January 24, 2005, Docket No. 113; *Visto Corporation v. Seven Networks, Inc.*, Eastern District of Texas Case No. 2:03-CV-333-TJW

Exh. H   Claim Construction Order dated December 29, 2006, Docket No. 132; *Visto Corporation v. Smartner Information Systems, Ltd.*, Eastern District of Texas Case No. 2:05-CV-91

Exh. I   Supplemental Amendment dated March 9, 2000 for Serial No. 09/008,354

Exh. J   WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1991)

Exh. K   DICTIONARY OF COMPUTER AND INTERNET TERMS  (SIXTH EDITION 1998)

Exh. L   MICROSOFT PRESS COMPUTER DICTIONARY  (3RD ED. 1997)

Exh. M   WIKIPEDIA, THE FREE ENCYCLOPEDIA - INTERNET (http://en.wikipedia.org/wiki/Internet)

Exh. N   WIKIPEDIA, THE FREE ENCYCLOPEDIA - INTERNET PROTOCOL SUITE (http://en.wikipedia.org/wiki/Internet)

Exh. O   WIKIPEDIA, THE FREE ENCYCLOPEDIA - TRANSPORT LAYER (http://en.wikipedia.org/wiki/Internet)

Exh. P   ONLINE OXFORD AMERICAN DICTIONARY - AUTOMATIC

Austin 38967v7

(http://www.askoxford.com/concixe_oed/automatic?view=uk)

Exh. Q          INTERNETWORKINGS TECHNOLOGY HANDBOOK (2ND ED)

Exh. R          RFC 1945 - Hyper Text Transport Protocol - HTTP1.0

Exh. S          RFC 1700 Assigned Numbers

Austin 38967v7

Plaintiff Visto Corporation ("Visto") respectfully submits this Opening Claim Construction Brief pursuant to P.R. 4-5(a) of the Rules of Practice for Patent Cases before the Eastern District of Texas and the Court's Docket Control Order dated November 17, 2006.

## I.   INTRODUCTION

The present action is brought by Visto against Good Technology, Inc. ("Good"), for infringement of U.S. Patents Nos. 6,085,192 ("the '192 patent"), 6,151,606 ("the '606 patent"), 6,708,221 ("the '221 patent") and 7,039,679 ("the '679 patent").   (Hereinafter, collectively referred to as the "patents-in-suit.")  Copies of the patents-in-suit are attached as Exhibits A-D.

The patents-in-suit in the present action include patents that were previously at issue and construed by the Court in *Visto Corporation v. Seven Networks, Inc.*, Eastern District of Texas Case No. 2:03-CV-333-TJW and in *Visto Corporation v. Smartner Information Systems, Ltd.,* Eastern District of Texas Case No. 2:05-CV-91-TJW.   [*See* Exh. E, Order dated April 20, 2005, Docket No. 145 ("Claim Construction Order I"); Exh. F, Order dated April 18, 2006, Docket No. 340 ("Claim Construction Order II"); and Exh. H, Order dated December 29, 2006, Docket No. 132 ("Claim Construction Order III")].   On August 1, 2007, the parties to the present action submitted a Joint Claim Construction and Prehearing Statement ("Joint Statement") in accordance with Local Patent Rule 4-3.    The parties agreed therein that the Court's claim construction orders from the *Visto v. Seven* and *Visto v. Smartner* actions should be adopted with a few exceptions.  This brief is submitted in support of Visto's interpretation of the terms and phrases from the asserted claims of Visto's patents-in-suit upon which the parties did not agree.

## II.   BACKGROUND OF THE INVENTIONS

At issue in this case is the technology that enables remote access to business information contained in a local area network (LAN), such as a network of desktop computers and servers at a business, using mobile computing devices such as the Motorola® Q, Samsung® Blackjack and Palm Treo® ("smart phones").  When the inventions of the Patents-in-Suit were made over ten years ago, the Internet as we know it today was in its infancy.  At that time, local area networks

1

("LANs") had been developed, as had the capability for personal computer users to browse sites on the Internet and communicate via the Internet with e-mail.  Commonplace tasks, such as using smart phones to view and revise e-mail, contacts, calendars, files, and the like ("workspace data"), led to the possibility of inconsistencies between the data in the LAN and the data on the smartphone.  These inconsistencies needed to be resolved (a process called "synchronization") without compromising security.

One of the main impediments to maintaining data consistency then and now is that most corporate networks have firewalls, which are security systems designed to prevent unauthorized access to the LAN.  Firewalls typically operate by permitting only specified communications determined by security policies, such as permitting only outbound communications initiated inside the firewall and incoming traffic that has advance authorization.  Communications passing through a firewall use a "port," for communicating between a program inside the firewall and other communications systems or programs outside the firewall.  For Internet traffic, firewalls typically include one or more normally open ports specified to pass messages using the Hyper Text Transfer Protocol ("HTTP"), which is the standard protocol for Internet web communications.

In 1996, securely enabling remote access to workspace data for smart phones and other remote devices was a very difficult problem, because it is generally preferred to minimize the number of ports in a firewall to reduce security risks.  For this reason, LAN administrators were (and still are) extremely reluctant to adopt software that requires the opening of firewall ports in addition to the ones that are already required for normal Internet access.  Thus, communications programs that require the opening of an additional firewall port are usually unacceptable.

An additional problem arises in designing a system capable of "universal" application. Where many different types of devices (*e.g.* Treos, Motorola® Q, Samsung® Blackjack, etc.) are used to access the LAN, the software must be capable of handling different operating formats and systems.  At the time the Visto inventions were made, no software was available for safe,

2

secure, seamless, synchronized communication between a variety of remote devices and programs at the user's LAN.

Visto developed solutions that overcame these and other impediments and enabled the tremendous expansion of wireless business communications seen today.  Visto's inventions are described and claimed in a number of issued and pending U.S. patents that cover technological innovations that others in the industry, including Good, have been quick to imitate.

In some preferred embodiments, the normally open HTTP and secure HTTP (a.k.a. HTTPS) firewall ports are used to communicate with servers and devices outside the firewall, thereby avoiding the need to open additional firewall ports with the attendant security risks.  In one exemplary embodiment, a global server, which may be located within a wireless carrier's infrastructure, stores portions of workspace data and enables communication between the firewall-protected LAN and trusted remote clients, such as smart phones.

Events such as the arrival of new e-mail at the LAN or the updating of a calendar appointment on a remote client are securely and automatically synchronized to each connected device so that users are always presented with up-to-date information at each connected device. The result is a safe and secure solution for remote access to workspace data that maintains data consistency across all connected devices.

Another feature of Visto's inventions is the concept of deleting data on a mobile device after the user has finished using the data.  *See e.g.,* '606 patent, col. 3, ll. 6-9.  The mechanism of deleting data on the mobile device is a useful security feature in situations where a mobile device is lost or misplaced and can easily fall into the hands of unprivileged users.   This feature, commonly known as "remote wipe" or "remote deletion," has been quickly imitated by Visto's competitors, including Good.

## III.    LEGAL STANDARDS FOR CLAIM CONSTRUCTION

"[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court."  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372

(1996).  Claim construction is an issue reserved exclusively for the court due to "the importance of uniformity in the treatment of a given patent[.]"  *Id.* at 390.

It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005).  Claim terms are given their ordinary and customary meaning to one of ordinary skill in the art at the time of the invention (unless there is clear evidence in the patent's specification or prosecution history that the patentee intended to otherwise define a specific term, thus acting as his own lexicographer).  *Id.* at 1312-1313.  Claim construction is supported by the intrinsic evidence, *viz.*, the patents' specification and file history.  *Id.* at 1315-1317.

"[A] claim construction analysis must begin and remain centered on the claim language itself, for that is the language the patentee has chosen to particularly point out and distinctly claim the subject matter which the patentee regards as his invention."  *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004) (citations omitted); *see also Nystrom v. Trex Co.*, 374 F.3d 1105, 1111 (Fed. Cir. 2004) ("We begin our claim construction analysis with the words of the claim. In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves.").

When construing a claim, a court should look first to the intrinsic evidence, *i.e.*, the claims themselves, the written description portion of the specification, and the prosecution history, if in evidence.  *Vitronics v. Conceptrinic*, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996).  Courts may also rely on evidence such as dictionary definitions and treatises to aid in determining the ordinary and customary meaning of claim terms.  *Phillips*, 415 F.3d at 1318.

"[A]lthough the specification often describes very specific embodiments of the invention, [the Federal Circuit has] repeatedly warned against confining the claims to those embodiments."  *Phillips*, 415 F.3d at 1323, citing *Nazomi Communications, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir. 2005).  Limitations from the specification should not be read into the claims unless the patentee "acted as his own lexicographer and imbued the claim terms with a particular meaning or disavowed or disclaimed scope of coverage, by using words or expressions

4

of manifest exclusion or restriction." *E-Pass Techs., Inc. v. 3COM Corp.*, 343 F.3d 1364, 1369 (Fed. Cir. 2003) (citations omitted).  Moreover, "[a]lthough [it] is correct that the prosecution history is always relevant to claim construction, it is also true that the prosecution history may not be used to infer the intentional narrowing of a claim absent the applicant's clear disavowal of claim coverage." *Superguide Corp. v. DirecTV Enters.*, 358 F.3d 870, 875 (Fed. Cir. 2004) (citations omitted).  "To be given effect, such a disclaimer must be made with reasonable clarity and deliberateness." *Id.*

Finally, if the meaning of the claim limitations is apparent from the totality of the intrinsic evidence, then the claim has been construed.  If, however, a claim limitation is still not clear, the court may look to extrinsic evidence to help resolve the lack of clarity.  Relying on extrinsic evidence to construe a claim is "proper only when the claim language remains genuinely ambiguous after consideration of the intrinsic evidence." *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997).  Extrinsic evidence may always be consulted, however, to assist in understanding the underlying technology. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999).  But extrinsic evidence may never be used "for the purpose of varying or contradicting the terms in the claims." *Markman*, 52 F.3d at 981.

### A.     Claim Terms Should Be Construed Consistently In Accordance With The Principles of Stare Decisis

Several claim terms appearing in Visto's patents for which Good seeks a claim construction are similar to claim terms that have previously been construed by the Court.  According to the Joint Statement, Good has already agreed to be bound by the majority of the Court's previous claim constructions with respect to the identical patents-in-suit.  Moreover, since the Court's claim construction orders address many of the same issues with respect to similar claim terms for which Good now seeks constructions, the previous claim construction orders should be viewed as "persuasive and highly relevant authority." *Verizon Cal. Inc. v. Ronald A. Katz Tech. Licensing, L.P.*, 326 F. Supp. 2d 1060, 1069 (C.D. Cal. 2003).

