# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

VISTO CORPORATION,

        **Plaintiff**

vs.

**SEVEN NETWORKS, INC.,**

        **Defendant.**

Civil Action No.: 2-03CV-333-TJW

Before: Hon. T. John Ward

## PLAINTIFF VISTO CORPORATION'S OPENING CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

Page

**I.** INTRODUCTION ................................................................................................ 1

**II.** BACKGROUND OF THE INVENTIONS ........................................................... 2

**III.** GENERAL PRINCIPALS OF CLAIM CONSTRUCTION .................................. 3

**IV.** PROPOSED CONSTRUCTION OF THE DISPUTED TERMS AND PHRASES ........... 4

    **A.** Communications Channel ('708 claims 5, 8 and 9)................................. 7

    **B.** Communications Module ('192 claim 11)............................................... 8

    **C.** Differences ('221 claims 1, 4, 6 & 8) ..................................................... 8

    **D.** First Examination Results/Second Examination Results ('131 claims 1, 16, 31-33, 35 & 36; '192 claims 1, 6-8 & 22) ............................................. 9

    **E.** Firewall ('708 claims 5 & 21; '192 claims 1, 6-8, 10, 11 & 22) .......... 11

    **F.** First Device/Second Device ('221 claims 1, 4, 6 & 8) ......................... 11

    **G.** General Synchronization Module/First General Synchronization Module/Second General Synchronization Module ('131 claim 16; '708 claims 7 & 8; '192 claims 10 & 11)..................................................... 12

    **H.** Independently Modifiable Copy ('131 claims 1, 31-33, 35 & 36; '708 claims 5, 21 & 24; '192 claims 1, 6-8, 10, 11 & 22) ............................. 13

    **I.** Last Synchronization Signature ('708 claims 8 & 24)......................... 15

    **J.** First Memory/Second Memory ('131 claims 1, 16, 31-33, 35 & 36).................. 15

    **K.** Modifications ('131 claims 1, 16, 31-33, 35 & 36) .............................. 16

    **L.** Preferred Version ('131 claims 1, 16, 31-33, 35 & 36; '192 claims 1, 6-8,10,11 & 22) ................................................................................. 17

    **M.** Previous Examination ('131 claims 1, 16, 31-33, 35 & 36) ................ 18

    **N.** Global Server ('221 claims 1, 4, 6 & 8)............................................... 19

    **O.** First Store/Second Store ('131 claims 16, 31-33, 35 & 36; '708 claims 5, 8, 9, 21, 24 & 25; '192 claims 1, 6-8, 10, 11 & 22)............................. 20

    **P.** Synchronization Agent ('131 claim 16; '192 claims 10 & 11)............. 22

    **Q.** Synchronization Start Module ('131 claim 16; '708 claim 9; '192 claims 10 & 11) ................................................................................... 23

    **R.** Translator ('708 claims 5, 8 & 9)......................................................... 24

    **S.** Translating ('708 claims 5, 8, 9, 21, 24 & 25)..................................... 25

# TABLE OF CONTENTS
(continued)

T. Version Information/First Version Information/Second Version Information ('131 claims 1, 16, 31-33, 35 & 36; '708 claims 8 & 24; '192 claims 1, 6-8, 10, 11 & 22) ............................................................... 26

U. Version Indicating Information ('221 claim 6) ..................................... 28

V. First Workspace Data/Second Workspace Data ('221 claims 1, 4, 6 & 8) .......... 29

W. Workspace Element/First Workspace Element ('131 claims 1, 16, 31-33, 35 & 36; '708 claims 5, 8, 9, 21, 24 & 25; '192 claims 1, 6-8, 10, 11 & 22) ................................................................................................... 30

X. E-mail (no claims) ............................................................................... 31

V. PROPOSED CONSTRUCTION OF MEANS-PLUS-FUNCTION ELEMENTS .......... 31

A. Means for Generating a Preferred Version ('192 claims 10 & 11) ..................... 33

B. Means for Storing the Preferred Version ('192 claims 10 & 11; '131 claim 16) ................................................................................................... 33

C. Synchronization Means for Synchronizing the First Workspace Element and the Second Workspace Element ('708 claims 5, 8 & 9) ............................... 33

D. Means for Determining Preferred Versions ('131 claim 16) ............................... 33

E. Means for Storing First Workspace Data on a First Device ('221 claim 8) ........ 33

F. Means for Storing Second Workspace Data on a Second Device ('221 claim 8) ................................................................................................... 34

G. Means for Determining Differences Between the First Workspace Data and the Second Workspace Data ('221 claim 8) ..................................... 34

H. Means for Storing the Differences at a Global Server ('221 claim 8) ................. 34

I. Means for Sending the Differences From the Global Server to the Second Device ('221 claim 8) ......................................................................... 34

VI. CONCLUSION ................................................................................................... 34

# TABLE OF AUTHORITIES

Page

## CASES

*Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*,
132 F.3d 701 (Fed. Cir. 1997)................................................................................... 4

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*,
334 F.3d 1294 (Fed. Cir. 2003)........................................................................... 7, 25

*Electro Medical Sys., S.A. v. Cooper Life Sciences*,
34 F.3d 1048 (Fed. Cir. 1994).................................................................................. 5

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
192 F.3d 973 (Fed. Cir. 1999).................................................................................. 3

*Fuji Photo Film Co. v. ITC*,
386 F.3d 1095 (Fed. Cir. 2004)........................................... 6, 12, 16, 17, 20, 24, 30

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*,
381 F.3d 1111 (Fed. Cir. 2004)........................................... 6, 14, 22, 23, 27, 28

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
256 F.3d 1323 (Fed. Cir. 2001).................................................................................. 3

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
383 F.3d 1295 (Fed. Cir. 2004)................................................................................ 29

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) (en banc),
*aff'd*, 517 U.S. 370 (1996) ................................................................................ 3, 4

*Mars, Inc. v. H.J. Heinz Co., L.P.*,
377 F.3d 1369 (Fed. Cir. 2004)........................................................................ 5, 21, 28

*Natl. Instruments Corp. v. The Mathworks, Inc.*,
2002 U.S. Dist. LEXIS 27577 at 27 (E.D. Tex. 2002) ........................................ 32

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
182 F.3d 1298 (Fed. Cir. 1999)........................................................................... 3, 4

*Raytheon Co. v. McData Corp.*,
2004 WL 952284, 11 (E.D. Tex. 2004) ..................................... 5, 7, 13, 31, 32

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
299 F.3d 1313 (Fed. Cir. 2002)............................................. 5, 8, 15, 18, 21, 26

*Texas Digital Sys., Inc. v. Telegenix, Inc.*,
308 F.3d 1193 (Fed. Cir. 2002)................................................. 3, 4, 5, 7, 9

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996)................................................................................ 3

## STATUTES

Patent Rule 4-5(a) ............................................................................................... 1

**TABLE OF AUTHORITIES**
(continued)

Page

**OTHER AUTHORITIES**

Barron's Dictionary of Computer and Internet Terms
(6th Ed. 1998) ................................................................................................................... 11, 20

Merriman Webster's Collegiate Dictionary
(10th Ed. 1999 (principal copyright 1993) ................................ 8, 9, 11, 13, 16, 17, 18, 20, 26

Microsoft Press Computer Dictionary
(3rd. Ed., 1997) ...................................................... 7, 8, 9, 11, 12, 15, 16, 19, 22, 24, 25, 29, 32

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| VISTO CORPORATION, | |
| **Plaintiff** | |
| vs. | Civil Action No.: 2-03CV-333-TJW |
| SEVEN NETWORKS, INC., | Before: Hon. T. John Ward |
| **Defendant.** | |

## PLAINTIFF VISTO CORPORATION'S OPENING CLAIM CONSTRUCTION BRIEF

Plaintiff Visto Corporation ("Visto") respectfully submits its Opening Claim Construction Brief pursuant to Patent Rule 4-5(a) of the Rules of Practice for Patent Cases before the Honorable T. John Ward, United States District Court for the Eastern District of Texas.

## I.     INTRODUCTION

The present action is brought by Visto against defendant Seven Networks, Inc. ("Seven") for infringement of U.S. Patent Nos. 5,968,131 ("the '131 patent"), 6,023,708 ("the '708 patent"), 6,085,192 ("the '192 patent") and 6,708,221 ("the '221 patent"). (Collectively referred to as "the patents in suit.") Copies of the patents in suit are included herewith in the attached Exhibit A.