In *Markman v. Westview Instruments, Inc.,* 517 U.S. 370 (1996), the United States Supreme Court noted that *stare decisis* favors promoting uniformity in claim construction. Even though a court's previous claim construction order does not necessarily collaterally estop a new defendant on issues of claim construction, courts have frequently deferred to a previous claim construction determination if new evidence has not been presented by the defendant. *See KX Indus., L.P., v. PUR Water Purification Prods., Inc.,* 108 F.Supp. 2d 380, 387 (D. Del. 2000) ("While the court's previous opinion does not have issue preclusive effect against [Defendant] in this case, to the extent the parties do not raise new arguments, the court will defer to its previous construction of the claims.")

Adopting a prior claim construction order is supported by the interest of maintaining consistency between copending actions and promoting judicial efficiency. *See, e.g. Zoltar Satellite Sys., Inc.*, 402 F.Supp.2d 731, 737 (E.D. Tex. 2005) ("[I]nconsistent claim constructions of the same claims by different courts can create serious problems. ... These problems especially deserve consideration when the same patent is simultaneously being litigated in another district."). *See also, Amtel Corp. v. Silicon Storage Tech., Inc.*, 2001 U.S. Dist. LEXIS 25641 (N.D. Cal. 2001) (Court adopted previous claim construction from plaintiff's lawsuit against another party).

It is also well-settled that a claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent. *See Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998) ("A word or phrase used consistently throughout a claim should be interpreted consistently."); *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1159 (Fed. Cir. 1997) ("We are obliged to construe the term 'elasticity' consistently throughout the claims."); *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir. 1995) (holding that claim terms found in different claims should be interpreted consistently).

Accordingly, the definitions of terms and phrases previously construed by the Court should be viewed as relevant and highly persuasive authority in construing similar claim terms for the same and related Visto patents in this litigation.

## IV.    VISTO'S PROPOSED CONSTRUCTIONS OF TERMS AND PHRASES

In general, the claims of the asserted patents can be easily understood by reference to the ordinary meaning of the words.  Nonetheless, Good insists that it is necessary to construe a list of additional terms and phrases, based mainly on the argument that several limitations drawn from the specification must be read into the claims.  It is well settled, however, that "claims are not to be interpreted by adding limitations appearing only in the specification." *Electro Medical Sys., S.A. v. Cooper Life Sciences*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).  Rather, "[c]laim terms take on their ordinary and accustomed meanings unless the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002).

### A.    "order of the steps of method claims" ('192: 1, 2, 8 and 22)

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|---|---|---|---|
| order of the steps of method claims | '192: 1, 2, 8 and 22 | *Visto contends there is no requirement for the order of the steps of method claims except as expressly set forth in the claims.* | Claim 1: <br> First step (a), then step (d), then steps (b) and (c) in interchangeable order, then step (e) and finally step (f). <br> Claims 2, 8, and 22: <br> First step (c) must take place, then steps (a) and (b) in interchangeable order, then step (d) and finally step (e). |

Visto contends there is no requirement for the order of the steps of method claims except as expressly set forth in the claims.

As a general rule, the order in which the inventor has listed the steps of a claimed method is not a limitation of the claim.  *Interactive Gift Express., Inc. v. CompuServe, Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001).  Thus, any method that performs all of the claimed steps regardless

of the order in which those steps are performed can infringe where no specific order has been expressly or implicitly claimed.  *Id.*

With respect to claims 1, 2, 8 and 22 of the '192 patent, no specific order of the method steps has been expressly or implicitly claimed.  Although Good cites to Figure 6 of the '192 patent in support of its proposed constructions, that figure and the portions of the '192 specification that describe it do not require the specific sequences proposed by Good.  Instead, the specification of the '192 patent explicitly states that the method steps presented in Figure 6 may occur in a different sequence depending on whether "more than one version [of a workspace element] has been modified."   [Exh. A, '192 patent, col. 7, ll. 31-45].   Likewise, the specification of the '192 patent provides that Figure 6 only illustrates "a method for synchronizing multiple copies of workspace data" [*Id*. at col. 6, ll. 57-58] and recognizes that the "foregoing description of the preferred embodiments of the invention is by way of example only, and other variations of the above-described . . . methods are provided by the present invention." *See Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1371 (Fed. Cir. 2003) (holding that despite the fact that the specification discussed only a single embodiment … it was improper to read a specific order of steps into method claims because the specification "nowhere [included] any disclaimer of any other order of steps, or any prosecution history indicating a surrender of any other order of steps.").

Although the method step sequences set forth in Good's proposed constructions would be covered by the claims, there is no support in the claims themselves nor in the intrinsic record for the unnecessary limitations that Good argues should be imported therein.  Good's proposed construction seeks improperly to require that step d be performed separately before steps b and c. The plain language of the claims includes no such limitation.  Rather, step d simply specifies the location from which steps b and c must be initiated, *i.e.*, "from within the firewall", "when predetermined criteria have been satisfied".   The claims do not require that the same "predetermined criteria" trigger initiation of steps b and c, as Good's proposed construction suggests.

8

Good's proposal that step e must precede step "f is clearly incorrect because it would exclude one of the preferred embodiments.  The '192 patent explains that: "[i]f only one version has been modified, then the corresponding general synchronization module 425 or 510 in step 630 forwards the updated preferred version of the workspace element to the other store."  [Ex. A, '192 Patent, col. 7, ll. 31-34].  In this embodiment, step f is partially completed before step e; the preferred version is already stored at one store before step e, "generating a preferred version", is performed.  Then step f is completed when the preferred version is forwarded to the other store.  Claim interpretations, such as that proposed here by Good, that do not read on the preferred embodiment are "rarely, if ever, correct and would require highly persuasive evidentiary support."  *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1337 (Fed. Cir. 2004) citing  *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1583 (Fed. Cir. 1996).

For all of these reasons, Good's attempt to impose a specific sequence to the method steps of claims 1, 2, 8 and 22 of the '192 patent is inappropriate and should be rejected.

**B.**     **"the firewall / the firewall / the first firewall" ('192 patent claims 1, 2, 8, 10, 11, 21 and 22)**

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|------|---------------------------|-------------------------------|------------------------------|
| the firewall | '192:1, 2, 8 and 22 | *Does not need separate construction.  See "firewall."* | the firewall of step (a) |
| the firewall | '192: 21 | *Does not need separate construction.  See "firewall."* | the firewall within which the first workspace element is stored |
| the first firewall | '192: 10 and 11 | *Does not need separate construction.  See "firewall."* | the firewall through which the communications channel passes |

This Court has already construed the term "firewall" as it relates to the '192 patent.  While Good purports to agree with the Court's construction, it seeks to further restrict the Court's definition of "firewall" as it is used in claims 1, 2, 8, 10, 11, 21, and 22 under the guise of construing the terms "the firewall" and "the first firewall."  The limitations that Good seeks to impose are unnecessary, as the surrounding claim language provides all needed context for each instance of the term "firewall".  Therefore, Good's attempts to circumvent the Court's prior

9

construction of the term "firewall" should be denied.

### C.   "examination results / first examination results / second examination results" ('192 patent claims 1, 2, 8, 21 and 22)

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|------|---------------------------|-------------------------------|------------------------------|
| examination results / first examination results / second examination results | '192: 1, 2, 8, 21 and 22 | Information regarding one or more workspace elements obtained by examining those workspace elements. (The terms "first" and "second" require no construction.) (*taken from the Court's Claim Construction Order in Visto Corporation v. Seven Networks, Inc.*, Civil Action No. 2:03-CV-333-TJW, Docket No. 145.*)* | Information regarding one or more workspace elements obtained by examining <u>the version information of</u> those workspace elements.* |

As set forth in the Court's Claim Construction Order I, the proper construction of the term "examination results" is: "information regarding one or more workspace elements obtained by examining those workspace elements. (The terms "first" and "second" require no construction.)" [Exh. E, "Claim Construction Order I" at 13-14].   Visto respectfully submits that the same construction should apply in the present action under the doctrine of *stare decisis. Markman*, 517 U.S. at 370; *Zoltar Satellite*, 402 F.Supp.2d at 737.

Good seeks to reargue a position previously rejected by the Court in *Visto v. Seven–viz.*, that "version information" should be included in the construction of first examination results.[1] For the same reasons the Court gave in its Claim Construction Order I, Good's proposed construction should be rejected here as well.  [Exh. E, Claim Construction Order I at 13-14].

### D.   "version information, version indicating information" ('192 patent claims 1, 2, 8, 10, 17, 18, 21 and 22; '221 patent claims 13; '679 patent claims 1)

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|------|---------------------------|-------------------------------|------------------------------|
| version information/ version | '192: 1, 2, 8, 10, 17, 18, 21 and 22; | Information that can be used to determine the version of a workspace element. (*taken from the Court's Claim* | Information identifying a version of a workspace element or independently modifiable copy that can be used to |

---

* For each of Good's constructions marked with an asterisk, Good requests that the Court clarify its prior constructions as set forth in the Court's order in *Visto Corporation v. Seven Networks, Inc.*, No. 2:03-CV-333-TJW, Docket No. 145 (April 20, 2005) by adding the underlined text and/or by revising the construction as proposed.

[1] Seven sought to construe "first examination results" as "a determination, based on a comparison of a last synchronization signature to first version information stored within a firewall-protected corporate LAN, whether the content of an associated first workspace element stored within the firewall protected corporate LAN has been modified." Court's Claim Construction Order I at 13-14.

| indicating information | '221: 13 '679: 1 | *Construction Order in Visto Corporation v. Seven Networks, Inc.,* Civil Action No. 2:03-CV-333-TJW, Docket No. 145.)* | determine whether the workspace element or copy has been modified without examining the content of the modifications.* |

As set forth in the Court's Claim Construction Order I, the proper construction of the term "version information" and "version indicating information" is: "information that can be used to determine the version of a workspace element. The copy of the workspace element does not have to be in the same format as the workspace element." [Exh. E, Claim Construction Order I at 26]. Visto respectfully submits that the same construction should apply in the present action under the doctrine of *stare decisis. Markman*, 517 U.S. at 370; *Zoltar Satellite*, 402 F.Supp.2d at 737.