In order to reduce the number of claim construction issues to be resolved by the Court, Visto has proposed to limit the present action to the following asserted claims of the patents in suit: claims 1, 16, 31-33, 35 and 36 of the '131 patent; claims 5, 8, 9, 21, 24 and 25 of the '708 patent; claims 1, 6-8, 10, 11 and 22 of the '192 patent; and, claims 1, 4, 6 and 8 of the '221 patent.  The parties are currently preparing a stipulated motion to reflect their agreement on limiting the claims.

On December 27, 2004, the parties submitted a Joint Claim Construction and Prehearing Statement ("Joint Statement") in accordance with Local Patent Rule 4-3.  This brief is submitted

in support of Visto's interpretation of those terms and phrases upon which the parties did not agree.

## II.   **BACKGROUND OF THE INVENTIONS**

In 1996, there were serious impediments to using remote devices to perform what are now commonplace tasks, such as revising and updating data on a local area network (LAN) via wireless handheld computing devices.  One reason that such tasks could not be performed was that so-called "firewalls" were in place to maintain security against unauthorized LAN entry. Typically, firewalls have one or more ports to pass outbound HTTP (Hyper Text Transfer Protocol) encoded messages, the standard format for Internet web communications.  Additional ports can be opened to allow remote devices to communicate with the LAN.  However, each time an additional port is opened in the firewall to communicate with a remote device, the security risk to the LAN increases significantly.  For this reason, communication with a remote device for purposes such as synchronizing e-mail was a very difficult problem.  [*See* Declaration of Sabin Head in Support of Plaintiff Visto's Motion for Preliminary Injunction, filed September 25, 2003 (No Docket No. assigned).]

Plaintiff's inventors developed a solution to the above-described problem, opening the way to the tremendous expansion of communications employed today.   What plaintiff's inventors did was to use the HTTP and secure HTTP (a.k.a. HTTPS) ports to communicate with a secure server outside the firewall, rather than request additional ports which posed security risks. That secure server, which is often located within a wireless carrier's infrastructure, may store documents and enables communication with trusted remote clients, including cell phones, PDAs, laptop computers, etc. Messages passing through the HTTP ports in the LAN are translated into the HTTP format so that no additional ports have to be opened.  Multiple copies of documents within and without the LAN may also be securely synchronized so that the material within and without the firewall is the same.  The result is a safe and secure system wherein it is possible to use a remote device just as though the user was in his or her own office. The patents in suit cover the technology that enables this innovative solution.

## III.   GENERAL PRINCIPALS OF CLAIM CONSTRUCTION

Issues regarding claim construction, -- i.e., what the claims mean -- are for a court to decide and explain on the record. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history. Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citation omitted).

First, the Court looks to the claim language. *Id.*; *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001); *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999). Then the rest of the intrinsic evidence is examined, beginning with the specification and concluding with the prosecution history, if in evidence. *See Vitronics*, 90 F.3d at 1582 (delineating this order). The Federal Circuit has also held that courts may consult dictionaries, encyclopedias and treatises in determining the ordinary and customary meanings of claim terms. *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d. 1193, 1202 (Fed. Cir. 2002).

If the claim language is clear on its face, then consideration of the rest of the intrinsic evidence is restricted to determining whether a deviation from the clear language of the claims is specified. *Interactive Gift Express*, 256 F.3d at 1331. A deviation may be necessary if "a patentee [has chosen] to be his own lexicographer and use terms in a manner other than their ordinary meaning. *Vitronics*, 90 F.3d at 1582. A deviation may also be necessary if a patentee has "relinquished [a] potential claim construction in an amendment to the claim or in an argument to overcome or distinguish a reference." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 979 (Fed. Cir. 1999). However, "[c]onsulting the written description and prosecution history as a threshold step in the claim construction process, before any effort is made to discern the ordinary and customary meanings attributed to the words themselves invites a violation of

[Federal Circuit] precedent counseling against importing limitations into the claims." *Texas Digital*, 308 F.3d at 1204-1205.

If the meaning of the claim limitations is apparent from the totality of the intrinsic evidence, then the claim has been construed. If however a claim limitation is still not clear, the court may look to extrinsic evidence to help resolve the lack of clarity. Relying on extrinsic evidence to construe a claim is "proper only when the claim language remains genuinely ambiguous after consideration of the intrinsic evidence." *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997). Extrinsic evidence may always be consulted, however, to assist in understanding the underlying technology. *See Pitney Bowes*, 182 F.3d at 1309. But extrinsic evidence may never be used "for the purpose of varying or contradicting the terms in the claims." *Markman*, 52 F.3d at 981.

## IV.   PROPOSED CONSTRUCTION OF THE DISPUTED TERMS AND PHRASES

In general, the claims of the asserted patents are written in plain English, and can be easily understood by reference to the ordinary meaning of the words. Nonetheless, Seven insists that it is necessary to construe an extraordinarily long list of terms and phrases, based mainly on its unsupportable position that several limitations drawn from the specification must be read into the claims. While such an extensive claim construction is unnecessary, Visto has identified a number of issues that are common to multiple disputed terms or phrases. An initial discussion of each of these issues should resolve that issue for all of the terms or phrases to which it relates, and thereby simplify the present analysis. Accordingly, these issues are addressed directly below as they relate to all the relevant terms or phrases in view of the general rules governing claim construction. Thereafter, an analysis of the proper claim construction for each term or phrase is provided on a point-by-point basis.

Turning to Seven's proposed constructions, many of its definitions include system features or elements that are not recited in the claims, but are instead drawn from exemplary embodiments in the specification. Seven submits, for example, that certain terms or phrases should be limited to features described in the specification as being on a "global server" or

within a "firewall-protected corporate LAN." [Joint Statement, p. 3]  It is well settled, however, that "claims are not to be interpreted by adding limitations appearing only in the specification." *Electro Medical Sys., S.A. v. Cooper Life Sciences*, 34 F.3d 1048, 1054 (Fed. Cir. 1994)  Rather, "[c]laim terms take on their ordinary and accustomed meanings unless the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002).  In the present situation, the intrinsic evidence shows that there has been no clear disavowal of claim scope, and the terms and phrases should be accorded their full range of ordinary meaning as understood by one of ordinary skill in the art. *Texas Digital*, 308 F.3d at 1202.

Seven similarly asserts that when a term or phrase is labeled as being a "first" or "second," it imparts distinct structural or functional limitations described in the specification with respect to the exemplary embodiments.  [Joint Statement, pp. 2-3.]  Seven therefore insists that a term or phrase labeled as a "first" must be construed separately from that term or phrase when labeled as a "second," which substantially increases the list of claim elements to be construed.  Again, "[u]nless there is an express intent to impart a novel meaning to the claim terms, the words of the claim are presumed to take on the ordinary and customary meanings attributed to them by those of ordinary skill in the art." *Mars, Inc. v. H.J. Heinz Co., L.P.*, 377 F.3d 1369, 1373 (Fed. Cir. 2004) (citations omitted).  The intrinsic evidence shows that the terms "first" and "second" are merely used as labels to designate one of one or more common terms within a claim, and that there is no express intent to impart a novel meaning.  As such, it is improper to read additional limitations into the claims by way of these terms, and it is unnecessary to provide separate constructions of a term or phrase for both "first" and "second" occurrences.  In fact, this Court held in a recent decision that when a term is designated by both "first" and "second" labels, only the term itself need be construed. *Raytheon Co. v. McData Corp.*, 2004 WL 952284, 11 (E.D. Tex. 2004) ("The Court believes that only the term "signal"

need be construed and that from that construction the jury will be able to determine the meaning of 'first signal,' 'second signal,' 'first command signal,' and 'second command signal.'")

For a number of terms or phrases, Seven also submits that the proposed construction should be defined as relating to the "content" of a workspace element or an independently modifiable copy thereof. [Joint Statement, p. 2] In the context of the claim language, however, none of these terms or phrases are recited as being limited in this way. The word "content" does not even appear in any of the asserted claims. Apparently, Seven's argument is drawn from the written descriptions of the patents in suit, which disclose the operation of a content based synchronization module that examines the contents of workspace elements for conflicts. [*See, e.g.,* '221 patent, col. 15, ll. 51-62.] What Seven fails to acknowledge, is that this examination process is described as being carried out only in situations where multiple versions of a workspace element have been modified. In other situations, the patents in suit expressly describe making determinations based on information other than content, such as by "comparing the date of last modification ... or a comparison between the current status and the previous status." ['221 patent, col. 15, ll. 12-16.] A claim construction reciting the "content" of a workspace element or an independently modifiable copy thereof improperly limits the relevant terms or phrases to a single exemplary embodiment described by the specification. "[P]articular embodiments appearing in the written description will not be used to limit claim language that has broader effect." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004).