Good seeks, among other things, to modify the Court's construction of version information to exclude information obtained by "examining the content of the modifications." As Visto explained in its claim construction briefing in *Visto v. Seven*, version information should not be limited to either content based determinations or non-content based determinations, but should be broad enough to encompass both. [Exh. G, Visto's Opening Claim Construction Brief in *Visto v. Seven* at 27-29]. The Court agreed with Visto, by refusing to incorporate these additional limitations. [*See* Exh. E, Claim Construction Order I at 26]. Likewise, Good's proposal to reintroduce additional limitations previously rejected by the Court should fail.

**E.** **"independently modifiable copy / the copy" ('192 patent claims 1, 2, 8, 10, 21 and 22)**

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|------|---------------------------|-------------------------------|------------------------------|
| independently modifiable copy | '192: 1, 2, 8, 10, 21 and 22 | A copy of a workspace element capable of being modified independent of the workspace element. The copy of the workspace element does not have to be in the same format as the workspace element. (*adopted from the Court's Claim Construction Order in Visto Corporation v. Seven Networks, Inc.,* Civil Action No. 2:03-CV-333-TJW, Docket No. 145.)* | A copy of a workspace element capable of being modified <u>by a user</u> independent of the workspace element. The copy of the workspace element does not have to be in the same format as the workspace element.* |

11

| the copy | '192: 1, 2, 8, 10, 21 and 22 | *Does not need separate construction. See "independently modifiable copy."* | the independently-modifiable copy |

As set forth in the Court's Claim Construction Order I, the proper construction of the term "independently modifiable copy" is: "a copy of a workspace element capable of being modified independent of the workspace element.  The copy of the workspace element does not have to be in the same format as the workspace element." [Exh. E, Claim Construction Order I at 16-17].  Visto respectfully submits that the same construction should apply in the present action under the doctrine of *stare decisis. Markman*, 517 U.S. at 370; *Zoltar Satellite*, 402 F.Supp.2d at 737.

Good seeks to add the limitation "by a user" to the Court's prior construction.  The intrinsic evidence does not support Good's proposed construction.  Nowhere in the specification of the '192 patent does the patentee require that "a copy of a workspace element [be] capable of being modified by a user independent of the workspace element."   Likewise, the '192 patent reexamination file history does not contain any disclaimers or distinctions that would substantiate Good's definition.  Therefore, the Court need not construe these terms further.

### F.      "independently modifiable e-mail(s)" ('679 patent claim 1)

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|---|---|---|---|
| independently modifiable e-mail(s) | '679: 1 | An e-mail capable of being modified independent of another version of the e-mail. The e-mails do not have to be in the same format. | A copy of an e-mail capable of being modified by a user independent of the e-mail. The copy of the e-mail does not have to be in the same format as the e-mail. |

The proper construction of the term "independently modifiable e-mail(s)" is: ***"An e-mail capable of being modified independent of another version of the e-mail. The e-mails do not have to be in the same format."***  This definition reflects and is consistent with the construction of the similar term "independently modifiable copy" that was previously construed by the Court in Claim Construction Order I.   Specifically, the Court construed the term "independently modifiable copy" to mean a "*copy of a workspace element* capable of being modified *independent of the workspace element. The copy of the workspace element* does not have to be in

12

*the same format as the workspace element.*" [*See* Exh. E, Claim Construction Order I at 16-17 (emphasis added)].

The term "independently modifiable e-mails" should be interpreted consistently with the Court's prior construction of the term "independently modifiable copy" by substituting the term "e-mails" for the term "copy" (which the Court previously construed as "copy of a workspace element").  Good, on the other hand, seeks to improperly add the "copy" language from the Court's prior claim construction order (even though the term "copy" does not appear in *any* of the claims of the '679 patent) and also seeks to add the requirement that any modification of the copied e-mail occur "by a user."   There is no support for either limitation proposed by Good, and the Court should therefore adopt Visto's construction.

**G.**   **"initiating … from within the firewall [through the communication channel] when predetermined criteria have been satisfied" ('192 patent claims 1, 2, 8, 10, 21 and 22)**

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|---|---|---|---|
| initiating … from within the firewall [through the communication channel] when predetermined criteria have been satisfied | '192: 1, 2, 8, 10, 21 and 22 | *Visto contends that the plain meaning of the phrase is apparent with the exception of the term initiating.  Visto's proposed construction for "initiating" is:* To cause or facilitate the beginning of.<br><br>*Should the Court wish to construe the entire phrase as proposed by Good, Visto contends the Court should adopt Visto's proposed construction for "initiating" and the Court's previous constructions for "firewall" and "communication channel" from Visto Corporation v. Seven Networks, Inc.,* Civil Action No. 2:03-CV-333-TJW and *Visto Corporation v. Smartner Information Systems, Ltd.,* Civil Action No. 2:05-CV-091-TJW. | Starting the generating first examination results step and sending a command from within the firewall [through an Internet/the established communication channel] to start the generating second examination results step when predetermined criteria have been satisfied. |

The proper construction of the term "initiating" is: **"*To cause or facilitate the beginning of.*"**

The phrase "initiating … from within the firewall [through the communication channel] when predetermined criteria have been satisfied" requires no construction beyond defining the term "initiating."   The meaning of "initiating" is "to cause or facilitate the beginning of." [*See* Exh. J, Webster's Ninth New Collegiate Dictionary (1991) at 622]. The remaining language of

the claim phrase is easily understood by reference to the ordinary meaning of the words and the Court's prior constructions.[2]  As such, the remainder of the claim phrase does not require construction by the Court:

> The Markman decisions do not hold that the trial judge must repeat or restate every claim term in order to comply with the ruling that claim construction is for the court. Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.  It is not an obligatory exercise in redundancy.

*United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).

Good's attempt to construe the phrase "initiating … from within the firewall [through the communication channel] when predetermined criteria have been satisfied" is flawed for several reasons.  First, Good's construction is improper because it attempts to import limitations (such as the "generating first examination results" step and the "generating second examination results" step) that do not appear in the phrase being construed.  Second, Good's "through an internet" and "[through] the established communications channel" limitations appear nowhere in the '192 patent specification.  Third, Good's insistence that the phrase should be construed so that the "generating the second examination results" step is started by "sending a command from within the firewall [through an Internet/the established communication channel]" is neither required by the claim language nor the specification.  *See Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004) ("[A] claim construction analysis must begin and remain centered on the claim language itself, for that is the language the patentee has chosen to particular point out and distinctly claim the subject matter which the patentee regards as his invention.")

---

[2] The Court has previously construed the terms "firewall" and "communications channel."  Visto Corporation v. Seven Networks, Inc., Civil Action No. 2:03-CV-333-TJW and Visto Corporation v. Smartner Information Systems, Ltd., Civil Action No. 2:05-CV-091-TJW.

### H.    "storing" ('192 patent claims 1, 2, 8, 10 and 22)

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|------|---------------------------|-------------------------------|------------------------------|
| storing | '192: 1, 2, 8, 10 and 22 | *Visto contends that the plain meaning of this term is apparent and, therefore, no construction by the Court is required.* | Transmitting for storage.[3] |

Visto does not believe that the term "storing" needs to be construed.  The term "storing" has a plain meaning, understood by those of ordinary skill in the art.  Moreover, given that the Court has previously construed the term "store," construction of the term "storing" is unnecessary.  [*See* Exh. E, Claim Construction Order I at 23-24].

Good's proposed definition of "storing" – "transmitting for storage" – replaces the root of the verb being construed (*i.e.*, "store") with a different verb (*i.e.*, "transmit") that has a distinctly different meaning.   The ordinary meaning of the term "store" is: "to place or leave in a location (as a warehouse, library or computer memory) for preservation or later use or disposal." [*See* Exh. J, Webster's Ninth New Collegiate Dictionary at 1162].  The term "transmit," on the other hand, means: "to send or transfer from one person or place to another: forward." [*See* Exh. J, Webster's Ninth New Collegiate Dictionary at 1232].  Therefore, Good's proposed construction is improper.

Furthermore, Good's proposed definition is inconsistent with the full breadth of the claims.  Claims 1, 2, 8, 10, and 22 of the '192 patent all recite "generating a preferred version" in addition to "storing the preferred version at the first store and at the second store."  Because the "generating" and "storing" of the preferred version can occur on the same computer, construing the term "storing" to mean "transmitting for storage" improperly excludes embodiments from the scope of the claim.  *See Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).  Consequently, the Court should not adopt Good's proposed construction of this term.

---

[3] This proposed construction is adopted from the Court's Order in *Visto Corporation v. Seven Networks, Inc.*, No. 2:03-CV-333-TJW, Docket No. 145, at 30-32 (April 20, 2005), in which the Court stated that "storing" in the '192 patent refers to "transmission" while "storing" in the '221 patent refers to "passive" storage in memory.

### I.      "general synchronization module" ('679 patent claims 1, 12, 13 and 15)

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|------|---------------------------|-------------------------------|------------------------------|
| general synchronization module | '679: 1, 12, 13 and 15 | Software routines or code that perform the task of determining whether one or more independently modifiable e-mails has (or have) been modified, based on one or more criteria. | Software routines or code that perform the task of determining whether an e-mail and/or an independently modifiable copy thereof has (or have) been modified, based on one or more criteria. |

The proper construction of the term "general synchronization module" in the context of the '679 patent is: "*Software routines or code that perform the task of determining whether one or more independently modifiable e-mails has (or have) been modified, based on one or more criteria.*" This definition reflects and is consistent with the construction of the same term appearing in other related patents, including the '192 patent, where the Court construed the term to mean "*software routines or code that perform the task of determining whether a workspace element and/or an independently modifiable copy thereof has (or have) been modified, based on one or more criteria.*" [*See* Exh. E, Claim Construction Order I at 15-16 (emphasis added)].

The term "general synchronization module" in the context of the '679 patent should be interpreted consistently with the Court's prior claim construction order (as Visto has done) by substituting the term "e-mails" for the term "copy" in the previously construed claim language. Good, on the other hand, improperly seeks to include the "copy" language from the Court's prior claim construction order even though the term "copy" does not appear in *any* of the claims of the '679 patent.   Limitations and language appearing in other claims from other patents should not be read into the construction of this term.  [*See Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1366-67, 53 (Fed. Cir. 2000); *Multiform Dessicants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1479-80 (Fed. Cir. 1998)].  The Court should therefore adopt Visto's construction, which is consistent with the Court's prior claim construction order.