It is evident that most of the differences between the parties' proposed claim constructions involve Seven's attempt to limit the scope of the asserted claims by importing limitations drawn from the specification. It is well established, however, that "an accused infringer cannot overcome the heavy presumption that claims should be given their ordinary meaning simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification." *Fuji Photo Film Co. v. ITC,* 386 F.3d 1095, 1105 (Fed. Cir. 2004) (citations omitted). In the instant case, the terms and phrases of the asserted claims should generally be

afforded their full range of meaning, which can be easily understood by reference to the claims themselves, as well as to technical and non-technical dictionaries where necessary. *See Raytheon*, 2004 WL 952284 at 3 ("courts may consult dictionaries, encyclopedias and treatises in determining the ordinary and customary meanings of claim terms")(citing *Texas Digital*, 308 F.3d at 1204-1205).

### A.  Communications Channel ('708 claims 5, 8 and 9)

Claims 5, 8 and 9 of the '708 patent depend from claim 1.  Claim 1 recites the limitation of "a communications channel coupling the first store to the second store."  The proper construction of the term "communications channel" is: *A path or link by which information is passed between two locations.  A communications channel can be a physical or wireless link.*

This construction is apparent from the ordinary meaning of the words, which are defined as "a medium for transferring information." [Microsoft Press Computer Dictionary (3rd. Ed., 1997)("Microsoft Dictionary"), p. 86 and 103. (Copies of excerpts cited from the Microsoft Dictionary are included herewith in the attached Exhibit B.)]  "A communications channel can be a physical link, such as a cable connecting two stations in a network, or it can consist of some electromagnetic transmission." *Id.*  This straightforward definition, from a technical dictionary that was publicly available contemporaneously with the filing and issuance of the '708 patent, sets forth the appropriate construction. *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294 (Fed. Cir. 2003) (noting the relevance of dictionary definitions that are contemporaneous with the patent's filing and issuance).

Seven submits that the "communications channel" should be defined as being between "a remote computer terminal and a global server (i.e., second store) or between the global server and a first store within the firewall-protected corporate LAN." [Joint Statement, Exh. B, no. 1.] This structure is drawn from exemplary embodiments appearing in the specification and should not be read into the claims.  There is no indication in the specification of an intent to deviate from the ordinary meaning of "communications channel." [*See, e.g.*, '708 patent, col. 2, l. 64-65, which merely indicates a communications channel may comprise a path or link "such as the

Internet."]  As such, it would be improper to limit the claim in this manner. *Teleflex*, 299 F.3d at 1327.

### B.    Communications Module ('192 claim 11)

The proper construction of the term is: ***Software routines or code that perform the task of communicating.***    Again, this term requires no extraordinary explanation and may be construed by reference to the ordinary meaning of the words.   "In computer-related areas, communications involves data transfer from one computer to another through a communications medium." [Microsoft Dictionary, p. 102.]  In software programming, a module is defined as "a collection of routines and data structures that performs a particular task or implements a particular abstract data type." *Id.* at p. 313.  The specification of the '192 patent is consistent with these definitions and refers to an exemplary embodiment wherein the communications module "includes routines for compressing data, and routines for communicating via the communications interface with the synchronization agent." ['192 patent, col. 5, ll. 1-10.]

Based on this exemplary embodiment, however, Seven submits that the term "communications module" must also be construed as "having routines for compressing data and communicating with a synchronization agent on a global server." [Joint Statement, Exhs. B and C, no. 2.]  There is no indication in the intrinsic evidence of an intent to limit the scope of the claimed invention to that embodiment.  The Federal Circuit has held that "[a]bsent such clear statements of scope, [the court is] constrained to follow the language of the claims, rather than that of the written description." *Teleflex*, 299 F.3d at 1328.  Accordingly, it would be improper to read these features into "communications module."

### C.    Differences ('221 claims 1, 4, 6 & 8)

The proper construction of the term is: ***One or more distinctions between information or values contained in sets of data.***  This construction is apparent from the ordinary meanings of the word.  The term "difference" is defined as "a characteristic that distinguishes one from another or from the average," [Merriman Webster's Collegiate Dictionary (10th Ed. 1999 (principal copyright 1993)("Webster's Dictionary"), p. 323 (Copies of excerpts cited from the

Webster's Dictionary are included herewith in the attached Exhibit C.)] or "the amount by which two values differ." [Microsoft Dictionary, p. 143.] Nowhere in the specification is the term "differences" limited in any way. Where the specification does not limit the ordinary meaning of a term, the full breadth of such ordinary meaning is given to the term. *Texas Digital*, 308 F.3d at 1202.

Seven submits that the term "differences" must be construed as being distinctions between "the content of workspace elements." [Joint Statement, Exh. B, no. 3.] In the context of the asserted claims, however, the term "differences" (i.e., one or more distinctions between information or values) is recited as being "between the first workspace data and the second workspace data." The specification of the '221 patent expressly defines "workspace data" as encompassing, and consequently being broader in scope, than "workspace elements." [*See, e.g.*, '192 patent, col. 3, ll. 31-32 ("each e-mail, file, calendar, etc. may be referred to as 'a workspace element' in workspace data.")] Furthermore, and as discussed in detail above, there is no basis for limiting the claim as relating to the "content" of a workspace element. The '708 patent, to which the '221 patent claims priority, provides further evidence that the inventors did not intend to limit "differences" to differences in content. As illustrated by Figure 6 of that patent, information to be synchronized between workspace elements may also include a deleted ID or other types of ID flags in addition to content. ['708 patent, Fig. 6 and col. 8, ll. 47-62.] As such, Seven's proposed construction improperly limits the scope of the term "differences."

### D. First Examination Results/Second Examination Results ('131 claims 1, 16, 31-33, 35 & 36; '192 claims 1, 6-8 & 22)

The proper construction of the term "examination results" is: *Information regarding one or more workspace elements obtained by examining those workspace elements or related data.* This construction is apparent from the ordinary meaning of the words. "Examination" is defined as "the act or process of examining." [Webster's Dictionary, p. 403.] "Result" is defined as "something obtained by calculation or investigation." [Webster's Dictionary, p. 999.] In the context of the asserted claims, the "examination results" are recited as relating to information

generated from "version information" which indicates whether a workspace element or an independently modifiable copy thereof has been modified.

Seven submits that the term must also be construed as being "based on a comparison of a last synchronization signature." [Joint Statement, Exh. B, nos. 4-5.]   While the specifications of the asserted patents do describe an exemplary embodiment where examination results are determined by comparing version information to a last synchronization signature, there is no indication of an intent to limit the scope of the claimed invention to that embodiment.  In fact, when summarizing the invention, the asserted patents describe embodiments that generate examination results based on an examination of version information alone. [See, e.g., '192 patent, col. 2, ll. 17-25.  See, also, col. 5, ll. 55-59 ("The general synchronization module 425 further includes routines for comparing the version information 124 and the version information 255 to determine if only one or both versions of a particular workspace element have been modified.")]  Claims depending from the asserted claims also recite that generating examination results includes the step of comparing the version information "against a date and time of last synchronization." [See, e.g., '192 patent, claims 4 and 5.] This language is an express indication that this term is not limited as suggested by Seven.  Accordingly, it would be improper to limit "examination results" to being "based on a comparison of a last synchronization signature."

Seven also asserts that "first examination results" should be construed in terms of version information and the "content" of an associated workspace element "stored within a firewall-protected corporate LAN."  Similarly, Seven construes "second examination results" in terms of the "content" of an independently modifiable copy of a workspace element."  As previously discussed above, however, there is no basis for limiting the claims as relating to the "content" of a workspace element or independently modifiable copy.  Visto has also shown that it is improper to read additional limitations into the claims based on the labels "first" and "second," and separate constructions for "examination results" is unnecessary.

### E.     Firewall ('708 claims 5 & 21; '192 claims 1, 6-8, 10, 11 & 22)

The proper construction of the term is: ***Software and/or hardware for protecting a network against external threats coming from another network, which allows or blocks packets of information traveling between the networks.***  The ordinary meaning of the term "firewall" is well known in the art and is defined as: "a security system intended to protect an organization's network against external threats, such as hackers, coming from another network, such as the Internet. [Microsoft Dictionary, p. 197.]  "A firewall prevents computers in the organization's network from communicating directly with computers external to the network and vice versa." *Id.*  A firewall is "a link in a network that relays only data packets clearly intended and authorized to reach the other side." [Barron's Dictionary of Computer and Internet Terms (6th Ed. 1998)("Barron's Dictionary"), p. 176 (Copies of excerpts cited from the Barron's Dictionary are included herewith in the attached Exhibit D.)]