16

### J.    "server" ('679 patent claims 4, 8, 12, and 16)

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|------|---------------------------|-------------------------------|------------------------------|
| server | '679: 4, 8, 12, and 16 | A computer that provides services to another computer. | A computer in a network that responds to commands from a client. |

The proper construction of the term "server" is: **"a computer that provides services to another computer."**   The Federal Circuit has held that "technical dictionaries may allow a court 'to better understand the underlying technology' and the way in which one of skill in the art might use the claim terms."  *See Phillips v. AWH Corp.,* 415 F.3d 1303, 1318, *citing Vitronics*, 90 F.3d at 1584 n.6.  A claim term should also receive the full range of its ordinary meaning consistent with the intrinsic evidence.  *See Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001), *see also Phillips* 415 F.3d at 1322-23, 24.

Visto's proposed construction reflects the ordinary meaning of the term as set forth in a contemporaneous technical dictionary, which defines "server" as: "a computer that provides services to another computer (called the *client*)." [*See* Exh. K, *Dictionary of Computer and Internet Terms*, Sixth Edition at 421-422].  Visto's proposed definition is also consistent with the intrinsic evidence. [*See* Exh. C, '221 patent, col. 7, ll. 52-64: "FIG. 3 is a block diagram illustrating the details of the global server 115, which includes a Central Processing Unit (CPU) 310 such as a Motorola Power PC microprocessor or an Intel Pentium microprocessor"; *see also* Exh. D, '679 patent, col. 6, ll. 23-32: "[t]he global server 115 further includes a configuration system . . . [t]he configuration system 155 uses the configuration data 356 to enable the remote terminal to access the services provided by the service engine 175"].  The specification clearly shows that the global server is a computer providing services to another computer, such as a remote terminal (the client computer).

When claim terms are susceptible to multiple dictionary definitions (some having no relation to the claimed invention), the intrinsic record must be consulted to identify which of the possible meanings is most consistent with the use of those words by the inventor.  *See Dow*

*Chem. Co. v. Sumitomo Chem.* Co., 257 F.3d 1364, 1372-73 (Fed. Cir. 2001); *Multiform Desiccants, Inc. v. Medzam, Ltd*., 133 F.3d 1473, 1478  (Fed. Cir. 1998).  If more than one dictionary definition is consistent with the use of the words in the intrinsic record, the claim terms may be construed to encompass all such consistent meanings. *Rexnord,* 274 F.3d at 1343 (holding that the claim term "portion" may be interpreted in accordance with the dictionary definitions to encompass both "separate" and "integral" parts of an object).

Good's proposed construction of server to mean "a computer in a network that *responds to commands* from a client" is too restrictive – a server can perform a myriad of functions that may include, but does not necessarily always include, responding to client commands.  For example, as stated in the '679 patent a "server may be configured to identify and authenticate a user seeking . . . access . . .  from a remote terminal." '679 Patent, Abstract.   Therefore, Good's proposed construction should be rejected.  Visto's proposed construction, on the other hand, affords the term "server" the full scope of its ordinary meaning that is consistent with the way that term is used in the specification of the patents-in-suit .

**K.      "normally open LAN firewall port" ('679 patent claims 1 and 3)**

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|---|---|---|---|
| normally open LAN firewall port | '679: 1 and 3 | A port that is typically configured to be open for packet traffic in a firewall, such as ports 80 and 443. | A port that is typically configured to be open for network data to pass through a firewall. |

The proper construction of the term "normally open LAN firewall port" is: **"*a port that is typically configured for packet traffic in a firewall, such as Ports 80 and 443."***

The phrase "normally open ... port" appears in claim 1 of the '679 patent, which reads: [a]n e-mail system for providing synchronized communication of independently modifiable e-mails over an Internet between a local area network (LAN) server secured by a LAN firewall with at least one *normally open LAN firewall port*." (emphasis added).

Visto's construction of this phrase is consistent with its ordinary meaning.    The Microsoft Press Computer Dictionary, 3d Edition, recognizes that certain port numbers are "well known":

> A "port number" is a "number that enables IP [Internet Protocol] packets to be sent to a particular process on a computer connected to the Internet. Some port numbers, called 'well known' port numbers, are permanently assigned."

[*See* Exh. L at 374].   The HTTP protocol (a protocol commonly used for the World Wide Web) uses well known ports, including permanently assigned port 80. [*See* Exh. L, Microsoft Press Computer Dictionary, 3d Edition at 238; Exh. R, RFC 1945 "Hyper Text Transport Protocol - HTTP/1.0" at 8 ("The default port is port 80, but other ports can be used"); Exh. S, RFC 1700 "Assigned Numbers" at 16, 20].   Secure Sockets Layer (SSL) (an Internet security protocol allowing for secure transactions to take place over the World Wide Web) also uses a well known port – namely, port 443.  [*See* Exh. L, Microsoft Press Computer Dictionary, 3rd Ed. at 425-426; Exh. S, RFC 1700 "Assigned Numbers" at 34 (listing port 443 as a "well known" port for HTTPS/SSL)].

Visto's construction of this term is also consistent with the specification of the '679 patent, which teaches the use of common Internet Protocols (such as HTTP and SSL) since firewalls are typically configured to allow traffic on the ports associated with these protocols (namely, port 80 and port 443, respectively) and therefore do not act as an impediment to e-mail synchronization with remote devices:

> The communications module 805 may include routines for applying Secure Socket Layer (SSL) technology and user identification and authentication techniques (i.e., digital certificates) to establish a secure communication channel through the LAN firewall 135 and through the global firewall 130. Because synchronization is initiated from within the LAN firewall 135 and uses commonly enabled protocols such as HyperText Transfer Protocol (HTTP), the typical firewall 135 which prevents in-bound communications in general and some outbound protocols does not act as an impediment to e-mail synchronization. Examples of communications modules 805 may include TCP/IP stacks or the AppleTalk™ protocol.

[*See* Exh. D, '679 patent, col.  10, ll. 39-54 (emphasis added)].

19

As a result, Visto's proposed construction (which contemplates that a "normally open . . . firewall port" is one that is configured to allow packet traffic in a firewall, and further includes as examples port 80 (associated with HTTP) and port 443 (associated with SSL)) is consistent with both the intrinsic record and extrinsic evidence.

Good's proposed construction is objectionable because it includes the term "network data," which is ambiguous at best.  For example, "network data" could refer to "information *about* a network" or it could imply "information *passed* on a network.  Because Good's proposed construction lacks clarity, it should be rejected.

**L.   "a first Internet communication channel…" ('679 patent claim 1)**

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|------|---------------------------|-------------------------------|------------------------------|
| a first Internet communication channel… | '679: 1 | *Does not need separate construction. See constructions for "Internet" and "communications channel."*<br><br>Internet: A network that connects other networks, such as corporate, university, and government networks. | An Internet Protocol (IP) connection for transferring data through the public Internet between the global server and the LAN server.<br>Internet: The worldwide collection of networks and gateways that use the TCP/IP suite of protocols to communicate with one another. |

The term "a first Internet communication channel…" requires no additional construction beyond the term "Internet" and the previously construed term "communication channel."   The Court previously construed the term "communications channel" to mean "a medium for transferring information. A communications channel can be a physical or wireless link."[4]  [*See* Exh. E, Claim Construction Order I at 11-12 (emphasis added)].   With respect to the term "Internet," the proper construction is: ***"a network that connects other networks, such as corporate, university, and government networks."***

The term "Internet" appears in claim 1 of the '679 patent.  *See, e.g.,* ("[a]n e-mail system for providing synchronized communication of independently modifiable e-mails over an Internet between a local area network (LAN) server secured by a LAN firewall . . .").

---

[4] It should be noted that Good has agreed to the Court's construction of "communications channel."  *See* Exh. D to the Parties' Joint Claim Construction Statement.

A court should give a claim term the full range of its ordinary meaning as understood by a person of ordinary skill in the art. *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1341 (Fed. Cir. 2001).   Visto's proposed construction is consistent with its broadest reasonable interpretation in light of the specification.   [*See e.g.,* Exh. D, '679 patent, col. 1, ll. 59-60 ([t]he internet currently interconnects about 100,000 *computer networks* and several million computers") (emphasis added) ; *see also id.* at col. 2, ll. 53-56 ("[a] user can gain access to a global server using any terminal, which is connected via a *computer network* such as the Internet to the global server and which is enabled with a  web engine") (emphasis added)].   In addition, Visto's proposed definition is consistent with the Court's construction of the term "firewall" to mean "software and/or hardware for protecting an organization's network against external threats, such as hackers, coming from *another network, such as the Internet*." [*See* Exh. E, Claim Construction Order I (emphasis added)].

Good's proposed definition requires that the "Internet" be "public," "worldwide" and "use the TCP/IP suite of protocols."   However, in some situations, Internet access on certain networks may not be public or worldwide due to security and user access restrictions.   This fact is explicitly acknowledged in the specification of the '679 patent, which states that "due to network security systems such as conventional firewall technology, a user may have access *only to a particular one of these network locations*." (emphasis added).   [See e.g., Exh. D, '679 patent, col. 2, ll. 25-28].   Moreover, the Internet may use types of transport layer protocols other than the TCP protocol, including for example, the UDP protocol. [*See* Exhibits M-O, "Internet," "Internet Protocol Suite," and "Transport Layer" from Wikipedia].

Good's proposed construction also attempts to impose additional restrictions on the Court's prior construction of the term "communications channel" by requiring it to transfer data between the global server and LAN.  As discussed above with regard to the term "initiating …

21

from within the firewall [through the communication channel]" such a restriction is not required by the claims or by the specification.

For all of these reasons, Good's proposed construction should be rejected.