The specifications of the patents in suit also indicate that the claimed invention is directed to the above, generally accepted definitions of a "firewall."  The background of the invention, for example, states that the invention is related to "conventional firewall technology." ['192 patent, col. 39-42.]  The written description goes on to describe the benefits of the invention as applying to "the typical firewall which prevents inbound communications." ['708 patent, col. 2, ll. 34-37.]  The prior art references cited during the prosecution of the patents also refer to a firewall in this manner.  See, e.g., U.S. Patent No. 5,613,012 cited during the prosecution of the '192 and '708 patents (col. 91, ll. 13-14: "Firewall Machine: The Internet-local net router that regulates traffic into and out of the DPC.")  Accordingly, there is ample support for the claim construction set forth above.

### F.     First Device/Second Device ('221 claims 1, 4, 6 & 8)

The proper construction of the term is: ***An electronic device for storing workspace data.***  Once again, this term is clear on its face and  there is no deviation from the ordinary meaning of the word.  The term "device" is defined as "a piece of equipment or a mechanism designed to serve a special purpose or perform a special function." [Webster's Dictionary, p. 317.]  In the

context of the asserted claims, the purpose and function of the device is "storing first workspace data."

Seven asserts that a "first device" should be construed as being "located within a firewall-protected corporate LAN," and that a "second device" should be "located outside a firewall-protected corporate LAN." [Joint Statement, nos. 7-8.] None of the asserted claims recite the presence of a "firewall" or a "corporate LAN" claim element, nor do they include limitations directed to the location of the first and second devices with respect thereto. Seven is simply attempting to narrow the scope of the claims by improperly inserting limitations from the specification. *Fuji Photo Film,* 386 F.3d at 1105. The terms "first" and "second" are merely used as labels to designate one of one or more common terms within a claim, and there is no intrinsic evidence indicating an express intent to impart a novel meaning.

### G. General Synchronization Module/First General Synchronization Module/Second General Synchronization Module ('131 claim 16; '708 claims 7 & 8; '192 claims 10 & 11)

The proper construction of the term is: ***Software routines or code that perform the task of determining whether a workspace element and/or an independently modifiable copy thereof has (or have) been modified, based on one or more criteria.*** With respect to application or database files, "synchronization" is defined as "version comparisons of copies of the files to insure they contain the same data." [Microsoft Dictionary, p. 456.] A module is defined as "a collection of routines and data structures that performs a particular task or implements a particular abstract data type." [Microsoft Dictionary, p. 313. ] In the context of the claims, the function of the "general synchronization module" is to examine workspace elements or version information for modifications, which is consistent with the above-described definition of "synchronization."

Once again, Seven submits that the term should be construed as relating to determination based on the "content" of a workspace element. [Joint Statement, Exhibit B, nos. 9-11.] Specifically, Seven defines the term as including "routines for determining whether the content of a workspace element ... has been modified" and "routines for reacting to a determination of a

modification in content." The specifications of the patents in suit, however, expressly indicate that it is a "content-based synchronization module" that is used to examine the content of a workspace element, and not a "general synchronization module." [See, e.g., '192 patent, col. 7, ll. 38-42.] The '708 patent also expressly states that with the general synchronization module "no content based review of the changes is needed." ['708 patent, col. 7, ll. 40-44.] Rather, "[c]omputing the changes made may be performed by examining the current status against the previous status as of the last synchronization or by comparing the two versions." *Id.*

Seven also continues to assert that a "general synchronization module," a "first general synchronization module" and a "second general synchronization module" all require separate constructions (e.g., "first general synchronization module" relates to first "workspace element" and "second general synchronization module" relates to "second workspace element.") But the claims reciting "first" and "second" modules ('708 claims 7 and 8) already recite the relationship to first and second workspace elements. Therefore, only the term "general synchronization module needs to be construed, and the jury will be able to determine the meaning of "first" and "second." *Raytheon*, 2004 WL 952284, at 11.

### H. Independently Modifiable Copy ('131 claims 1, 31-33, 35 & 36; '708 claims 5, 21 & 24; '192 claims 1, 6-8, 10, 11 & 22)

The proper construction of the term is: *a copy of a workspace element capable of being modified independent of the workspace element. The copy does not have to be an exact copy.* This construction is apparent from the ordinary meaning of the words. A "copy" is defined as an imitation, transcript, or reproduction of an original work." [Webster's Dictionary, p. 256.] As recited in the asserted claims, the term is directed to a copy of a "workspace element" that is "independently modifiable" of the workspace element. According to the written descriptions set forth by the patents in suit, the term "copy" as used in the claims does not require an exact copy of a workspace element, but may be in a different format. *See, e.g.*, the '708 patent, which states: "The system includes a first store for storing a first workspace element in a first format, [and] a second store for storing a second workspace element which is an independently

modifiable copy of the first workspace element in a second format." ['708 patent, Abstract.] Based on these separate formats, a workspace element may include information such as headers or other ID flags that are not included in its independently modifiable copy, and vice-versa. In one exemplary embodiment directed to a bookmark workspace element, for example, "a bookmark in Format A needs elements X, Y and Z and a bookmark in Format B needs elements W, X and Y." ['708 patent, col. 8, ll. 47-54.]

According to Seven's proposed construction, an "independently modifiable copy" must be "stored on a global server." [Joint Statement, Exh. B, no. 12.] None of the asserted claims, however, recite the presence of such a limitation. There is also no indication in the specifications of the patents in suit to limit the term "independently modifiable copy" in this manner. In fact, exemplary embodiments are provided that indicate copies of workspace elements are stored on other than a global server. The '708 patent describes, for example, "workspace data 116 [on a remote terminal such as a smart telephone], which may include information common with information in the workspace data 136 [residing on a client server in a LAN]," and that the system "synchronizes workspace data 136 with workspace data 116." ['708 patent, col. 3, ll. 42-47.] Copies of workspace elements are also described as being stored at both first and second stores in cases of content based synchronization. ['192 patent, col. 2, ll. 13-17.] It is further noted that claim 1 of the '192 patent recites that the independently modifiable copy is stored at a second store. Claim 2, which depends from claim 1, recites that "the second store is on a global server." The doctrine of claim differentiation therefore prevents limiting an "independently modifiable copy" in the manner suggested by Seven. "[T]he doctrine of claim differentiation normally means that limitations stated in dependent claims are not to be read into the independent claim from which they depend." *Innova/Pure Water*, 381 F.3d at 1123 (citations omitted).

Finally, Seven submits that an independently modifiable copy must have "content" that is capable of being modified. As previously discussed above, however, a claim construction reciting the "content" of a workspace element or an independently modifiable copy thereof

improperly limits the relevant terms or phrases to a single exemplary embodiment described by the specification.

## I. Last Synchronization Signature ('708 claims 8 & 24)

The proper construction of the term is: *information regarding synchronization actions carried out with respect to a workspace element*. With respect to application or database files, "synchronization" is defined as "version comparisons of copies of the files to insure they contain the same data." [Microsoft Dictionary, p. 456.] "Signature" is defined as "a sequence of data used for identification, such as text appended to an e-mail." [Microsoft Dictionary, p. 430.] The specification of the '708 patent indicates that a synchronization signature may include information about synchronization of workspace element versions "such as last synchronization date and time" and is consistent with these definitions. ['708 patent, col. 7, ll. 24-26.]

Seven asserts that a "synchronization signature" must be defined as being "computed by the general synchronization module." [Joint Statement, Exh. B, no. 13.] Neither the claims nor the specification of the '708 patent, however, limit the term in this way. The written description expressly indicates that "the general synchronization module 515 may maintain its own last synchronization signature 435 copy (not shown) or may request the last synchronization signature 435 from the base system 146 or 118." ['708 patent, col. 8, ll. 36-39.] Seven also defines "synchronization signature" as indicating "the last date and time of synchronization." While the specification of the '708 patent does describe an exemplary embodiment where the synchronization signature does include information "such as last synchronization date and time," the language is exemplary, and there is no indication of an intent to limit the scope of the claimed invention to that embodiment. Accordingly, it would be improper to limit the claims as suggested by Seven. *Teleflex*, 299 F.3d at 1327.