**M.**     **"a plurality of second Internet communication channels, each coupling said global server to a respective one of said smartphone devices…" ('679 patent claim 1)**

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|------|---------------------------|-------------------------------|------------------------------|
| a plurality of second Internet communication channels, each coupling said global server to a respective one of said smartphone devices… | '679: 1 | *Visto contends that the plain meaning of the phrase is apparent with the adoption Visto's proposed construction for "Internet communication channel" and the Court's previous constructions for "global server", "smartphone", and "device" from Visto Corporation v. Seven Networks, Inc.,* Civil Action No. 2:03-CV-333-TJW. | Two or more Internet Protocol connections for transferring data through the public Internet between the global server and two or more smart phones. |

The phrase "a plurality of second Internet communication channels, each coupling said global server to a respective one of said smartphone devices…" requires no additional construction beyond the term "Internet" since the terms "communication channel," "global server," "smartphone" and "device," have already been construed by the Court.     [*See* Exh. E, Claim Construction Order I at 11-12 (emphasis added)].   For these reasons and those discussed above for the term "a first Internet communications channel …," Good's proposed construction should be rejected.

**N.**     **"workspace data manager" ('606 patent claims 10, 11 and 19-21)**

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|------|---------------------------|-------------------------------|------------------------------|
| workspace data manager | '606: 10, 11 and 19-21 | A program that allows workspace data to be manipulated. | A program that allows a user to manipulate workspace data. |

Visto respectfully submits that the proper construction of the term "workspace data manager" is: **"*a program that allows workspace data to be manipulated*."**

The specification of a patent acts as a dictionary when it expressly defines terms used in the claims. *See Vitronics,* 90 F.3d at 1582.   Claims are given their broadest reasonable

interpretation consistent with the specification. *See In re Graves*, 69 F.3d 1147, 1152 (Fed. Cir. 1995).

Visto's construction is based on the definition set forth in the specification of the '606 patent, which states: "A workspace data manager may include a Personal Information Manager (PIM), a word processing program, a spreadsheet program, <u>or any application program that enables manipulation of workspace data.</u>" [Exh. D, '606 patent, col. 2, ll. 11-15 (emphasis added)]. The specification clearly contemplates that a "workspace data manager" can be "any application program that enables manipulation of workspace data." Other portions of the specification further support Visto's proposed construction. [*See e.g., id.* at col. 2, ll. 47-53 ("[t]he present invention further provides a method of using a workspace data manager to enable access, *manipulate* and synchronize workspace data . . . requesting a workspace data manager to *enable manipulation of data and thereby create manipulated data.*") (emphasis added)].

Good's proposed construction of this term requires manipulation of workspace data *by a user.* However, nothing in the '606 patent justifies this additional limitation. Indeed, claim 1 of the '606 patent teaches a "<u>computer based method,</u> comprising the steps of: … using the workspace data manager to present the downloaded data." (emphasis added). Hence, Good's proposed construction must be rejected.

### O. "untrusted client site" ('606 patent claims 10, 20 and 21)

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|------|---------------------------|-------------------------------|------------------------------|
| untrusted client site | '606: 10, 20 and 21 | A computer or mobile device that is outside the firewall and has the possibility of being used by an unauthorized person. | A computer expected to be shared by users who are not authorized to access data from the remote site. |

The proper construction of the term "untrusted client site" is: "***a computer or mobile device that is outside the firewall and has the possibility of being used by an unauthorized person.***" Although the term "untrusted client site" does not appear directly in the specification of the '606 patent, its meaning is apparent from both its ordinary usage and supporting intrinsic evidence.

The term "client" is defined in Microsoft Press Computer Dictionary as: "On a local area network or the Internet, a computer that accesses shared network resources provided by another computer (called a *server*)." [*See* Exh. L at 92].  A client can be any computer or mobile device. [*See* Exh. A, '192 patent (incorporated by reference), col. 3, ll. 58-60 ("The remote terminal 105 may include a smart telephone or a Personal Data Assistant (PDA) . . ."); *see also* Exh. B, '606 patent, Figs. 2 and 4].

In the field of computing, the term "untrusted" generally refers to a computer that is outside of the firewall–e.g., a corporate firewall.  [*See* Exh. Q, Internetworkings Technology Handbook, 2nd ed. (1998) at 51-6-8].  The '606 patent also recognizes that "client sites" which are outside the firewall may be "untrusted." [*See id.* at col. 4 ll. 6-9 ("First, the base system 140 on the work client 110 site *negotiates a secure communications channel via any firewalls* with the synchronization agent 130, for example, using Secure Sockets Layer (SSL) technology" (emphasis added)); *id.* at col. 8, ll. 52-59 ("The security module 725 includes routines for obtaining user identification and authentication using such techniques as obtaining login and password information obtaining a response to the challenge, obtaining a public key certificate, etc. *The security module 725 performs identification and authentication techniques to confirm authorization by the user to access the workspace data 135 stored on the global server 105.*" (emphasis added))].

The disclosure of the '192 patent, which is incorporated by reference in the '606 patent, also supports the concept of a computer or mobile device outside the firewall using security measures to gain access to data behind a firewall: "The communications module 405 may further include routines for applying Secure Sockets Layer (SSL) technology and user identification and authentication techniques (i.e., digital certificates) to establish a secure communications channel through the corporate firewall 130 and through the global firewall 126."  [*See* Exh. A, '192 patent, col.  5, ll. 3-9].  Therefore, Visto's proposed construction of this term is consistent with both the intrinsic and extrinsic evidence.

Good's proposed construction of this term as "a computer expected to be shared by users who are not authorized to access data from the remote site" does not comport with the intrinsic evidence of record.  In an amendment made during the prosecution of the '606 patent, the applicant clarified what is meant by the term "untrusted" by pointing to a portion of the specification that states: "[t]he system and method also advantageously delete downloaded data and all interfaces from the local client, so that no traces are left on the client for *unprivileged* users to review." [*See* Exh. I, Supplemental Amendment, 3/9/00; *see also*  Exh. B, '606 patent, col. 3, ll. 6-9 (emphasis added)].  Accordingly, there is no support in the intrinsic or extrinsic evidence that an "untrusted client site" is *expected* to be shared by users who are not authorized to access data from the remote site*,*" as Good suggests.

**P.      "access data temporarily" ('606 patent claims 20 and 21)**

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|---|---|---|---|
| access data temporarily | '606: 20 and 21 | Obtain temporary access to data. | Obtain data for temporary use but not for permanent storage. |

The proper construction of the term "access data temporarily" is: ***"obtain temporary access to data."***

Visto's proposed construction is based on the plain language of the term, which requires little if any construction.

Good's proposed construction, on the other hand, seeks to completely redefine the claim term by replacing with word "access" with the phrase "use but not for permanent storage." While use and storage of data may occur after data has been accessed, the term "access" refers to the process of gaining entry to the data in the first instance.  [*See* Exh. L, Microsoft Press Computer Dictionary, 3rd Ed., 1997 at 12 (defining "access" as "to gain entry to memory in order to read or write data.")].  Thus, Good's proposed construction is unsupported.

Good's proposed construction is also flawed because it would render other limitations appearing in the same claim superfluous and impose limitations on claims where they do not appear.  The term "access data temporarily" appears, for example, in claim 21 of the '606 patent,

25

which recites "requesting the workspace data manager to *access data temporarily* from a remote site."  The same claim later recites: "placing the data in temporary storage on the untrusted client site."   Good's proposed construction would render the temporary storage limitation of claim 21 superfluous.   Even more troubling is that Good's proposed construction would impose a temporary storage requirement on claim 20 of the '606 patent, where no such limitation is recited.  As such, Good's proposed construction is improper, and Visto's proposed construction should be adopted.

> **Q.**      **"automatically disabling" ('606 patent claims 10 and 21)**

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|------|---------------------------|-------------------------------|------------------------------|
| automatically disabling | '606: 10 and 21 | Preventing further access without user intervention. | Disabling without a request to do so. |

The proper construction of the term "automatically disabling" is: ***preventing further access without user intervention.***

The term "automatically disabling" appears in, for example, claim 21 of the '606 patent, which reads in pertinent part: "automatically disabling the untrusted client site from accessing at least a portion of the downloaded data after a user has finished using the data."

The ordinary meaning of the term "automatically" is: "(of a device or process) working by itself with little or no direct human control", *i.e.,* without user intervention. [*See* Exh. P, online Oxford American Dictionary].   In addition, amendments made by the patentee during prosecution of the '606 patent provide support for the notion of "automatically disabling" the untrusted client site:

> Applicant provides further support for the amendment specifying that the disabling of the untrusted client is effected "automatically" at least on page 5, line 4 and 5, which states, "Upon logout, a de-instantiator initiates synchronization and deletes the data stored locally."

*See also* Exh. B, '606 Patent, col. 2, ll. 4-42].   This process is carried out automatically upon logout; in other words, the de-instantiator automatically disables (or prevents) access to the local data by deleting the data stored locally without user intervention.   Thus, Visto's proposed

construction of "automatically disabling" to mean "preventing further access without user intervention" is supported by both the intrinsic record and available extrinsic evidence.

By contrast, Good's proposed definition, "disabling without a request to do so," contradicts embodiments in the specification.   For example, column 11, lines 11-20 states: "Upon receiving an 'end session' or 'unborrow me' request . . . [t]he deinstantiator 745 in step 860 deletes the workspace data on the client." (emphasis added).   The Federal Circuit has cautioned against construing claims in a manner that reads out embodiments in the specification. *See Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1337 (Fed. Cir. 2004) (stating that claim interpretations "that do not read on the preferred embodiments are rarely, if ever, correct and would require highly persuasive evidentiary support.").   Therefore, the Court should reject Good's proposed construction.

**R.      "after a user has finished using the data" ('606 patent claims 10, 20 and 21)**

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|------|---------------------------|-------------------------------|------------------------------|
| after a user has finished using the data | '606: 10, 20 and 21 | *Visto contends that the plain meaning of this term is apparent and, therefore, no construction by the Court is required.* | When the user of the workspace data manager at the shared computer gives an indication that he/she is done using the downloaded data. |

Visto believes that this term requires no construction by the Court because none of the terms contain any technical or special meaning.

This claim term appears in for example, claim 21 of the '606 patent which reads in pertinent part: "automatically disabling the untrusted client site from accessing a portion of the downloaded data *after a user has finished using the data*." (emphasis added).

The ordinary meaning of the phrase "after a user has finished using the data" is readily apparent when viewed in light of the specification of the '606 patent because the concept of disabling data access after an authorized user has finished using the data lies at the very heart of that patent.   [*See e.g.,* Exh. B, '606 patent, col. 2, ll. 9-11 ("[t]he present invention provides a system for using a workspace data manager *to access*, manipulate and synchronize workspace data."); *see also* col. 3, ll. 6-9 ("[t]he system and method also advantageously delete downloaded

data and all interfaces from the local client, so that no traces are left on the local client for unprivileged users to review.") (emphasis added).   Therefore, the phrase "after a user has finished using the data" requires no further construction.