## J. First Memory/Second Memory ('131 claims 1, 16, 31-33, 35 & 36)

The proper construction of the term is: *A medium where information can be stored and retrieved*. As generally defined, "memory can refer to external storage such as disk drives or

tape drives." [Microsoft Dictionary, p. 302.]   As another example, memory refers to "the semiconductor storage (RAM) directly connected to the processor." *Id.*

Seven asserts that a "first memory" should be construed as being "located within a firewall-protected corporate LAN," and that a "second memory" should be "located on a global server." [Joint Statement, Exh. B, nos. 14-15.] None of the asserted claims recite the presence of a "firewall," a "corporate LAN" or a "global server" claim element, nor do they include limitations directed to the location of the first and second devices with respect thereto.  Seven is simply attempting to narrow the scope of the claims by improperly inserting limitations from the specification. *Fuji Photo Film,* 386 F.3d at 1105.  The terms "first" and "second" are merely used as labels to designate one of one or more common terms within a claim, and there is no intrinsic evidence indicating an express intent to impart a novel meaning.

### K.    Modifications ('131 claims 1, 16, 31-33, 35 & 36)

The proper construction of the term is:  *Any changes related to a workspace element or an independently modifiable copy of the workspace element*.  This construction is apparent from the ordinary meaning of the word in the English language.  A "modification" is defined as "the making of a limited change in something." [Webster's Dictionary, p. 748.]  In the context of the asserted claims, the modifications are to "workspace element(s)" or to "an independently modifiable copy (or copies)" of the workspace elements.

Seven submits that the term "modifications" must be construed as being changes to the "content" of workspace elements or independently modifiable copies. [Joint Statement, Exh. B, no. 16.]  As previously discussed above, however, there is no basis for limiting the claims as relating to the "content" of a workspace element or independently modifiable copy.  With respect to the term "modifications," for example, the specification of the '131 patent describes an embodiment where "a workspace element has been modified if the date and time of last modification is after the date and time of last synchronization." ['131 patent, col. 7, ll. 26-29.] This language is an express indication that "modifications" are not limited to "content," but may involve changes to any attribute of a workspace element of independently modifiable copy,

including indicators such as read/unread status. The '708 patent, which is related to and incorporates the specification of the '131 patent, provides further evidence that the inventors did not intend to limit "modifications" to modifications in content. As illustrated by Figure 6 of that patent, information to be synchronized between workspace elements may also include deleted or other types of ID flags in addition to content. ['708 patent, Fig. 6 and col. 8, ll. 47-62.]

### L. Preferred Version ('131 claims 1, 16, 31-33, 35 & 36; '192 claims 1, 6-8,10,11 & 22)

The proper construction of the term is: *a version of a workspace element that is generated or selected from among one or more versions*. This term is clear on its face. "Version" is defined as "a form or variant of a type or original." [Webster's Dictionary, p. 1313.] As recited in the context of the asserted claims, the version relates to a form or variant of a workspace element. The specifications of the patents in suit describe a preferred version as one that is selected or generated from a workspace element or a copy of the workspace element (*i.e.*, another version of the workspace element). The preferred version may be generated, for example, by "forwarding the modified version (as the preferred version) of a workspace element in workspace data 1 85 or forwarding just a compilation of the changes to the other store(s)." ['192 patent, col. 5, ll. 61-65.] As another example, "the content-based synchronization module 430 may request a user to select the preferred one of the modified versions or may respond ... by integrating the changes into a single preferred version which replaces each modified version at both stores." ['192 patent, col. 6, ll. 22-27.]

Seven asserts that a preferred version is limited to being selected or generated from a "modified" version of a workspace element or a copy thereof. [Joint Statement, Exhibit B, no. 17.] Again, Seven is simply attempting to narrow the scope of the claims by improperly inserting limitations from an exemplary embodiment described in the specification. *Fuji Photo Film,* 386 F.3d at 1105. In some instances, it is true that a preferred version may be selected from a modified version. It is also possible, however, that the preferred version might not be modified, such as in a situation where a user selects the preferred version from a version of a

workspace element that has not been modified. Absent words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope, a claim term should be given the full range of its meaning. *Teleflex*, 299 F.3d at 1327.

### M. Previous Examination ('131 claims 1, 16, 31-33, 35 & 36)

The proper construction of the term is: *a prior examination of one or more workspace elements and/or one or more independently modifiable copies of the workspace elements, or data related thereto, to determine modifications.* Again, this term may be construed by reference to the ordinary meaning of the words as understood by one of ordinary skill in the art. "Examination" is defined as "the act or process of examining." [Webster's Dictionary, p. 403.] The adjective "previous" defines the examination as "going before in time or order." [Webster's Dictionary, p. 924.] As recited in the context of the claims, the term refers to an examination of workspace elements or independently modifiable copies of the workspace elements.

Seven submits that the term must also be construed as based on "comparing version information to a last synchronization signature." [Joint Statement, Exh. B, no. 18.] While the specification of the '131 patent does describe an exemplary embodiment where an examination is carried out by comparing version information to a last synchronization signature, there is no indication of an intent to limit the scope of the claimed invention to that embodiment. In fact, when summarizing the invention, the specification describes generating examination results based on an examination of version information alone. [See, *e.g.*, '131 patent, col. 2, ll. 22-30.] Accordingly, it would be improper to limit the term "previous examination" to comparing version information to a last synchronization signature as suggested by Seven.

Seven also asserts that the previous examination is to determine whether the "content" of a workspace element or independently modifiable copy thereof has been modified. Nowhere in the specification is the term defined in this manner and, as previously discussed above, there is no basis for limiting the claims to the "content" of a workspace element.

**N.  Global Server ('221 claims 1, 4, 6 & 8)**

The proper construction of the term is: *a computer or a related set of computers that mediate connections between data stores within and without a secured network and that may store data.* A "server" is defined as "a computer running administrative software that controls access to the network and its resources." [Microsoft Dictionary, p. 430.] "[A] file server may contain an archive of data or program files." *Id.* The specification of the '221 patent states "a server can be any computer which is polled by a client." ['221 patent, col. 16, ll. 52-53.] A "global server" is generally described as a server that allows a remote user to access services or data on a computer network. ['221 patent, Abstract.] "The global server is configured to identify and authenticate a user attempting to access it from a remote terminal, and is configured to provide access based on the client configuration either to the first set of workspace data stored on the client or to the second set of workspace data stored on the global server." ['221 patent, col. 2, ll. 57-63.] In other words, the global server is one that mediates the connection between the remote user and the computer network, and may store data. The storage may be for a brief period of time. This is made clear, for example, by claim 5 of the '221 patent, which further requires that storage "is continued after sending." The specification of the '192 patent, which is incorporated by reference into the '221 patent, also states that "although the global server is illustrated as a single device, the global server may include several computers networked together." ['192 patent, col. 7, ll. 62-65.]

Seven defines a global server as one that "stores independently modifiable copies of workspace elements and version information." [Joint Statement, Exh. B, No. 19.] Yet in the context of the asserted claims, the global server is recited as storing data comprising the above-defined "differences." As previously discussed, these differences comprise distinctions between information or values contained in sets of data, in this case "first workspace data" and "second workspace data." Seven's assertion that a global server must store "independently modifiable copies of workspace elements and version information" is drawn from an exemplary

embodiment set forth in the specification. The specification also expressly indicates, however, that workspace elements may not be stored on the global server if so desired:

> Further, a roaming user may be enabled to access workspace data from the global server or may be enabled to access *a service for accessing workspace data from a client*. For example, a user may prefer *not to store personal information on the global server* but may prefer to have remote access to the information. Further, the user may prefer to store highly confidential workspace elements *on the client* at work as added security should the global server be compromised. ['221 patent, col. 4, ll. 25-33 (emphasis added).]

The specification also contemplates that a global server may store other types of data besides copies of workspace data and version information, such as workspace data that is not stored on the network. ['221 patent, col. 2, ll. 54-56.] In view of the foregoing, there can be no doubt that Seven's proposed construction would improperly limit the scope of the claims.

Seven also submits that a global server must be "outside a corporate LAN and inside a global firewall." Once again, Seven is simply attempting to narrow the scope of the claims by improperly inserting limitations from the specification. *Fuji Photo Film,* 386 F.3d at 1105. None of the asserted claims recite the presence of a "corporate LAN" or a "global firewall" claim element, nor do they include limitations directed to the location of a global server with respect thereto. In fact, the '192 patent, of which the '221 patent is a continuation-in-part, includes claims reciting "a global server which is protected by a global firewall." [See, e.g., '192 patent, claim 12.] This distinction between a global server itself and a global firewall is further evidence that Seven's proposed construction is incorrect.

### O. First Store/Second Store ('131 claims 16, 31-33, 35 & 36; '708 claims 5, 8, 9, 21, 24 & 25; '192 claims 1, 6-8, 10, 11 & 22)

The proper construction of the term is: *a storage location for data that may reside on any type of memory device*. The term is apparent from the ordinary meaning of the word, which may be generally defined as "memory." [Webster's Dictionary, p. 1159.] To store is "to transmit a data item from the computer to a memory device." [Barron's Dictionary, p. 443.] This construction is also supported by the description of a "store" as set forth by the specifications of the patents in suit. The '192 patent, for example, indicates "the portion of memory in the data

storage device 2[3]0 which contains the service data 250 is referred to as the service 'store.'"
['192 patent, col. 4, ll. 35-38.]