Good's proposed definition for this term (namely, "when the user of the workspace data manager at the shared computer gives an indication that he/she is done using the downloaded data") improperly attempts to narrow the scope of the claim by requiring a *user* of the workspace data manager *at the shared computer* to perform *an affirmative act* that indicates he or she is finished using the data (by, for example, logging off of a secure website).   The claims and the specification of the '606 patent are not so limiting.   While it is true that the specification states that a "user *may* initiate operations of the de-instantiator 745 by depressing an 'unborrow me' button," the de-instantiator may also be initiated by other means, including the receipt of an "end session" request, which does not require any action by the user at the shared computer.   [*See* Exh. B, '606 patent, col. 11, ll. 7-20].   There is also no support for Good's proposed "shared computer" limitation.[5]

Visto's proposed construction should be adopted because it affords the claim term the full breadth of its ordinary meaning.  *Teleflex*, 299 F.3d at 1327.

S.       "Instantiator" ('606 patent claim 11)

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|------|---------------------------|-------------------------------|------------------------------|
| Instantiator | '606: 11 | Software that requests the workspace data manager to provide an interface for enabling manipulation of the downloaded workspace data. | A software routine that creates an operating system window on the display of the shared computer for displaying and enabling manipulation of the workspace data. |

Visto respectfully submits that the term "instantiator" should be construed as:  ***Software that requests the workspace data manager to provide an interface for enabling manipulation of the downloaded data.***

---

[5] This is the same limitation that Good is attempting to import into the construction of the term "untrusted client site."   For the same reasons discussed above with respect to that term, the imposition of Good's "shared computer" limitation should be rejected.

This construction tracks the language of the specification of the '606 patent.  [Exh. B, '606 patent, col. 2, ll. 30-32 ("An instantiator requests the workspace data manager to provide an interface for enabling manipulation of downloaded data.")].

Good's proposed construction of "instantiator" improperly attempts to limit the term to software that creates an *operating system window* on the *display* of a *shared computer* for *displaying* the workspace data in addition to enabling manipulation of same.  None of the highlighted limitations are supported by the specification of the '606 patent.  Limitations from the specification should not be read into the claims unless the patentee uses "words or expressions of manifest exclusion or restriction."  *See E-Pass*, 343 F.3d at 1369 (citations omitted).  Visto did not use any words of exclusion or restriction in the specification that would justify Good's proposed construction.  Therefore, Good's proposed construction should be rejected.

## V.      **VISTO'S PROPOSED CONSTRUCTION OF MEANS-PLUS-FUNCTION ELEMENTS**

When a claim term is expressed as a "means-plus-function" limitation, the "claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." *See* 35 U.S.C. § 112 ¶ 6.  The specification must be read as a whole to determine the structure capable of performing the claimed function. *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1379-80 (Fed. Cir. 2004); *see also Serrano v. Telular Corp.*, 111 F.3d 1578, 1583 (Fed. Cir. 1997) (holding that the proper construction of a claim limitation under § 112, ¶ 6 looks to the "disclosed structure [that] is described in a patent specification, including any alternative structures identified").  In construing terms used in patent claims, it is necessary to consider the specification as a whole, and to read all portions of the written description, if possible, in a manner that renders the patent internally consistent. In addition, it is important to construe claim language through the "viewing glass" of a person skilled in the art. *Interactive Gift Express, Inc. v. Compuserve Inc.*, 231 F.3d 859, 866 (Fed. Cir. 2000).

The specifications of the patents-in-suit describe software architectures comprised of functional modules implemented on exemplary computer networks.   Therefore, the structures that correspond to the recited functions are comprised of the software itself, not the hardware on which the software is installed.  *See, e.g.*, *Natl. Instruments Corp. v. The Mathworks, Inc.*, 2002 U.S. Dist. LEXIS 27577 at 27 (E.D. Tex. 2002) (indicating that the corresponding structures comprise software: "the corresponding structure are various control or software modules").

A.   **"means for updating the first version information whenever the first workspace element is modified" ('192 patent claim 17)**

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|---|---|---|---|
| means for updating the first version information whenever the first workspace element is modified | '192: 17 | <u>Corresponding Structure</u>: service engine 245, desktop service engine 345, or general synchronization modules 425 or 510. | Desktop service engine 345 or service engine 245. |

The structure corresponding to the claimed means-plus-function limitation is: ***"service engine 245, desktop service engine 345, or general synchronization modules 425 or 510."***

Visto and Good agree that service engine 245 or desktop service engine 345 can perform the claimed function and therefore qualify as corresponding structure.   However, Good fails to appreciate that "general synchronization modules 425 or 510" are also capable of "updating the first version information whenever the first workspace element is modified" by sending the preferred version of the workspace element (or the compilation of the changes) to the other store and then updating the outdated workspace element:

<u>General synchronization module 425 or 510</u> in step 645 s<u>ends the preferred version of the workspace element or just a compilation of the changes to the other store</u>. That is, if the preferred version is a workspace element in the workspace data 185, then <u>general synchronization module 425 sends the preferred version or the changes to general synchronization module 510 to update the outdated workspace element</u> in the workspace data 123. If the preferred version is a workspace element in the workspace data 123, then the <u>general synchronization module 510 sends the preferred version or the changes to the general synchronization module 425 to update the outdated workspace element</u> in the workspace data 185.

30

[Exh. A, '192 patent, col. 7, ll. 46-52].   Consequently, Good's failure to include "general synchronization modules 425 or 510" as corresponding structure is improper and should be rejected.

**B.      "means for updating the first version information whenever the first workspace element is modified or updating the second version information whenever the copy is modified" ('192 patent claim 21)**

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|------|---------------------------|-------------------------------|------------------------------|
| means for updating the first version information whenever the first workspace element is modified or updating the second version information whenever the copy is modified | '192: 21 | <u>Corresponding Structure:</u> service engine 245, desktop service engine 345, or general synchronization modules 425 or 510. | There is no corresponding structure disclosed in the specification of the '192 patent performing the function of updating the second version information whenever an independently-modifiable copy of a workspace element stored in a second store on a smart phone is modified. |

The structure corresponding to this means-plus-function limitation is: ***"service engine 245, desktop service engine 345, or general synchronization modules 425 or 510."***

The specification unambiguously states that "[t]he <u>service engine 245</u> operates to update the version information 255 whenever modifications are made." ('192 patent, col. 4, ll. 33-35) (emphasis added).   Additionally, the specification states that the "<u>desktop service engine 345</u> (i.e., a particular service engine 245, FIG. 2) includes a service program for managing user data 180 (i.e., particular service data 250, FIG. 2) which includes version information 350 (i.e., particular version information 255, FIG. 2)." [Exh. A, '192 patent, col. 4, ll. 48-51 (emphasis added)].   Moreover, the same "general synchronization modules 425 or 510" that correspond to the claim element "means for updating the first version information whenever the first workspace element is modified" also perform the claimed function of "updating the first version information whenever the first workspace element is modified or updating the second version information whenever the copy is modified:"

> general synchronization module 425 sends the preferred version or the changes to general synchronization module 510 to update the outdated workspace element in the workspace data 123. If the preferred version is a workspace element in the workspace data 123, then the general synchronization module 510 sends the

31

> preferred version or the changes to the general synchronization module 425 to update the outdated workspace element in the workspace data 185.

[Exh. A, '192 patent, col. 7, ll. 46-52]

Good's argument that there is no corresponding structure in the specification that performs the claimed function is without merit.  Good has already conceded that "service engine 245 or desktop service engine 345" performs the claimed function of "updating the first version information whenever the first workspace element is modified."  These same structures along with "general synchronization modules 425 or 510" are each capable of performing the claimed function of "updating the first version information whenever the first workspace element is modified or updating the second version information whenever the copy is modified," as shown above.  Therefore, Visto's proposed construction should be adopted.

**C.**   **"first means for generating first examination results from first version information which indicates whether a first workspace element stored at a first store within a firewall has been modified" ('192 patent claim 21)**

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|---|---|---|---|
| first means for generating first examination results from first version information which indicates whether a first workspace element stored at a first store within a firewall has been modified | '192: 21 | <u>Corresponding Structure:</u> general synchronization modules 425 or 510. | The general synchronization module 425 of base system 190 in desktop computer 160 within the firewall. |

The structure corresponding to this means-plus-function limitation is: ***"general synchronization modules 425 or 510."***

Good agrees that "general synchronization module 425" is structure corresponding to this means-plus-function limitation but incorrectly contends that it should be limited to the general synchronization module 425 that corresponds to "base system 190 in desktop computer 160 within the firewall."  Unless the patentee relies on the location of particular structure to define the invention, there is no basis for limiting the structure to a particular location. *See Catalina Mktg. Int'l v. Coolsavings,com, Inc.*, 289 F.3d 801, 810 (Fed. Cir. 2002) (holding that the

32

location of the point of sale should not be read into the corresponding terminals even though the specification refers to terminals located at points of sale).   Nothing in the specification or prosecution history of the '192 patent supports the requirement that the "general synchronization module 425" reside in "base system 190 in desktop computer 160 within the fire" to perform the claimed function.  Thus, Good's attempt to limit the claim term in this manner is improper.

Moreover, Good's contention that "general synchronization module 510" does not qualify as structure corresponding to this means-plus-function limitation is at odds with the specification of the '192 patent and should be rejected.  The specification of the '192 patent teaches that general synchronization module 425 *and* general synchronization 510 are both capable of performing the recited function:

> The general synchronization module 510 includes routines for comparing the version information 124 with the last synchronization signature 435, and routines for forwarding to the general synchronization module 425 version information 124 determined to be modified. The general synchronization module 510 may either maintain its own last synchronization signature 435 copy (not shown). Alternatively, the request to synchronize from the base system 190 may include a copy of the last synchronization signature 435.

Further support for including general synchronization module 510 as structure corresponding to this term is found in col. 7, ll. 8-30 of the '192 patent:

> The general synchronization module 510 in step 620 compares the version information 124 of each of the selected workspace elements in workspace data 123 against the last synchronization signature 435 to determine modified workspace elements, and forwards the version information 124 of workspace elements determined to be modified to the general synchronization module 425. Further, the general synchronization module 425 in step 620 compares the version information 255 of each selected workspace element in the workspace data 185 against the last synchronization signature 435 to locate modified workspace elements. In this embodiment, a workspace element has been modified if the date and time of last modification is after the date and time of last synchronization.