Seven asserts that a store should be defined as "a permanent storage device, such as a magnetic hard disk, but not including temporary memory such as random access memory (RAM)." [Joint Statement, Exh. B, nos. 20-21.]  For support, Seven refers to an exemplary embodiment of a server within a LAN that is described as having "a data storage device 230 (such as read only memory or a magnetic disk)." [Joint Statement, Exh. C, No. 20 (citing '192 patent, col. 4, ll. 16-18).]  As discussed above, however, it is the "portion of memory" in the data storage device that is described as a "store," not the data storage device itself.  Moreover, the qualifier "such as" in the portion of the specification cited by Seven is exemplary in nature, and is not an expression "of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex*, 299 F.3d at 1327.  U.S. Patent No. 5,961,590 ("the '590 patent"), which is a continuation-in-part of the '708 patent, also indicates that when downloading e-mails to a remote terminal, the invention may store the e-mails on a data storage device, or it "may store the e-mails 1340 only in RAM 1335 so that at the end of the session copies of the e-mails 1340 do not remain at the remote terminal 1505." ['590 patent, col. 17, ll. 25-30. (Included in Exhibit A attached hereto.)]  This language expressly indicates that a "store" may be a memory storage location on RAM, and that the term is not limited to some type of "permanent storage device" as suggested by Seven.

Seven also submits that when the term "store" is labeled as being a "first" or "second," it imparts distinct structural or functional limitations described in the specification with respect to the exemplary embodiments, and that separate constructions are necessary.  Specifically, Seven defines a "first store" as being "located within a firewall-protected corporate LAN" and a "second store" as being "located on a global server."  Again, "[u]nless there is an express intent to impart a novel meaning to the claim terms, the words of the claim are presumed to take on the ordinary and customary meanings attributed to them by those of ordinary skill in the art." *Mars*, 377 F.3d at 1373.  None of these claims recite the presence of a "firewall-protected corporate

LAN" or a "global server" claim element, nor do they include limitations directed to the location of the first and second stores with respect thereto. The terms "first" and "second" are merely used as labels to designate one of one or more common terms within a claim, and there is no intrinsic evidence indicating an express intent to impart a novel meaning. In fact, other dependent claims not at issue evidence a clear intention to leave out the features suggested by Seven from the asserted claims. Claim 12 of the '192 patent, for example, depends from asserted claim 10 and recites that the second store is "on a global server which is protected by a global firewall." Likewise, claim 4 of the '708 patent recites that "the first store is in a LAN." Under the doctrine of claim differentiation, it would, therefore, be improper to limit the claims as suggested by Seven. *Innova/Pure Water*, 381 F.3d at 1123.

### P. Synchronization Agent ('131 claim 16; '192 claims 10 & 11)

The proper construction of the term is: ***software routines or code that send at least a portion of second version information to a general synchronization module for purposes of synchronization.*** With respect to application or database files, "synchronization" is defined as "version comparisons of copies of the files to insure they contain the same data." [Microsoft Dictionary, p. 456.] An "agent" is defined as "a program that performs a background task for a user and reports to the user when the task is done or some expected event has taken place." [Microsoft Dictionary, p. 19.] In the context of the claims, the purpose of the synchronization agent is for forwarding second version information (or "at least a portion" thereof) to a general synchronization module. The specifications of the patents in suit indicate that the synchronization agent cooperates with a general synchronization module on one or more base systems to synchronize workspace data, which is consistent with the above claim construction. [See, e.g., '192 patent, col. 3, ll. 46-67.]

According to the definition proposed by Seven, a synchronization agent must be "on a global server outside the firewall-protected corporate LAN," and must send version information to a general synchronization module "within a firewall-protected corporate LAN." [Joint Statement, Exh. B, No. 22.] There is simply no support for defining the term to include these

limitations.  None of these claims recite the presence of a "firewall-protected corporate LAN" or a "global server" claim element.  Only claim 10 of the '192 patent recites the location of the synchronization agent, and then it is only in terms of a "firewall," not a "fire-wall protected corporate LAN."  Other dependent claims not at issue evidence a clear intention to leave out the features suggested by Seven from the asserted claims.  Claim 12 of the '192 patent, for example, depends from asserted claim 10 and recites that the synchronization agent is "on a global server which is protected by a global firewall."  Under the doctrine of claim differentiation, it would, therefore, be improper to limit the claims as suggested by Seven.  *Innova/Pure Water*, 381 F.3d at 1123.

Once again, Seven is attempting to limit the scope of the claims by picking among limitations from the written description that are set forth with respect to exemplary embodiments.  While the synchronization agent is described in one embodiment as being on a global server, for example, the specification states in nonlimiting language that it is "*preferably* on the global server." ['192 patent, col. 3, ll. 44-46.]  Similarly, although  the written description does describe a general synchronization module as being within a firewall-protected corporate LAN, it also describes a general synchronization module located on a remote terminal:  "the remote terminal 105 may include a second base system similar to the base system 190" ['192 patent, col. 3, ll. 60-63.] ; "FIG. 4 is a block diagram illustrating details of the base system 190, which includes ... a general synchronization module 425." *Id.* at col. 4, ll. 60-65.]  In view of the foregoing, it would be improper to limit the claims to particular embodiments appearing in the written description when the claim language has broader effect.  *Innova/Pure Water*, 381 F.3d at 1117.

### Q.    Synchronization Start Module ('131 claim 16; '708 claim 9; '192 claims 10 & 11)

The proper construction of the term is: ***software routines or code that initiate synchronization***.  Again, this term requires no extraordinary explanation and may be construed by reference to the ordinary meaning of the words.  With respect to application or database files, "synchronization" is defined as "version comparisons of copies of the files to insure they contain

the same data." [Microsoft Dictionary, p. 456.] A module is defined as "a collection of routines and data structures that performs a particular task or implements a particular abstract data type." [Microsoft Dictionary, p. 313.] In the context of the claims, the task of the synchronization start module is "determining when to initiate synchronization" or "initiating the general synchronization module and the synchronization agent."

Seven asserts that the synchronization start module should be defined as being "located within a firewall-protected corporate LAN." [Joint Statement, Exh. B, no. 23.] Again, the asserted claims do not recite the presence of a "firewall-protected corporate LAN" claim element. Only claim 10 of the '192 patent recites the location of the synchronization start module, and then it is only in terms of a "firewall," not a "fire-wall protected corporate LAN." Furthermore, while the written description of the invention does provide an exemplary embodiment where the synchronization start module is located within a corporate LAN, there is no indication of an intent to limit the scope of the claimed invention to that embodiment. The specification of the '708 patent, for example, states that "communication with the synchronization agent 124 *preferably* initiates from within the LAN 10, because the typical firewall 114 prevents in-bound communications and allows out-bound communications." ['708 patent, col. 7, ll. 16-20 (emphasis added).] The use of the qualifier "preferably" indicates that the synchronization start module may be located within the LAN, but that it is also not required to be. "It is a familiar axiom of patent law ... that the scope of the claims is not limited to the preferred embodiments described in the specification." *Fuji Photo Film*, 386 F.3d at 1106.

### R. Translator ('708 claims 5, 8 & 9)

Claims 5, 8 and 9 of the '708 patent depend from claim 1. Claim 1 recites the limitation of "a translator for translating between the first format and the second format." The proper construction of the term is: ***software routines or code that convert information or data in one format to information or data in another format***. This construction is apparent from the ordinary meaning of the word, which is defined as "a program that translates one language or data format into another." [Microsoft Dictionary, p. 475.] This straightforward definition, from a

technical dictionary that was publicly available contemporaneously with the filing and issuance of the '708 patent, sets forth the appropriate construction. *Brookhill-Wilk 1,* 334 F.3d at 1294. Seven submits that the claimed translator is limited to a "global translator" described in an exemplary embodiment of the specification, and that it "can only translate between the global format and Format A or between the global format and format B." [Joint Statement, Exh. B, no. 24.] First, Seven is improperly limiting the claims to an exemplary embodiment. There is no indication in the intrinsic evidence of an intent to limit the scope of the claimed invention to that embodiment. Second, the specification does not even indicate that a global format must *always* be involved in the translation process, and this is simply a mischaracterization of the intrinsic evidence on the part of Seven. The specification states, for example, that if changes were made to only one version of a workspace element, "then the global translator 122 in step 750 translates the changes to the format used by the other store." ['708 patent, col. 9, ll. 55-58.] The specification does not indicate that a global format must be involved in this translation. Accordingly, it would be improper to deviate from the ordinary meaning of the term "translator" to include the limitations added by Seven.