For all of these reasons, Visto's proposed construction should be adopted.

33

**D.**     **"second means for generating second examination results from second version information which indicates whether an independently modifiable copy of the first workspace element has been modified, the copy being stored at a second store on a smart phone outside the firewall" ('192 patent claim 21)**

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|---|---|---|---|
| second means for generating second examination results from second version information which indicates whether an independently modifiable copy of the first workspace element has been modified, the copy being stored at a second store on a smart phone outside the firewall | '192: 21 | <u>Corresponding Structure</u>: general synchronization modules 425 or 510. | The general synchronization module 425 of second base system in smartphone 105. |

The structure corresponding to this means-plus-function limitation is: "*general synchronization modules 425 or 510.*"

The support in the specification for the corresponding structure "general synchronization module 425 or 510" is the same as that cited for the preceding term, "first means for generating first examination results from first version information which indicates whether a first workspace element stored at a first store within a firewall has been modified."

Once again, Good's proposed corresponding structure for this means-plus-function element the general synchronization module 425 of second base system in smartphone 105 unnecessarily limits the general synchronization modules 425 to a particular location and fails to appreciate that the "general synchronization module 510" is also capable of performing the claimed function.

The specification does not support the additional limitation on the "general synchronization module 425" to a "second base system in smartphone 105." Good mistakenly interprets the portion of the claim term "the copy being stored at a second store on a smart phone outside the firewall" as requiring the corresponding structure to be on a smart phone. To the contrary, the clause merely states that a *copy* is stored at a second store on a smartphone and does not require the "means for generating the second examination results" to reside on the smartphone. On its face, the claim term does not limit the location of the "second means for

34

generating second examination results" to a particular location on the smartphone, much less on the smartphone itself.  Therefore Good's proposed construction should be rejected.

**E.**   **"means for initiating the first and second means from within the firewall when predetermined criteria have been satisfied" ('192 patent claim 21)**

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|---|---|---|---|
| means for initiating the first and second means from within the firewall when predetermined criteria have been satisfied | '192: 21 | <u>Corresponding Structure</u>: synchronization-start module 420. | Synchronization-start module 420 of base system 190 in desktop computer 160 within the firewall. |

The structure corresponding to this means-plus-function limitation is:  ***synchronization-start module 420."***

The support for the corresponding structure "synchronization-start module 420" is found in col. 5, ll. 35-45:

> The <u>synchronization-start module 420 includes routines for determining when to initiate synchronization of workspace data 123 and workspace data 185</u>. For example, the synchronization-start module 420 may initiate data synchronization upon user request, at a particular time of day, after a predetermined time period passes, after a predetermined number of changes, after a user action such as user log-off or upon like criteria. The <u>synchronization-start module 420 initiates data synchronization</u> by instructing the general synchronization module 425 to begin execution of its routine. (emphasis added).

Good does not disagree that "synchronization-start module 420" is a corresponding structure but instead attempts to read in the additional limitation that the "synchronization-start module 420" must reside in "base system 190 in desktop computer 160 within the firewall."  As before, there is no justification for including the precise location of the structure in the identification of corresponding structure, particularly where the patentee did not rely on the location to define the invention. *See Catalina Mktg. Int'l v. Coolsavings,com, Inc*., 289 F.3d 801, 810 (Fed. Cir. 2002).  Therefore Good's proposed construction should be rejected.

**F.**   **"means for generating a preferred version from the first workspace element and from the copy based on the first and second examination results" ('192 patent claim 21**

| Term | Asserted Claim | Visto's Proposed | Good's Proposed |
|---|---|---|---|

| | Term Is In | Construction | Construction |
|---|---|---|---|
| means for generating a preferred version from the first workspace element and from the copy based on the first and second examination results | '192: 21 | Corresponding Structure: General synchronization modules 425 or 510 or content based synchronization module 430. | General synchronization module 425 of base system 190 in desktop computer 160. |

The structure corresponding to this means-plus-function limitation is: "***general synchronization modules 425 or 510 or content based synchronization module 430***."

The support for Visto's proposed construction comes from the '192 patent, col. 5, ll. 50-65:

> The <u>general synchronization module 425 further includes routines for comparing the version information 124 and the version information 255</u> to determine if only one or both versions of a particular workspace element have been modified and routines for performing an appropriate synchronizing responsive action. Appropriate synchronizing responsive actions may include forwarding the modified version (as the preferred version) of a workspace element in workspace data l 85 or forwarding just a compilation of the changes to the other store(s).

In addition to the general synchronization modules 425 or 510, the specification describes that the "content based synchronization module 430" also performs the recited function:

> "If more than one version has been modified,<u> then the general synchronization module 425 in step 640 instructs the content-based synchronization module 430 to reconcile the modified versions</u>. Reconciliation may include requesting instructions from the user or, based on preselected preferences, performing responsive actions such as storing both versions at both stores. ('192 patent, col. 7, ll. 39-45).

Good's proposed construction again improperly limits "general synchronization module 425" to a particular location within "base system 190 in desktop computer."  Good's proposal also fails to recognize that the "general synchronization module 510" and the "content based synchronization module 430" are structures disclosed in the specification which are capable of performing the claimed function.  Therefore, the Court should reject Good's proposed construction.

G.      **"means for storing first workspace data on a first device" ('221 patent claim 8)**

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|------|---------------------------|-------------------------------|------------------------------|
| means for storing first workspace data on a first device | '221: 8 | <u>Corresponding Structure</u>: the physical memory structure on a first device, including data storage devices 250, 350, and 720. | Data storage devices 250, 350 and 720. |

The structure corresponding to this means-plus-function limitation is: "***the physical memory structure on a first device, including data storage devices 250, 350, and 720.***"

The Court has previously construed this term and identified the corresponding structure as the "physical memory structure on a first device, including data storage devices 250, 350, and 720." [*See* Exh. E, Claim Construction Order I].     Visto believes that the Court's prior construction is correct and need not be revisited.

The specification of the '221 patent provides the following support for the physical memory structure on a first device and identifies data storage devices 250, 350, and 720 as corresponding to the means for storing first workspace data:

> FIG. 2 is a block diagram illustrating details of the remote terminal 105, which includes a Central Processing Unit (CPU) 210 such as a Motorola Power PC™ microprocessor or an Intel Pentium™ microprocessor. An input device 220 such as a keyboard and mouse, and an output device 230 such as a Cathode Ray Tube (CRT) display are coupled via a signal bus 235 to CPU 210. A communications interface 240, <u>a data storage device 250</u> such as Read Only Memory (ROM) <u>and a magnetic disk</u>, and a Random-Access Memory (RAM) 260 are further coupled via signal bus 235 to CPU 210."

'221 patent, col. 7, ll. 10-20.

> FIG. 3 is a block diagram illustrating details of the global server 115, which includes a Central Processing Unit (CPU) 310 such as a Motorola Power PC™ microprocessor or an Intel Pentium™ microprocessor. An input device 320 such as a keyboard and mouse, and an output device 330 such as a Cathode Ray Tube (CRT) display are coupled via a signal bus 335 to CPU 310. A communications interface 340, <u>a data storage device 350</u> such as Read Only Memory (ROM) <u>and a magnetic disk</u>, and a Random-Access Memory (RAM) 370 are further coupled via signal bus 335 to CPU 310."

*Id.* at col. 7, ll. 52-61.

FIG. 7 is a block diagram illustrating details of the client 165, which includes a CPU 705, an input device 710, an output device 725, a communications interface 710, a data storage device 720 and RAM 730, each coupled to a signal bus 740."

*Id.* at col. 9, l. 66 - col. 10, l. 3.

Despite the Court's prior construction of this term, Good attempts to limit the proposed corresponding structure to "data storage devices 250, 350 and 720," but fails to acknowledge that the "data storage devices 250, 350 and 720" are merely exemplary forms of physical memory as described within the '221 patent.

**H.     "means for storing second workspace data on a second device" ('221 patent claim 8)**

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|---|---|---|---|
| means for storing second workspace data on a second device | '221: 8 | Corresponding Structure: the physical memory structure on a second device, including data storage devices 250, 350, and 720. | Data storage devices 250, 350 and 720 |

The structure corresponding to this means-plus-function limitation is: ***"the physical memory structure on a second device, including data storage devices 250, 350, and 720."***

Similar to "means for storing first workspace data on a first device," the Court has previously construed this term and identified the corresponding structure as the "physical memory structure on a first device, including data storage devices 250, 350, and 720." [*See* Exh. E, Claim Construction Order I].

The support for Visto's construction of this term is the same as that identified above for the claim term "means for storing first workspace data on a first device."

Despite the Court's prior construction of this term, Good improperly attempts to limit the proposed corresponding structure to "data storage devices 250, 350 and 720." As pointed out above, such a construction is improper because "data storage devices 250, 350 and 720" are merely exemplary forms of physical memory described in the '192 patent. Visto believes that the Court's prior construction is correct and should be adopted.

I.      **"means for executing a workspace data manager on an untrusted client site"**
        **('606 patent claim 20)**

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|------|---------------------------|-------------------------------|------------------------------|
| means for executing a workspace data manager on an untrusted client site | '606: 20 | <u>Corresponding Structure</u>: the software code of operating system 240 or 440 and processor 205 or 405. | Processor 405, internal storage 430, and operating system 440 in the Remote client 120. |

The structure corresponding to this means-plus-function limitation is:  "***the software code of operating system 240 or 440 and processor 205 or 405.***"

The specification of the '606 patent supports Visto's citation of operating system 240 as corresponding structure.  For example, at col. 4, ll. 53-55, the specification states that "[a]n <u>operating system 240 controls processing by processor 205</u>, and is typically stored in data storage 230 and loaded into internal storage 235 (as illustrated) <u>for execution</u>." (emphasis added).  Additional support for Visto's construction is found at col. 6, ll. 3-5: "An <u>operating system 440 controls processing by processor 405</u>, and is typically stored in data storage 430 and loaded into internal storage 435 (as illustrated) <u>for execution</u>." (emphasis added).   Figures 2 and 4 also depict a workspace data manager being executed on operating system 240 and 440, respectively.