### S.     Translating ('708 claims 5, 8, 9, 21, 24 & 25)

The proper construction of the term is: ***converting information or data in one format to information or data in another format***. Again, this term is clear on its face and there is no deviation from the ordinary meaning of the word. In programming, to "translate" means "to convert a program from one language to another." [Microsoft Dictionary, p. 475.] In the context of the asserted claims, "translating" is recited in terms of converting data between a "first format" and a "second format."

As with the term "translator," Seven asserts that translating must involve the use of a global format "to translate between a global format and a format A or between a global format and a format B." [Joint Statement, Exh. B, no. 25.] For the same reasons discussed above with respect to the term "translator," there is no basis for limiting the claims in this manner. Absent

words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope, a claim term should be given the full range of its meaning. *Teleflex*, 299 F.3d at 1327.

**T.    Version Information/First Version Information/Second Version Information ('131 claims 1, 16, 31-33, 35 & 36; '708 claims 8 & 24; '192 claims 1, 6-8, 10, 11 & 22)**

The proper construction of the term is: ***information that can be used to determine a version of a workspace element or data related thereto***. The ordinary meaning of "information" is defined as "the attribute inherent in and communicated by one of two or more alternative sequences or arrangements of something (as ... binary digits in a computer program)." [Webster's Dictionary, p. 599.]   The information may be "a signal or character (as in a communications system or computer)." *Id*.    A "version" is defined as "a translation from another language" or "a form or variant of a type or original." *Id*. at p. 1313. As recited in the asserted claims, version information relates to information about a version of a workspace element that may be used to determine whether the workspace element has been modified.

The specifications of the patents in suit are consistent with the ordinary meanings of the words and the construction set forth above. The written description, for example, states that "each workspace element folder or each workspace element individually is identified by particular version information." ['708 patent, col. 3, ll. 23-25.] Version information may be compared with a last synchronization signature, or with other version information "to determine if only one or both versions of a particular workspace element have been modified." ['192 patent, col. 5, ll. 55-59.] "This comparison may include comparing the date and time of last modification with the date of last synchronization, or may include a comparison between the current status and the previous status as of the last interaction." ['708 patent, col. 9, ll. 33-37.]

The prior art references cited during the prosecution of the patents also refer to version information in a manner consistent with the proposed construction. *See, e.g.*, U.S. Patent No. 5,386,564, col. 4, ll. 40-42 ( "Version[:] Contains the file format version number, which also serves as a signature."); U.S. Patent No. 4,875,159, Abstract (describing using information in the form of "sync-complete control bits" to determine whether a version of a data set has been

modified); and, U.S. Patent No. 5,600,834, col. 7, ll. 15-24. ("As time passes, a file with the same name will have different versions, which can be distinguished by their different timestamps.") Based on the foregoing, there is ample support for the claim construction set forth above.

According to Seven, version information must include "date and time of last modification." [Joint Statement, Exh. B, no. 26.] While the written description does discuss an embodiment where version information includes date and time of last modification, there is no evidence of an intent to limit the scope of the term to that embodiment. In addition to date and time, for example, version information is also described as including "status as of the last interaction with the global server.' ['708 patent, col. 5, ll. 35-38.] Moreover, dependent claims not at issue evidence a clear intention to leave out "date and time of last modification" from the definition of version information in the asserted claims. Claims 2, 3, 17, and 18 of the '131 patent, for example, depend from asserted claims 1 and 16 and recite that the version information "includes a date and time indicating when the first [or second] workspace element was last modified." Under the doctrine of claim differentiation, it would, therefore, be improper to limit the claims as suggested by Seven. *Innova/Pure Water*, 381 F.3d at 1123.

Seven's definition also states that version information must be limited to indicate "whether the content of a workspace element or the content of an independently modifiable copy of the workspace element, respectively, has been modified and excluding whether a peripheral characteristic of the independently modifiable copy has been modified." Again, and as previously discussed above, there is no basis for limiting claim terms to "content" of a workspace element or an independently modifiable copy thereof. The specification of the '131 patent describes, for example, an embodiment where "a workspace element has been modified if the date and time of last modification is after the date and time of last synchronization." ['131 patent, col. 7, ll. 26-29.] This language is an express indication that "modifications" are not limited to "content," but may involve changes to any attribute of a workspace element or independently modifiable copy, including indicators such as read/unread status. The '708 patent

provides further evidence that the inventors did not intend to limit "modifications" to modifications in content. As illustrated by Figure 6 of that patent, information to be synchronized between workspace elements may also include deleted or other types of ID flags in addition to content. ['708 patent, Fig. 6 and col. 8, ll. 47-62.]

Finally, Seven asserts that when the term "version information" is labeled as being a "first" or "second," it imparts distinct structural or functional limitations described in the specification with respect to the exemplary embodiments, and that separate constructions are necessary. Specifically, Seven defines "first version information" as being "stored within a firewall-protected corporate LAN" and "second version information" as being "stored on a global server." Again, "[u]nless there is an express intent to impart a novel meaning to the claim terms, the words of the claim are presumed to take on the ordinary and customary meanings attributed to them by those of ordinary skill in the art." *Mars*, 377 F.3d at 1373. None of these claims recite the presence of a "firewall-protected corporate LAN" or a "global server" claim element. The terms "first" and "second" are merely used as labels to designate one of one or more common terms within a claim, and there is no intrinsic evidence indicating an express intent to impart a novel meaning. In fact, other dependent claims not at issue evidence a clear intention to leave out the features suggested by Seven from the asserted claims. Claim 12 of the '192 patent, for example, depends from asserted claim 10 and recites that the second store is "on a global server which is protected by a global firewall." Under the doctrine of claim differentiation, it would, therefore, be improper to limit the claims as suggested by Seven. *Innova/Pure Water*, 381 F.3d at 1123.

U.  **Version Indicating Information ('221 claim 6)**

The proper construction of the term is: ***information that can be used to determine a version of a workspace element or data related thereto***. This term is merely a variation of the term "version information" and, for the reasons described above, has the same definition. Seven asserts that no definition of the term is discernable from the specification, presumably because there is not an exact citation to the phrase in the written description. [Joint Statement, Exh. B,

no. 29.] It can be easily ascertained from the discussion of version information in the specification, however, that "version indicating information" has the same meaning. For example, version information may indicate the status of a workspace element with respect to a last synchronization event. ['221 patent, col. 15, ll. 12-16. *See, also*, col. 14, ll. 60-63 ("The general synchronization module 825 in step 1515 sets the previous status of the workspace elements equal to the null set, which indicates that all information of the workspace element has been added.")] "Even when guidance is not provided in explicit definitional format, the specification may define claim terms 'by implication' such that the meaning may be found in or ascertained by a reading of the patent documents." *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004)(citations omitted).

### V. First Workspace Data/Second Workspace Data ('221 claims 1, 4, 6 & 8)

The word "data" means "an item of information." [Microsoft Dictionary, p. 129.] "In practice, data is often used for the singular as well as the plural form of the noun." *Id.* The proper construction of the term "workspace data" is: ***data that may include e-mail data, file data, calendar data, user data, etc. Workspace data may also include other types of data such as application programs***. This definition is drawn directly from the specification of the '221 patent, which expressly defines the meaning of the term. ['221 patent, col. 5, ll. 45-52.]

Seven defines workspace data as "a plurality of workspace elements or independently modifiable copies of workspace elements including version information and external status indicators." [Joint Statement, Exh. B, nos. 31-32.] This definition is overly limiting. While the specification does describe exemplary embodiments where workspace data may include data such as version information and external status indicators, there is no intrinsic evidence suggesting this is required. Furthermore, there is nothing to suggest that workspace data must include a "plurality" of workspace elements. As discussed above, the word "data" may be used for the singular as well as the plural. The specification states that workspace data "may each be divided into workspace elements." ['221 patent, col. 5, ll. 52-55.] Based on this description, it is evident that workspace data might comprise only a single workspace element.