Good's interpretation of the corresponding structure as the "processor 405, internal storage 430, and operating system 440 in the Remote client 120" includes more structure than necessary to perform the recited function and fails to include any structure from the home/work client (see, e.g., Figure 2).   Good's citation of internal storage 430 on the remote client as corresponding structure is incorrect, because it is the software (*i.e.*, the operating system) running on the processor that performs the recited function. *See*, e.g., *Natl. Instruments Corp. v. The Mathworks, Inc.*, 2002 U.S. Dist. LEXIS 27577 at 27 (E.D. Tex. 2002); *WMS Gaming Inc. v. International Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999).   Moreover, Good fails to identify any structure appearing on the home and work clients.   Because the home and work clients can both be "untrusted client sites"  (see Visto's proposed construction above at pages X thru Y or sections L thru M), the corresponding structure must also include in the alternative the

39

software code of operating system 240 running on processor 205.  Good's proposed construction

must therefore be rejected.

**J.**      **"means for requesting the workspace data manager to access data temporarily from a remote site" ('606 patent claim 20)**

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|------|---------------------------|-------------------------------|------------------------------|
| means for requesting the workspace data manager to access data temporarily from a remote site | '606: 20 | Corresponding Structure: instantiator 730. | "Borrow-me" button 545 in user interface of the workspace data manager. |

The structure corresponding to this means-plus-function limitation is:   "*instantiator*

*730.*"

The support for Visto's construction comes from several places in the '606 patent

specification. First, the specification states that:

> The instantiator 730 is an application program interface 730 that creates a window
> for displaying and enabling manipulation of the workspace data 135 downloaded
> from the global server 105. In an object-oriented environment, the instantiator
> 730 may create a new instance for the workspace data 135.   Alternatively, the
> instantiator 730 may store the local data to a buffer (not shown) and use the
> current interface to display and enable manipulation of the workspace data 135."

[Exh. B, '606 Patent, col. 8-9, ll. 62-3].  Additional support for this structure is found at col. 10,

ll. 28-31: "[t]he instantiator 730 on the client 110, 115 or 120 creates a new instance, *e.g.*, a new

window of PIM API 740 and stores the received global data into another file, *i.e.*, global.org." [

Exh. B, '606 patent, col. 9, ll. 59-61].

Good's proposed  is improperly based on an exemplary description of a user interface

button used for accessing and synchronizing data.  *See Serrano*, 111 F.3d at 1583.  Moreover, the

"borrow me" button is not a software module, but rather a "function of the assistant 700 [which]

uses the communications module 705, the locator module 710, the security module 725, *the*

*instantiator 730*, the data reader 735, the PIM API 740 and the de-instantiator 745."  [Exh. B,

'606 patent, col. 7, ll. 53-58].  Good's proposed construction must therefore be rejected.

### K.      "means for downloading data from the remote site" ('606 patent claim 20)

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|---|---|---|---|
| means for downloading data from the remote site | '606: 20 | Corresponding Structure: the assistant 175, 180, 185, 260 or 700. | Communications module 705. |

The structure corresponding to this means-plus-function limitation is:  "*assistant 175, 180, 185, 260 or 700.*"

Support for Visto's construction is derived from col. 7, ll. 10-16 of the '606 patent:

Selecting a button 507 causes the assistant <u>175, 180 or 185 to download the corresponding workspace data 135</u>, and causes the PIM 160, 165 or 170 to display and enable manipulation of the downloaded data 135 on a workspace element set interface (shown and described with reference to FIG. 6) (emphasis added).

Figures 1, 2 and 7 depict "assistants 170 [*sic*], 260 and 700," which are similar to "assistants 175, 180 and 185" and are therefore included as the corresponding structures for this means-plus-function claim limitation.

While the parties do not dispute that "communications module 705" is a corresponding structure for the "means for initiating a communications channel with the remote site," Good erroneously identifies the same structure for performing the downloading data from the remote site function – i.e., "communications module 705."  As discussed in the preceeding paragraph, the specification makes clear that it is Assistant 175, 180, 185, 260 or 700 that performs the downloading data function.    Because Visto's proposed construction finds support in specification, and Good's construction contradicts the specification, the Court should adopt Visto's construction.

41

**L.** **"means for placing the data in temporary storage on the untrusted client site" ('606 patent claim 20)**

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|------|---------------------------|------------------------------|------------------------------|
| means for placing the data in temporary storage on the untrusted client site | '606: 20 | <u>Corresponding Structure</u>: the operating system 240 or 440 or assistant 175, 180, 185, 260 or 700. | Instantiator 730. |

The structure corresponding to this means-plus-function limitation is:  ***"operating system 240 or 440 or assistant 175, 180, 185, 260 or 700."***

The "operating systems" and/or the "assistants" installed on the relevant client device cooperate in placing data in storage on the untrusted site.  The operating system is the backbone for all programs and operations on the client devices.  The "assistants" are the specific programs installed on the operating system that allow data to be downloaded and synchronized with a remote site.

According to the specification of the '606 patent, the "operating system 240 controls processing by processor 205, and is typically stored in data storage 230 and loaded into internal storage 235 (as illustrated) for execution."  *See* '606 patent, col. 4, ll. 53-55.  Support for the role of the assistant in placing the data in data storage is found in col. 4, ll. 63-66:

> A PIM 255 includes an assistant 260, which enables a user to download workspace data 135 from the global server 105, and to use the PIM 255 for displaying and manipulating the workspace data 135. The assistant 260 further enables the PIM 255 to synchronize the manipulated data 135 with the workspace data 135 on the global server 105 (emphasis added).

In downloading data, the assistant may participate in placing the data in data storage on the client site.

Good's proposed structure, the "Instantiator 730," is not the correct corresponding structure for this means-plus-function limitation.  As discussed above, the Instantiator corresponds to the "means for requesting the workspace data manager to access data temporarily from a remote site".  Once access has been granted, it is the "operating system 240 or 440" or "assistant 175, 180, 185, 260 or 700" that performs the function of "placing the data in

42

temporary storage on the untrusted client site."   [Exh. B '606 patent, col. 4, ll. 63-66].

Therefore, the Court should adopt Visto's construction.

### M.   "means for using the workspace data manager to present the downloaded data" ('606 patent claim 20)

| Term | Asserted Claim Term Is In | Visto's Proposed Construction | Good's Proposed Construction |
|---|---|---|---|
| means for using the workspace data manager to present the downloaded data | '606: 20 | <u>Corresponding Structure</u>: the assistant 175, 180, 185, 260 or 700. | PIM 160, 165 or 170. |

The structure corresponding to this means-plus-function limitation is: "***assistant 175, 180, 185, 260 or 700.***"

Support for Visto's construction comes from the '606 patent, col. 4, ll. 63-66:

A PIM 255 includes <u>an assistant 260</u>, which enables a user to download workspace data 135 from the global server 105, and to use the PIM 255 f<u>or displaying and manipulating the workspace data 135.</u> The assistant 260 further enables the PIM 255 to synchronize the manipulated data 135 with the workspace data 135 on the global server (emphasis added).

Further support for the role of the Assistant for presenting the downloaded data is found in col. 4, ll. 27-37:

Each PIM 160, 165, and 170 includes <u>an assistant 175, 180 and 185</u> that adds data access and synchronization functions to the PIM 160, 165 and 170.  <u>Accordingly, a user can transparently use an assistant 175, 180 or 185 via a PIM 160, 165 or 170 to access workspace data 135 from the global server 105, to present and enable manipulation of downloaded data 135,</u> and to synchronize manipulated data 135 with the workspace data 135 on the global server 105.

The above cited portions of the specification clearly contemplate the role of the Assistant in presenting downloaded data to the user.

Good's proposed structure, the (*i.e.*, PIM 160, 165 or 170) includes more structure than necessary for performing the recited function, and is thus incorrect.  As shown in the excerpt above from the specification of the '606 patent, it is the "assistant 175, 180, 185, 260 or 700" that uses the workspace data manager to present the downloaded data, not the PIMs.  While it is true, that the assistants are components of the PIMs referred to in Good's constructions, the other

components of the PIMs are not necessary to perform the function and are hence not corresponding structure.   Therefore Visto's proposed construction is correct and should be adopted.

## I.      <u>CONCLUSION</u>

Visto's proposed constructions are fully supported by the intrinsic and extrinsic evidence cited herein and are consistent with the other Claim Construction Orders issued by this Court and adopted by the parties.   For the reasons discussed above, Visto respectfully requests that the Court interpret the disputed terms and phrases from the asserted claims as proposed herein.

Austin 38967v7

DATED:  August 27, 2007                    Respectfully submitted,


                                           /s/ Sam Baxter
                                           Sam Baxter, Lead Attorney
                                           TX State Bar No. 01938000
                                           McKOOL SMITH, PC
                                           505 East Travis Street, Suite 105
                                           Marshall, Texas 75670
                                           Telephone: (903) 927-2111
                                           Fax: (903) 927-2622
                                           sbaxter@mckoolsmith.com

                                           Michael S. Perez
                                           TX State Bar No. 24002752
                                           McKOOL SMITH, PC
                                           300 West 6th Street
                                           Suite 1700
                                           Austin, Texas 78701
                                           512-692-8708
                                           512-692-8744 (fax)
                                           mperez@mckoolsmith.com

                                           William E. Davis III
                                           TX State Bar No. 24047416
                                           McKOOL SMITH, PC
                                           300 Crescent Court, Suite 1500
                                           Dallas, Texas 75201
                                           Telephone: (214) 978-6351
                                           Telephone: (214) 978-4044
                                           wdavis@mckoolsmith.com

                                           Of Counsel:
                                           Ronald S. Katz, CA State Bar No. 085713
                                           rkatz@manatt.com
                                           Robert D. Becker, CA Bar No. 160648
                                           rbecker@manatt.com
                                           MANATT, PHELPS & PHILLIPS LLP
                                           1001 Page Mill Road, Building 2
                                           Palo Alto, CA 94304
                                           Telephone: (650) 812-1300
                                           Fax: (650) 213-0260
                                           rkatz@manatt.com

                                           **ATTORNEYS FOR PLAINTIFF**
                                           **VISTO CORPORATION**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served upon all counsel of record via electronic mail and/or CM/ECF on the 27th day of August, 2007.

/s/ Geoffrey L. Smith
Geoffrey L. Smith

Austin 38967v7