Once again, Seven also submits that "first workspace data" and "second workspace data" require separate definitions. According to Seven, "first workspace data" must be stored "inside of the firewall-protected corporate LAN," and "second workspace data" must be stored "outside of the firewall-protected corporate LAN." None of the asserted claims recite the presence of a "firewall" or a "corporate LAN" claim element, nor do they include limitations directed to the location of the first and second devices with respect thereto. Seven is simply attempting to narrow the scope of the claims by improperly inserting limitations from specific embodiments of the specification. *Fuji Photo Film,* 386 F.3d at 1105. The terms "first" and "second" are merely used as labels to designate one of one or more common terms within a claim, and there is no intrinsic evidence indicating an express intent to impart a novel meaning. In fact, the specification of the '221 patent contemplates that "workspace data 180 or portions thereof may be stored at different locations such as locally on the client 165, on other systems in the LAN 125 or on other systems (not shown) connected to the global server 115." ['221 patent, col. 5, ll. 59-64.]

### W. Workspace Element/First Workspace Element ('131 claims 1, 16, 31-33, 35 & 36; '708 claims 5, 8, 9, 21, 24 & 25; '192 claims 1 ,6-8, 10, 11 & 22)

The proper construction of the term is: *a subset of workspace data*. According to the '708 patent, for example, "each e-mail or e-mail folder, file or file folder, calendar or calendar folder, bookmark or bookmark folder, document or document folder, etc. may be referred to as 'a workspace element.'" ['708 patent, col. 3, ll. 26-29.] The '192 patent further states that workspace data such as e-mail data, filed data, calendar data and user data "may each be divided into workspace elements." ['192 patent, col. 3, ll. 25-28.]

Seven submits that a workspace element must be defined as "excluding version information and excluding external status indicators indicating whether the e-mail, file, calendar, bookmark or data has been viewed or deleted by a user." [Joint Statement, Exh. B, no. 32.] This definition, however, is directly contrary to the descriptions of a workspace element as set forth by the patents in suit. The '708 patent, for example, describes an example of a bookmark

workspace element shown in Figure 6 that includes information such as "a user identification (ID) 605, and entry ID 610, a parent ID 615, a folder ID flag 620, a name 625, a description 630, the Uniform Resource Locator (URL) 635, the position 640, a deleted ID flag 645, a last modified date 650, a created date 655 and a separation ID flag 660." ['708 patent, col. 8, ll. 47-62.] In view thereof, there can be no doubt that it is possible for a workspace element to include data comprising version information (e.g., "last modified date") and external status indicators (e.g., "a deleted ID flag").

Seven also asserts that a "first workspace element" element must reside "on a first store within the firewall-protected corporate LAN." As discussed above, however, the terms "first" and "second" are merely used as labels to designate one of one or more common terms within a claim, and that there is no express intent to impart a novel meaning. Moreover, the asserted claims already recite the relationship of the first workspace element to other features. Therefore, only the term "workspace element" needs to be construed, and the jury will be able to determine the meaning of "first." *Raytheon*, 2004 WL 952284, at 11.

### X.  E-mail (no claims)

The term "e-mail" is not found in any of the asserted claims and, therefore, does not require construction by the Court.

## V.  PROPOSED CONSTRUCTION OF MEANS-PLUS-FUNCTION ELEMENTS

Visto and Seven also disagree on the construction a number of means-plus-function elements set forth in the claims, based on what structure should correspond to the recited function. While there are a number of means-plus-function elements to be construed, they involve a single common issue. Visto submits that the corresponding structure for each of the disputed means-plus-function elements should be defined as "software routines or code, or equivalents thereof, capable of performing the recited function." [Joint Statement, p. 3] Seven, on the other hand, insists that the corresponding structure must be defined in terms of specific hardware and/or software modules that are described with respect to exemplary embodiments set

forth in the patent specifications. *Id.* A decision by the Court on this one issue should, therefore, resolve the claim construction for all the disputed means-plus-function elements. Accordingly, Visto presents the following general discussion as relating to all of the means-plus-function elements, which should greatly simplify the present analysis. A list of the specific constructions proposed by Visto for each means-plus-function element is also included for the Court's convenience.

First, it is noted that the specifications of the patents in suit describe embodiments of software as implemented on an exemplary computer network. As such, what is shown and described is a software architecture comprised of functional modules interrelated in a certain way. Therefore, the structure that corresponds to the recited functions is the software itself, not the hardware on which it is installed. *See, e.g.*, this Court's holding in *Natl. Instruments Corp. v. The Mathworks, Inc.*, 2002 U.S. Dist. LEXIS 27577 at 27 (E.D. Tex. 2002), indicating corresponding structure comprises software: "the corresponding structure are various control or software modules." As such, there is no support for Seven's assertions that the corresponding structure for a disputed means-plus-function element must include hardware described with respect to the embodiments set forth in the specifications.

Including the specific software modules listed by Seven as part of the corresponding structure is also unnecessarily results in overly complex claim constructions where simplicity will do. The overall structure performing the recited functions can be considered the software itself. As previously discussed above, a "module" is simply a "a collection of routines and data structures that performs a particular task or implements a particular abstract data type." [Microsoft Dictionary, p. 313.] As such, the various modules described with respect to exemplary embodiments of the invention comprise a collection of routines that are sub-components of the software as a whole. As previously stated by this Court, "[a] jury need not and should not determine whether sub-components perform the claimed function if, as the case here, the overall structure performs the claimed functions." *Raytheon*, 2004 WL 952284 at 8.

### A.    Means for Generating a Preferred Version ('192 claims 10 & 11)

The proper construction of the phrase is: *Software routines or code, or equivalents thereof, capable of performing the recited function, namely, generating a preferred version from the first workspace element and from the copy by comparing the first version information and the second version information.*

### B.    Means for Storing the Preferred Version ('192 claims 10 & 11; '131 claim 16)

The proper construction of the phrase is:  *Software routines or code, or equivalents thereof, capable of performing the recited function, namely, causing the preferred version to be stored at the first store and at the second store.*

### C.    Synchronization Means for Synchronizing the First Workspace Element and the Second Workspace Element ('708 claims 5, 8 & 9)

The proper construction of the phrase is:  *Software routines or code, or equivalents thereof, capable of performing the recited function, namely, synchronizing the first workspace element and the second workspace element.*

### D.    Means for Determining Preferred Versions ('131 claim 16)

The proper construction of the phrase is:  *Software routines or code, or equivalents thereof, capable of performing the recited function, namely, determining preferred versions based on the first and second examination results.*

### E.    Means for Storing First Workspace Data on a First Device ('221 claim 8)

The proper construction of the phrase is:  *Software routines or code, or equivalents thereof, capable of performing the recited function, namely, causing first workspace data to be stored on a first device.*

F. **Means for Storing Second Workspace Data on a Second Device ('221 claim 8)**

The proper construction of the phrase is: *Software routines or code, or equivalents thereof, capable of performing the recited function, namely, causing second workspace data to be stored on a second device.*

G. **Means for Determining Differences Between the First Workspace Data and the Second Workspace Data ('221 claim 8)**

The proper construction of the phrase is: *Software routines or code, or equivalents thereof, capable of performing the recited function, namely, determining differences between the first workspace data and the second workspace data.*

H. **Means for Storing the Differences at a Global Server ('221 claim 8)**

The proper construction of the phrase is: *Software routines or code, or equivalents thereof, capable of performing the recited function, namely, causing differences to be stored at a global server.*

I. **Means for Sending the Differences From the Global Server to the Second Device ('221 claim 8)**

The proper construction of the phrase is: *Software routines or code, or equivalents thereof, capable of performing the recited function, namely, sending differences from the global server to the second device.*

## VI. CONCLUSION

For the reasons discussed above, and on the basis of the evidence presented, Visto respectfully requests that the Court interpret the disputed terms and phrases from the asserted claims as proposed above.

Dated: January 24, 2005

/s/ Sam Baxter

Sam Baxter
State Bar No. 01938000
MCKOOL SMITH P.C.
P.O. Box O
505 East Travis Street, Suite 105
Marshall, TX 75671
Telephone: (903) 927-2111
Facsimile: (903) 927-2622

Of Counsel:
Ronald S. Katz
Robert D. Becker
J. Bruce McCubbrey
MANATT, PHELPS & PHILLIPS, LLP
1001 Page Mill Road, Building 2
Palo Alto, CA 24304
Telephone: (650) 812-1300
Facsimile: (650) 213-0260

ATTORNEYS FOR PLAINTIFF
VISTO CORPORATION

20126138.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been served upon all

counsel of record at the addresses listed below by CM/ECF and/or U.S. Mail on January 24,

2005.

                                                _____/s/ Sam Baxter_____
                                                      Sam Baxter

Mr. Calvin Capshaw
Brown McCarroll, L.L.P
1127 Judson Road, Suite 220
Longview, TX 75606

and

Mr. Robert E. Camors, Jr.
Thelen, Reid & Priest, LLP
225 West Santa Clara Street, Suite 1200
San Jose, CA 95113