**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| VISTO CORPORATION, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | CIVIL NO. 2:06-CV-39 (TJW) |
| | § | |
| GOOD TECHNOLOGY, INC., | § | |
| | § | |
| Defendant. | § | |
| | § | |

**DEFENDANT GOOD TECHNOLOGY, INC.'S
<u>RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>**

# TABLE OF CONTENTS

**Page(s)**

I.      INTRODUCTION ................................................................................. 1

II.     LEGAL PRINCIPLES ........................................................................ 1

III.    THE '192, '221 AND '679 PATENTS.............................................. 5

    A.    The '192, '221 and '679 patents Are Directed Toward Batch
           Synchronization – Not Real-Time Two-Way Push ................................ 5

    B.    The Court Should Modify Its Prior Constructions of Certain Terms in
           Light of Phillips and to Clarify the Scope of the Claims ...................... 8

          1.    "version information" / "version indicating information" ('192: 1,
                  2, 8, 10, 17, 21 & 22; '221: 13; '679: 1).................................... 8

          2.    "examination results" ("first" and "second") ('192: 1, 2, 8, 21 &
                  22) ...................................................................................... 11

          3.    "independently-modifiable copy" / "the copy" ('192: 1, 2, 8, 10, 21
                  & 22) ................................................................................... 12

    C.    Good's Constructions of Other Terms in the '192 Patent Should Be
           Adopted............................................................................................ 13

          1.    order of the steps of method claims ('192: 1, 2, 8 & 22)....................... 13

          2.    "initiating … from within the firewall [through the
                  communications channel / through an Internet communications
                  channel] when predetermined criteria have been satisfied" ('192: 1,
                  2, 8, 10, 21 & 22) ................................................................. 16

          3.    "the firewall" / "the first firewall" ('192: 1, 2, 8, 10, 11, 21 & 22)......... 19

          4.    "storing" ('192: 1, 2, 8, 10 & 22)............................................... 20

    D.    Good's Constructions of Terms in the '679 Patent Should Be Adopted ............ 20

          1.    "independently-modifiable e-mail(s)" ('679: 1) ...................................... 20

          2.    "general synchronization module" ('679: 1, 12, 13 & 15) ...................... 21

          3.    "normally open LAN firewall port" ('679: 1 & 3) ................................ 22

          4.    "a first Internet Communications channel" ('679: 1) .............................. 23

          5.    "a plurality of second Internet communication channels, each
                  coupling said global server to a respective one of said smartphone
                  devices" ('679: 1)................................................................... 24

          6.    "server" ('679: 4, 8, 12 & 16) ................................................... 24

    E.    Good's Constructions of the Means-Plus-Function Terms Should Be
           Adopted............................................................................................ 25

                         GOOD'S RESP. CL. CONSTR. BRF

# TABLE OF CONTENTS
## (continued)

Page(s)

1. "means for updating the first version information whenever the first workspace element is modified" ('192: 17) ..................................... 26

2. "means for updating the first version information whenever the first workspace element is modified or updating the second version information whenever the copy is modified" ('192: 21) ......................... 27

3. "first means for generating first examination results from first version information which indicates whether a first workspace element stored at a first store within a firewall has been modified" ('192: 21) ..................................................................................................... 28

4. "second means for generating second examination results from second version information which indicates whether an independently-modifiable copy of the first workspace element has been modified, the copy being stored at a second store on a smart phone outside the firewall" ('192: 21) ..................................................... 29

5. "means for initiating the first and second means from within the firewall when predetermined criteria have been satisfied" ('192: 21) ........................................................................................................... 30

6. "means for generating a preferred version from the first workspace element and from the copy based on the first and second examination results" ('192: 21) ............................................................. 31

7. "means for storing first workspace data on a first device" & "means for storing second workspace data on a second device" ('221: 8) ..................................................................................................... 32

IV. THE '606 PATENT ........................................................................................ 34

A. The '606 Patent Is Directed Toward Technology for Preventing Unauthorized Access to Private Data on a Shared, Public Computer ................ 34

B. Good's Constructions of Terms in the '606 Patent Should Be Adopted ............. 35

1. "workspace data manager" ('606: 10, 11 & 19-21) ............................... 35

2. "untrusted client site" ('606: 10, 20 & 21) ............................................ 36

3. "access data temporarily" ('606: 20 & 21) ............................................ 37

4. "automatically disabling" ('606: 10 & 21) ............................................. 38

5. "after a user has finished using the data" ('606: 10, 20 & 21) ................. 39

6. "instantiator" ('606: 11) ...................................................................... 40

C. Good's Construction of the Means-Plus-Function Terms From the '606 Patent Should Be Adopted .......................................................................... 41

# TABLE OF CONTENTS
## (continued)

Page(s)

1.  "means for executing a workspace data manager on an untrusted client site" ('606: 20) ........................................................................ 41

2.  "means for requesting the workspace data manager to access data temporarily from a remote site" ('606: 20) .............................................. 42

3.  "means for downloading data from the remote site" ('606: 20) .............. 43

4.  "means for placing the data in temporary storage on the untrusted client site" ('606: 20) ........................................................................ 44

5.  "means for using the workspace data manager to present the downloaded data" ('606: 20) ................................................................. 44

V.    CONCLUSION ............................................................................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

## <u>CASES</u>

*ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*,
  346 F.3d 1075 (Fed. Cir. 2003)......................................................................... 40

*Altech Controls Corp. v. E.I.L. Instruments, Inc.*,
  44 USPQ2d 1890 (S.D. Tex. 1997) ..................................................................... 4

*Asyst Techs., Inc. v. Empak, Inc.*,
  268 F.3d 1364 (Fed. Cir. 2001)......................................................................... 43

*Automotive Technologies International v. BMW, et al.*,
  Case No. 2006-1012, -1037 2007 U.S. App. LEXIS 21271 (Fed. Cir. Sept. 6,
  2007) .................................................................................................................. 28

*Boss Control, Inc. v. Bombardier Inc.*,
  410 F.3d 1372 (Fed. Cir. 2005)......................................................................... 41

*Cytologix Corp. v. Ventana Med. Sys.*,
  424 F.3d 1168 (Fed. Cir. 2005)......................................................................... 23

*Gobeli Research, Ltd. v. Apple Computer Inc.*,
  384 F. Supp. 2d 1016 (E.D. Tex. 2005) ............................................. 25, 26, 28

*In re Graves*,
  69 F.3d 1147, (Fed. Cir. 1995)............................................................................ 3

*In re Trans Tex. Holdings Corp.*,
  No. 2006-1599, -1600, 2007 U.S. App. LEXIS 19909 (Fed. Cir. Aug. 22,
  2007) .................................................................................................................... 4

*Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*,
  450 F.3d 1350 (Fed. Cir. 2006)............................................................................ 3

*Intamin, Ltd. v. Magnetar Techs., Corp.*,
  483 F.3d 1328 (Fed. Cir. 2007)......................................................................... 16

*Loral Fairchild Corp. v. Sony Corp.*,
  181 F.3d 1313 (Fed. Cir. 1999)......................................................................... 13

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
  344 F.3d 1205 (Fed. Cir. 2003)......................................................................... 28

*On Demand Mach. Corp. v. Ingram Indus.*,
  442 F.3d 1331 (Fed. Cir. 2006)................................................................ 3, 11, 23

*Ormco Corp. v. Align Tech. Inc.*,
  No. 2006-1240, -1274, 2007 U.S. App. LEXIS 20185 (Fed. Cir. Aug. 24,
  2007) .............................................................................................................. 3, 37

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)................................................................... passim

*Process Control Corp. v. HydReclaim Corp.*,
  190 F.3d 1350 (Fed. Cir. 1999)................................................................... 14, 19

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Renishaw PLC v. Marposs Societa' per Azioni*,
  158 F.3d 1243 (Fed. Cir. 1998) ............................................................. 35

*Tex. Instruments, Inc. v. Linear Techs. Corp.*,
  182 F. Supp. 2d 580 (E.D. Tex. 2002) ................................................... 4

*Unidynamics Corp. v. Automatic Prods. Int'l*,
  157 F.3d 1311 (Fed. Cir. 1998) ............................................................. 29

*Unique Concepts, Inc. v. Brown*,
  939 F.2d 1558 (Fed. Cir. 1991) ....................................................... 15, 37

*Visto Corp. v. Sproqit Techs., Inc.*,
  445 F. Supp. 2d 1104  (N.D. Cal. 2006) ............................................... 4

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ............................................................... 2

## OTHER AUTHORITIES

Manual of Patent Examining Procedure
  Section 2173.05(e) .................................................................................. 14

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| Good | Defendant Good Technology, Inc. |
| Visto | Plaintiff Visto Corporation |
| Visto Br. | Visto Corporation Opening Claim Construction Brief dated August 27, 2007 (Docket No. 96) |
| '192 | U.S. Patent No. 6,085,192 (Exhibit A to Visto Br.) |
| '221 | U.S. Patent No. 6,708,221 (Exhibit C to Visto Br.) |
| '679 | U.S. Patent No. 7,039,679 (Exhibit D to Visto Br.) |
| '606 | U.S. Patent No. 6,151,606 (Exhibit B to Visto Br.) |
| Visto patents | U.S. Patent No. 6,085,192, U.S. Patent No. 6,708,221, U.S. Patent No. 7,039,679 and U.S. Patent No. 6,151,606 |
| GoodLink | Good Mobile Messaging Server |
| NOC | Good Network Operations Center |
| Microsoft Case | *Visto v. Microsoft*, Case No. 2:05-CV-546-DF (E.D. Tex.), dated Aug. 28, 2007 |
| Seven Case | *Visto Corporation v. Seven Networks, Inc.*, Eastern District of Texas Case No. 2:03-CV-333-TJW |
| Seven CC Order | Exhibit E to Visto Corporation Opening Claim Construction Brief  dated August 27, 2007 (Docket No. 96): |
| | Claim Construction Order dated April 20, 2005, *Visto Corporation v. Seven Networks, Inc.*, Eastern District of Texas Case No. 2:03-CV-333-TJW (Docket No. 145) |
| Visto Br. Ex. G | Exhibit G to Visto Corporation Opening Claim Construction Brief  dated August 27, 2007 (Docket No. 96): |
| | Visto's Opening Claim Construction Brief dated January 24, 2005, *Visto Corporation v. Seven Networks, Inc.*, Eastern District of Texas Case No. 2:03-CV-333-TJW (Docket No. 113) |

GOOD'S RESP. CL. CONSTR. BR.

**TABLE OF ABBREVIATIONS**
**(continued)**

PTO                    Patent & Trademark Office


NOTE:  All emphasis in this brief has been added unless otherwise noted.

# TABLE OF EXHIBITS

Exhibit 1        Asserted Claims of U.S. Patent No. 6,085,192, U.S. Patent No. 6,708,221
                 & U.S. Patent No. 7,039,679

Exhibit 2        Asserted Claims of U.S. Patent No. 6,151,606

Exhibit 3        Patent Rule 4-3 Joint Claim Construction and Pre-Hearing Statement
                 (Docket # 83)

Exhibit 4        Order re Claim Construction from *Visto v. Sproqit Technologies*,
                 Case No. C-04-0651-EMC (N.D. Cal.), dated August 4, 2006

Exhibit 5        Claim Construction Order from *Visto v. Microsoft*, Case No. 2:05-CV-546-DF
                 (E.D. Tex.), dated Aug. 28, 2007

Exhibit 6        '192, Ex Parte Reexamination Application No. 90/007,093, Prosecution History
                     -Amendment and Response to Office Action, dated April 7, 2005

Exhibit 7        '606 Prosecution History
                     -Amendment and Response, dated Feb. 14, 2000 (Paper No. 19)
                     -Supplemental Amendment, dated Mar. 9, 2000 (Paper No. 20)
                     -Office Action, dated Apr. 10, 2000 (Paper No. 21)

Exhibit 8        U.S. Patent Application No. 10/637,267

Exhibit 9        Microsoft Press Computer Dictionary (3rd ed. 1997)

Exhibit 10       Trial Transcript from *Visto v. Seven*, Case No. 2:03-CV-333-JW (E.D. Tex.),
                 dated April 25, 2006

Defendant Good Technology, Inc. ("Good") respectfully submits this Responsive Claim Construction Brief pursuant to P.R. 4-5(b) of the Rules of Practice for Patent Cases before the Eastern District of Texas and the Court's Docket Control Order dated November 17, 2006.

## I.    INTRODUCTION

Visto seeks to extend the claims of its patents far beyond what it ever disclosed to the PTO and the public, and thereby lay claim to real-time two-way push technology that it did not invent.  It does this by repeatedly violating the legal principles and policies set out by the Federal Circuit in *Phillips*.  It ignores and sometimes does violence to the ordinary and customary meaning of the claim language and construes terms in the abstract, divorced from the context of the invention.  It also calls for a *Texas Digital* redux, relying on general purpose dictionaries, Wikipedia entries and technical dictionaries carefully selected by term to provide gerrymandered constructions.  Good is not here seeking the wholesale importation of any limitation from the specification or prosecution history into the claims.  However, the intrinsic evidence is the single best guide to the meaning of a disputed term, and Good contends that with this guidance, the Court should adopt the constructions set forth below and in Good's Proposed Order.

## II.    LEGAL PRINCIPLES

Visto urges this Court to apply legal standards that are outdated and, in some cases, just wrong.  It is telling that Visto does not cite a single claim construction case decided after *Phillips*.  More telling is Visto's failure to cite *Phillips* for its central holding:  that claims should be construed in **context** and that "the specification **necessarily** informs the proper construction." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005).  In *Phillips*, the Federal Circuit held that while claims are given their ordinary and customary meaning, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the

specification." *Phillips*, 415 F.3d at 1314.  Visto ignores this context and seeks to construe terms

in the abstract, divorced from the surrounding claim language, from the other claims, from the

specification and from the prosecution history.

Visto would have us return to the approach of *Texas Digital*, "in which the court has

given greater emphasis to dictionary definitions of claim terms and has assigned a less prominent

role to the specification and the prosecution history."  *Phillips*, 415 F.3d at 1319 (overruling

*Texas Digital*).  Indeed, Visto suggests that *Phillips* stands for the proposition that the

specification and prosecution history are only relevant if there is "clear evidence" that the

patentee was acting as his own lexicographer to define a specific term.  Visto Br. at 4.  That is

not the law.  In *Phillips*, the Federal Circuit rejected this approach:

> In effect, the *Texas Digital* approach limits the role of the specification in claim
> construction to serving as a check on the dictionary meaning of a claim term….
> ***That approach, in our view, improperly restricts the role of the specification in
> claim construction***.
>
> Assigning such a limited role to the specification, and in particular requiring that
> any definition of claim language in the specification be express, is ***inconsistent
> with our rulings*** that ***the specification is "the single best guide to the meaning of
> a disputed term,"*** and that the specification "acts as a dictionary when it expressly
> defines terms used in the claims or when it defines terms by implication."

*Phillips*, 415 F.3d at 1320-21 (quoting *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582

(Fed. Cir. 1996)).  The patent system is based on the notion that claims cover only the invented

subject matter—construing terms in the abstract creates a risk of systematic overbreadth.  *See id.*

at 1321.

Numerous post-*Philips* Federal Circuit decisions re-affirm the propriety of the contextual

approach to claim construction.  In *On Demand Machine Corp. v. Ingram Industries,* the Federal

Circuit reversed a district court's broad interpretation of the term "customer" as not limited to a

*retail* customer, where the specification "repeatedly reinforce[d] its usage of the term 'customer'

as the retail customer."  442 F.3d 1331, 1339-40 (Fed. Cir. 2006) ("the claims cannot be of broader scope than the invention that is set forth in the specification").  Likewise in *Ormco Corp. v. Align Technology,* the Federal Circuit affirmed a narrow construction of claims (directed to design of orthodontic appliances) as the interpretation most naturally aligned with the invention's description in the specification.  No. 2006-1240, -1274, 2007 U.S. App. LEXIS 20185, at *9 -13, *19 (Fed. Cir. Aug. 24, 2007) ("[T]o attribute to the claims a meaning broader than any indicated in the patents and their prosecution history would be to ignore the totality of the facts of the case and exalt slogans over real meaning.").  *See also Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.,* 450 F.3d 1350 (Fed. Cir. 2006) (court relied heavily on specification to affirm narrow construction of claim terms).  Visto ignores these cases and *Phillips* in an attempt to extend its claims far beyond any disclosure in the patents.

Indeed, Visto even argues at times that its claims should be given their "broadest reasonable interpretation."  Visto Br. at 21-23.  But that is not the right standard.  *See Phillips*, 415 F.3d at 1316 (claims construed according to ordinary and customary meaning informed by context of the entire patent).  It is the standard used by the PTO ***during prosecution***:  "Claims during prosecution … are also given the broadest reasonable interpretation possible, consistent with the specification."  *In re Graves,* 69 F.3d 1147, 1152 (Fed. Cir. 1995); *see also Phillips*, 415 F.3d at 1316-17 (comparing PTO standard).  This "broadest reasonable interpretation" standard has never been applied outside the prosecution/reexamination context.

Finally, Visto asserts that *stare decisis* should govern the constructions in this case.  However, Visto is forced to acknowledge that the prior claim construction orders have no preclusive effect on Good.  Visto Br. at 6.  Good was not a party to Visto's earlier lawsuits, and so there can be no *res judicata* or collateral estoppel.  *See In re Trans Tex. Holdings Corp.,*

GOOD'S RESP. CL. CONSTR. BR.

No. 2006-1599, -1600, 2007 U.S. App. LEXIS 19909, at *15-17 (Fed. Cir. Aug. 22, 2007) ("We have never applied issue preclusion against a non-party to the first action.").  Indeed, due process requires that Good be given a full and fair opportunity to litigate these issues.  *Id.*

Moreover, after the Court's original claim construction order in *Seven*, the Federal Circuit issued its *en banc* decision in *Phillips,* which made clear that claims must be construed in context based on the intrinsic evidence, and rejecting the dictionary-centric approach of *Texas Digital*. In similar circumstances, courts have refused to apply *stare decisis.  See, e.g., Altech Controls Corp. v. E.I.L. Instruments, Inc.*, 44 USPQ2d 1890, 1901 (S.D. Tex. 1997) (prior decision with broader claim construction not binding, in part because it was issued prior to the Federal Circuit's *Vitronics* decision "which clarified the need to focus on intrinsic evidence").  In addition, Visto raised this same *stare decisis* argument in its other case against Sproqit.  There, the district court refused to apply *stare decisis* and distinguished the very same authorities relied on by Visto here.  *Visto Corp. v. Sproqit Techs., Inc.*, 445 F. Supp. 2d 1104, 1107-09 (N.D. Cal. 2006); *see also Tex. Instruments, Inc. v. Linear Techs. Corp.*, 182 F. Supp. 2d 580 (E.D. Tex. 2002) (no *stare decisis* effect for claim construction even where prior action in the same district).  Visto's argument is still further compromised by its failure to give *stare decisis* effect to any *unfavorable* claim constructions—including the constructions in the *Sproqit* case.  *See* Ex. 4 (*Sproqit* Claim Construction Order).

These legal principles support the constructions offered by Good as detailed below.[1]

---

[1] For the convenience of the court, the asserted claims of the '192, '221 and '679 patents are set forth in Exhibit 1, with the contested claim terms, phrases and limitations identified in bold type. The asserted claims of the '606 patent are set forth in Exhibit 2.

GOOD'S RESP. CL. CONSTR. BR.

### III.     THE '192, '221 AND '679 PATENTS

#### A.     The '192, '221 and '679 patents Are Directed Toward Batch Synchronization – Not Real-Time Two-Way Push

Visto has asserted three patents in this case all relating to data synchronization methods and systems:  U.S. Patent No. 6,085,192, U.S. Patent No. 6,708,221 and U.S. Patent No. 7,039,679.  These patents are related and share similar specifications.  All describe a system with three basic components.  The first is a client site (corporate LAN) operating behind a corporate firewall.  The second is a global server operating outside the corporate firewall.  And the third is a remote terminal (such as a home PC or a smart phone) also operating outside the corporate firewall.  *See, e.g.,* '192, Fig. 1; '221, Fig. 1, '679, Fig. 1.  This system is designed to synchronize workspace elements (such as documents and e-mails) between the global server and multiple sites independent of whether the sites are protected by firewalls.  *See* '192, col. 1:56-59.

According to the patents, the system includes a general synchronization module at the client site 135.  This module operates within a first firewall and examines first version information to determine whether a first workspace element stored at the client site has been modified.  For example, version information may consist of the date and time when the workspace element was last modified.  The system further includes a synchronization agent at the global server 120 for operating outside the first firewall.  This synchronization agent forwards to the general synchronization module second version information which indicates whether an



FIG. 1

independently-modifiable copy of the first workspace element has been modified.

The system includes means for generating a preferred version from the first workspace element and from the copy by comparing the first version information and the second version information—for example, the examination results may show that the user has not modified the first workspace element since the last synchronization, but has modified the copy, in which case the copy would be selected as the preferred version. Finally, the system includes a means for storing the preferred version at the first store and at a second store. *See generally* '192, col. 1:60-2:15.

These patents are describing "batch" synchronization driven by software behind a corporate firewall. Modifications to workspace elements and modifications to any independently-modifiable copies accumulate between periodic synchronizations. When the periodic synchronization process is initiated, all the changes to all the copies are collected and reconciled into a preferred version. *See* Ex. 9 (Microsoft Press Computer Dictionary) at 45 (batch synchronization operates on multiple accumulated transactions stored for a period of time, i.e., a "batch") & *compare id.* at 474 (in transaction processing, each transaction is executed immediately, i.e., in real time). The system includes a synchronization-start module behind the corporate firewall that initiates synchronization at predetermined times, such as start-up, shut-down, or timed intervals. Once initiated, the synchronization modules check the version information of workspace elements and copies both inside and outside the firewall to see if either have been modified since the last synchronization process. If there have been modifications, then these modifications are reconciled, and the resulting preferred version is stored at each location. *See* '192, col. 2:17-31. Thus, there is a single periodic process that reconciles any accumulated differences between the workspace element and the copy. Such batch processing is

GOOD'S RESP. CL. CONSTR. BR.

the opposite of "real-time" processing in which changes or other events are processed individually as they occur, i.e., in "real time."

The batch synchronization process disclosed and claimed in the Visto patents is very different from real-time two-way push technology used today in wireless e-mail services such as the ones offered by Good Technology. Real-time two-way push is not a batch process run at periodic intervals. Rather, real-time two-way push operates by monitoring user actions in real time both at a corporate mail server and at a handheld (e.g., smart phone) and immediately pushing the changes to the other side as the user makes them.

Like the system described in Visto's patents, the Good system includes three main components: the Good Mobile Messaging Server ("GoodLink") behind the corporate firewall, the Network Operations Center ("NOC") outside the corporate firewall and wireless handheld devices (such as the Motorola Q) also outside the corporate firewall. But that is where the similarities end. The Good system relies on an "always-on" connection between GoodLink and the handheld device. Both GoodLink and the handheld constantly monitor user changes. As soon as a change is detected at either end, it is encrypted and sent to the other end through the NOC using the "always-on" connection. For example, when a user reads an e-mail at his work computer, the mail server (e.g., Microsoft Exchange) notifies GoodLink of the change in status of the email from unread to read. GoodLink immediately creates a message with the status change, encrypts it, and sends it to the corresponding handheld. Similarly, if a user reads a new message on the handheld, the handheld software sends the user status change in an encrypted message to GoodLink using the "always-on" connection.

Real-time two-way push technology does not rely on version information to synchronize data. All modifications are immediately pushed to the other store and there are no "preferred"

versions.  Moreover, there is no "initiation" of synchronization from behind the firewall or otherwise.  The handhelds and the corporate LAN are always connected, and changes are pushed to the other end when they are made, i.e., in real time.  Further, there is no "global server" that stores independently-modifiable copies or serves as a central repository available to multiple remote clients.  There is a network operations center to route changes to the correct devices and servers, but data transmitted through this center is end-to-end encrypted, and thus it is not possible for a user to modify any data while it is in transit between end points.

In short, real-time two-way push technology is very different from what was described and claimed in the '192, '221 and '679 patents.  Nonetheless, Visto attempts to offer constructions completely divorced from the context of these patents and its invention in an attempt to cover this technology developed by others including Good.[2]

### B.    The Court Should Modify Its Prior Constructions of Certain Terms in Light of *Phillips* and to Clarify the Scope of the Claims

Good asks the Court to modify three constructions from its prior order in the *Seven* case. These proposed constructions clarify the ordinary meaning of the disputed terms in light of the intrinsic evidence.  Good offers these constructions in large part because Visto has interpreted the prior constructions in a manner contrary to their ordinary and customary meaning and inconsistent with the intrinsic evidence, including the claim language itself.

#### 1.    "version information" / "version indicating information" ('192: 1, 2, 8, 10, 17, 21 & 22; '221: 13; '679: 1)

Version-information is properly construed to mean "***information identifying a version of a workspace element or independently-modifiable copy that can be used to determine whether***

---

[2] Good has been awarded several U.S. patents for its two-way real-time wireless communications system.

*the workspace element or copy has been modified without examining the modifications*."[3]

Good's proposed construction is supported by the claim language and the specifications of the '192, '221 and '679 patents.

"Version information" is information about a version—it is not the version itself. Examples of version information disclosed in the patents include the date and time of the last modification.  '192, col. 4:31-33.  This is information about the version—i.e., when it was last modified—that can be used to determine whether the workspace element or copy has been modified.  It is not, however, the modifications themselves.  This is not say that version information cannot be part of a workspace element—for example, Word documents will often include a "last modified" field as part of the text of the document.  However, this version information is still distinct and separate from the actual modifications.

The claims of the '192, '221 and '679 patents make this distinction clear.  Claim 6 of the '192 patent, for example, requires "updating the first version information whenever the first workspace element is modified."  '192, cl. 6; *see also* '192, cls. 7, 17 & 18.  If a modification to a version is the same thing as "version information," then this claim (and other similar claims) would make no sense—version information would never need to be updated.  Similarly, claim 9 recites "locating the first workspace element, the first version information, the copy and the second version information."  '192, cl. 9; *see also* cl. 20.  Thus, it explicitly distinguishes the "version information" component from the entirety of the "workspace element" or "copy."   As made clear by *Phillips*, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term."  *Phillips*,

---

[3] Good has revised this proposed construction to address an issue raised by Visto in its opening brief.  *See* Visto Br. at 11.  Visto asserted that "the inventors did not intend to limit 'modifications' to modifications in content," using the term "content" narrowly.  Visto Br., Ex. G at 27-28.  Good has accordingly removed any reference to "content" from its construction to avoid any confusion on this issue.

415 F.3d at 1314.  Here, the other claims show that version information and modifications are not the same thing.

The specifications provide further support for this distinction.  As described in the specifications, version information is a short-cut, used to identify whether a workspace element or copy has been modified.  *See, e.g.,* '192, col. 1:60-2:10, 5:50-6:15; '221, col. 3:43-50, 11:11-16; '679, col. 3:52-59.  For example, the patents disclose routines that compare the version information against the last synchronization date and time.  '192, col. 5:50-55; '221, col. 11:11-16; '679, col. 11:19-23.  Using these routines, there is no need to examine the modifications themselves to determine whether the workspace element or copy has been modified—only the version information.  *Id.*  The patents also describe a ***separate content-based analysis*** for reconciling several modified versions.  *See, e.g.,* '192, col. 2:11-17, 6:16-28; '221, col. 3:50-54, 11:26-30, 42-57; '679, col. 3:59-64, 11:34-38, 50-65.  This analysis ***does not involve the examination of version information*** but instead integrates changes from two versions that have both been modified into a single preferred version by examining the modifications themselves or by asking the user to select one.  *Id.*  Thus, the specifications consistently use the term "version information" to refer to "information identifying a version of a workspace element or independently-modifiable copy that can be used to determine whether the workspace element or copy has been modified without examining the modifications."

Visto's proposed construction is based on a concatenation of general purpose dictionary definitions.  *But see Phillips,* 415 F.3d at 1321 ("The main problem with elevating the dictionary to such prominence is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent.").  The Federal Circuit has cautioned against just this approach:  "Care must be taken lest word-by-word definition, removed from the

context of the invention, leads to an overall result that departs significantly from the patented

invention." *On Demand,* 442 F.3d at 1344.  Visto's construction is divorced from the context of

the patents and ignores inconsistencies in the claim language—as discussed above, Visto's

construction attempts to erase any distinction between version information and the actual

modifications.  This contradicts the many claims requiring that version information be updated

when modifications are made.  *See* '192, cl. 6, 7, 17, 18, 21, 23-25.

Visto's construction is also based on an improper attempt to read the patents on real-time

push technology.  In real-time push, modifications made in one system (such as a desktop) are

immediately pushed to the handheld device and vice versa.  There is no "version information"

and thus Visto improperly argues that version information is the same thing as a modification.

### 2.    "examination results" ("first" and "second") ('192: 1, 2, 8, 21 & 22)

Here, Good has proposed only a slight modification to the Court's prior construction:

"information regarding one or more workspace elements obtained by examining *the version*

*information of* those workspace elements."  The claim language makes clear that the

examination results are generated *from version information*, not from the workspace element as

a whole or from the modification made to it.  For example, claim 1 of the '192 patent provides:

(*b*) generating first examination results from first version information which indicates whether a first workspace element stored at a first store within [a] *the* firewall has been modified;

([b]*c*) generating second examination results from second version information which indicates whether an independently-modifiable copy of the first workspace element has been modified, the copy being stored at a second store *on a smart phone* outside the firewall;

Visto suggests that Good is rearguing issues already raised by Seven.  However, Seven's

proposed construction looks nothing like Good's.  *Compare* Visto Br. at 10 n.1.  Moreover, there

is nothing in the specification or even in the claim language to support examination results

derived from the workspace element as a whole —in every instance, examination results are generated solely from the version information.  *See* '192, col. 2:17-25, cl. 1, 2, 6, 7, and 21-24.

### 3. "independently-modifiable copy" / "the copy" ('192: 1, 2, 8, 10, 21 & 22)

Good has likewise suggested only a minor clarification to the Court's prior construction of "independently-modifiable copy" to indicate that the covered modifications are those done ***by a user***.  The '192 patent is not about synchronizing "modifications" that happen as a result of normal computer data transmission, such as packaging or unpackaging as data is sent from point to point, or even about the accidental loss of data due to power failure or other unforeseen equipment failure.  It is about modifications made by users.

Visto claims that nowhere in the specification does the patentee require that a copy of a workspace element be capable of being modified by a user.  Visto Br. at 12.  But this is the entire point of the claimed invention.  As the Background describes, the problem in the prior art was that ***users*** maintained multiple independently-modifiable copies of a document at different locations:  "[B]y the time the ***user*** notices the inconsistency, interparty miscommunication or data loss may have resulted.  The ***user*** must spend more time attempting to reconcile the inconsistent versions."  '192, col. 1:31-36.  The point of centrally storing them at the global server is "for easy access ***by a user*** from the remote terminal 105."  '192, col. 3:33-36 & 1:40-43; '192 Reexam. Cert., col. 2:5-13 (referring to "***user*** workspace element[s]").  If independently-modifiable copies are not capable of being modified ***by a user***, how can there even be different versions?  Let alone versions that need to be (or should be) reconciled?  Indeed, if a version is corrupted due to power failure, the last thing the user would want is to spread the damage through synchronization.

Visto apparently is resisting any clarification to this construction because it would like to point to copies of workspace elements that are not modifiable by a user and call them "independently-modifiable copies."  These include transient copies of messages that are compressed and end-to-end encrypted during transmission such that they cannot be read—let alone modified—if they are intercepted in transit.  Such an interpretation of the Court's prior construction finds no support in the claim language or the specification.[4]

## C.   Good's Constructions of Other Terms in the '192 Patent Should Be Adopted

### 1.   order of the steps of method claims ('192: 1, 2, 8 & 22)

The order of the steps of the method claims of the '192 patent is determined by the logic and grammar of the claim language itself.  *See, e.g., Loral Fairchild Corp. v. Sony Corp.*, 181 F.3d 1313, 1321 (Fed. Cir. 1999) (claim language itself indicated that steps had to be performed in order because the second step required the alignment of a second structure with a first structure formed by the prior step).  Moreover, whether a specific order is required is an issue of claim construction and cannot be left to the jury.  *Id.*  Visto's ambiguous statement that there is no requirement for order "except as expressly set forth in the claims" simply begs the question:  what order is expressly set forth in the claims?

Claim 1 is representative.  The plain language of this claim requires that the steps be ordered as follows:  "***First step (a), then step (d), then steps (b) and (c) in interchangeable order, then step (e) and finally step (f)***."  The first step (a) requires that a communication channel be established.  This must be done before step (d), as this step involves communicating

---

[4] The '192 patent refers to encrypting data for transmission.  *See* '192, col. 5:1-11 (referring to SSL).  But it never refers to the encrypted transmissions as the modifiable copies.  In particular, the modifiable copies stored on the global server are decrypted when they are received and before they are stored so that they can be accessed and modified by users of the remote terminals. *See* '192, col. 3:33-40 (describing independently modified copies stored in the global server for easy access from remote terminals.)  Otherwise, they would not be independently-modifiable.  Dr. Head, Visto's technical expert, testified in the Seven trial that encrypted messages are not independently-modifiable.  *See* Ex. 10 (*Seven* Trial Tr.) at 58:3-5.

GOOD'S RESP. CL. CONSTR. BR.

1. A computer-based method comprising the steps of:

(a) *establishing a communications channel through a firewall using an HTTP port or an SSL port;*  **1**

(b) generating first examination results from first version information which indicates whether a first workspace element stored at a first store within [a] *the* firewall has been modified;  **3**

([b]c) generating second examination results from second version information which indicates whether an independently-modifiable copy of the first workspace element has been modified, the copy being stored at a second store *on a smart phone* outside the firewall;  **3**

([c]d) initiating steps ([a]b) and ([b]c) from within the firewall *through the communications channel* when predetermined criteria have been satisfied;  **2**

([d]e) generating a preferred version from the first workspace element and from the copy based on the first and second examination results, *wherein if only one of the first workspace element and the copy has been modified, then the step of generating includes selecting the one as the preferred version;* and  **4**

([e]f) storing the preferred version at the first store and at the second store.  **5**

"through *the* communications channel."  The communications channel must be the communications channel already established (or the claim would be indefinite as lacking antecedent basis).  *See* MPEP § 2173.05(e); *see also Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1356-57 (Fed. Cir. 1999) (construing claim term employing definite article "the" as having antecedent basis in the claim to avoid "any lack of antecedent basis problem").  If the communications channel has not been established, then step (d) cannot occur.  Step (d) further requires "initiating steps (b) and (c) from within the firewall … when predetermined criteria have been satisfied."  Thus, step (d) must occur before steps (b) and (c) since step (d) "initiates" these steps.  Steps (b) and (c)—generating first and second examination results—may occur simultaneously or in interchangeable order, but they must occur before step (e).  Step (e) requires generating a preferred version "based on the first and second examination results."  If those results do not yet exist, step (e) cannot occur.  Finally, step (f) requires storing the preferred version.  As this version is generated in step (e), step (f) must occur after step (e).  Similar logic compels the ordering of steps in claims 2, 8 and 22.[5]

---

[5] Visto contends that the method steps of Figure 6 "may occur in different sequences."  Visto Br. at 8.  That is beside the point and also wrong.  That is beside the point because the claims themselves dictate the ordering of the steps—not any disclosure in the specification and not Figure 6.  That is also wrong because Figure 6 is a flow chart that describes different outcomes based on different conditions.  The order of the steps is the same; only the conditions change. See '192, Fig. 6.

GOOD'S RESP. CL. CONSTR. BR.

Visto complains that Good's proposed construction would require that step (d) be performed separately before steps (b) and (c).  Visto Br. at 8.  However, step (d) explicitly requires "initiating steps (b) and (c) from within the firewall through the communications channel when predetermined criteria have been satisfied."  Even Visto agrees that "initiating" must at least mean "to cause or facilitate the beginning of."  Visto Br. at 13.  Yet Visto then goes on to argue that step (d) simply specifies the location from which step (b) and (c) must be initiated, i.e., from within the firewall.  This does violence to the plain language of the claim.  Step (d) does specify a location (from within the firewall).  It also specifies a means (through the communications channel).  But it also specifies a time (*when predetermined criteria have been satisfied*).  Visto would have the Court read out the last part of this limitation and get rid of any requirement that predetermined criteria trigger "initiation" of either steps (b) or (c), let alone *both* steps (b) *and* (c) as required by the claims.  Reading out express claim limitations is contrary to law.  *See Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1562 (Fed. Cir. 1991) ("All the limitations of a claim must be considered meaningful.").  Visto's construction is completely at odds with the plain meaning.

Finally, Visto argues that Good's construction requiring that step (e) occur before step (f) in claim 1 of the '192 patent would exclude a preferred embodiment.  Visto Br. at 9.  Step (e) refers to "generating a preferred version" while step (f) refers to storing the preferred version at the first store and at the second store.  Visto asserts that in one of the preferred embodiments, the preferred version is stored at one of the stores before it is actually generated.  *Id.*  Not so.  A first workspace element is stored in one store, and an independently-modifiable copy is stored in another store.  Neither is a "preferred version" until the preferred version is generated.  Rather, as described in the patent and in the claims, the version information of the workspace element

and the copy is examined to determine whether either has been modified.  If only one has been

modified since the last synchronization, then it will be selected as the "preferred version."  This

is step (e), "generating a preferred version ... wherein ... the step of generating includes selecting

the [modified] one as the preferred version."  It is only then that the "preferred version" is stored

as described in step (f) at a first and second store.  In one case, it will continue to be stored at the

same store, and in the other, it will forwarded for storage.  '192, col. 7:31-38.  Thus, Good's

construction does not exclude any preferred embodiment.  In any case, the Federal Circuit does

not require that every claim cover every embodiment.  *See Intamin, Ltd. v. Magnetar Techs.,*

*Corp*., 483 F.3d 1328, 1337 (Fed. Cir. 2007).

> **2.      "initiating … from within the firewall [through the communications**
> **channel / through an Internet communications channel] when**
> **predetermined criteria have been satisfied" ('192: 1, 2, 8, 10, 21 & 22)**

This phrase should be construed to mean "***starting the generating first examination***

***results step and sending a command from within the firewall [through the communications***

***channel/through an Internet communication channel] to start the generating second***

***examination results step when predetermined criteria have been satisfied***."  This construction

is compelled by the logic of the claim language and supported by the specification.

Visto contends that only the term "initiating" needs further construction and that this

phrase can otherwise be construed according to its plain meaning.  Normally, Good might agree.

However, Visto's "plain meaning" is so far a field from the claim language that construction is

necessary.  This is a real dispute, not an exercise in redundancy.

As an initial matter, Visto's proposed construction of the term "initiating" is so vague

that any act could constitute "initiating."  Visto proposes to construe this term to mean "to cause

or facilitate the beginning of."  This construction is plucked from a general purpose dictionary

and illustrates precisely why the Federal Circuit in *Phillips* warned against the use of such

dictionaries: "heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification." *Phillips*, 415 F.3d at 1321.

Under Visto's construction (and particularly its "facilitation" loophole), anything could be "initiating," including entering a computer room, turning the lights on, turning the computer on, and opening a program. But that is not what the specification is talking about. When the specification talks about initiating, it is referring to a "synchronization-start module" located at the client site behind the firewall that "initiates" the general synchronization module and the synchronization agent when predetermined criteria have been satisfied. '192, col. 2:2-5; *see also* '192, cl. 10 ("initiating the general synchronization module and the synchronization agent"). This causes the general synchronization module to examine first version information to determine whether a first workspace element has been modified and it causes the synchronization module to send a command to the synchronization agent at the global server outside the firewall to forward to the synchronization module second version information. '192, col. 1:52-2:2. As described in the specification, "[t]he synchronization-start module 420 initiates data synchronization by instructing the general synchronization module 425 to begin execution of its routines." '192, col. 5:42-45. These routines include routines "for requesting version information 124 from the synchronization agent 126." '192, col. 5:50-52.

Good has not proposed that these preferred embodiments be imported wholesale into the claims. Rather, it has offered a construction of the "initiating" step based on the meaning of this language to the artisan in context with the specification. In particular, the synchronization-start module "starts" the synchronization process, including the step of "generating first examination results" (this is step (b) in claim 1) and including sending a command from within the firewall to

the synchronization agent outside the firewall to "start" the step of "generating second examination results" (this is step (c) in claim 1).  And it does this "when predetermined criteria have been satisfied."  Good's proposed construction simply mirrors the ordinary and customary meaning of this language as it would be understood in context.

Visto's accusation that Good is importing limitations is without basis.  First, the "generating first examination results" step and "generating second examination results" step directly reference the steps initiated by the claims (for claim 1, these are steps (b) and (c), but for other claims, these are steps (a) and (b)).  Second, the "through the communications channel" and "through an Internet communications channel" limitations may appear nowhere in the '192 patent specification, but they do appear in claims 1 and 22 of the '192 patent.  These are obviously limitations of those claims (but not others, as indicated by the brackets).

Third, initiating the generating second examination results step is properly construed to mean "sending a command from within the firewall … to start the generating second examination results step."  The claims provide that the independently-modifiable copy is "***stored at a second store outside the firewall***."  Thus, while the initiating takes place within the firewall, the second examination results are generated outside the firewall.  This requires that some communication, i.e., a command, be sent to start the generating second examination results step. This command should not be confused with a user request to initiate data synchronization.  *See, e.g.,* '192, col. 5:35-39 (describing various "predetermined criteria" for initiating synchronization, including a user request).  A user request may trigger the initiating step, but this step then further requires that a command be sent to start the generating second examination results step at the second store.[6]  This is further supported by the specification as described above

---

[6] In the related *Microsoft* case, Judge Folsom recently addressed the construction of the "initiating" step in the '192 patent.  *See* Ex. 5 (*Microsoft* Claim Construction Order) at 12-14.

GOOD'S RESP. CL. CONSTR. BR.

and by the prosecution history.  *See* Ex. 6 ('192, *Ex Parte Reexam. App. No.* 90/007,093, 4/7/05

Amendment and Response to Office Action) at 13.

Visto twists the language of the claims again in its attempt to claim that it invented real-

time push technology.  Real-time push systems do not have a synchronization process initiated

behind a corporate firewall.  If a user makes a change on his smart phone, then that change is

immediately forwarded to the other end.  This is not initiated by anything behind the firewall.

Unlike the claimed invention, in a real-time push system, the server does not have to ask the

smart phone for changes.

### 3.    "the firewall" / "the first firewall" ('192: 1, 2, 8, 10, 11, 21 & 22)

The parties are apparently in agreement that "the firewall" in claims 1, 2, 8 and 22 must

refer to "***the firewall of step (a)***," that "the firewall" in claim 21 must refer to "***the firewall***

***within which the first workspace element is stored***" and that "the first firewall" in claims 10 and

11 must refer to "***the firewall through which the communication channel passes***."  Visto

merely contends that this meaning is evident from the plain language and that the surrounding

claim language provides all of the necessary context.  Indeed, this construction is compelled if

Visto is to avoid a finding that its claims are indefinite for lack of antecedent basis.  *Process*

*Control Corp.*, 190 F.3d at 1356-57.  Good has, however, requested this explicit construction

because Visto has argued in other cases that a different firewall than the one recited previously in

the claims can satisfy "the firewall" and "the first firewall" limitations.  Such an interpretation is

expressly contrary to the ordinary meaning.

---

Microsoft proposed construing "initiating" to mean "issuing a synchronization request."  The
Court, however, appears to have equated the "request" in Microsoft's construction with the "user
request" referred to in the specification.  *Id.* at 13.  As explained herein, they are not the same.
The Court also did not address the vagueness problems with Visto's proposed dictionary
construction.

4.       "storing" ('192: 1, 2, 8, 10 & 22)

Good agrees that "storing" needs no further construction.  As noted in the Court's prior

claim construction order, storing in the '192 patent must refer at least in some instances to

"transmission" rather than passive storage.  *See* Seven CC Order at 30.  Visto reaches the same

conclusion in its brief.  Visto Br. at 9 ("Then step f [the storing step] is completed when the

preferred version is ***forwarded*** to the other store.").  However, Good believes that the jury will

understand where the claims must be referring to transmission and where they may also be

referring to passive storage.  Accordingly, there is no dispute as to this term.

**D.       Good's Constructions of Terms in the '679 Patent Should Be Adopted**

**1.       "independently-modifiable e-mail(s)" ('679: 1)**

In the '679 patent, the patentees replaced the term "independently-modifiable copy" with

"independently-modifiable e-mail(s)."  Good has proposed a construction that tracks the Court's

prior construction of "independently-modifiable copy" (with the same "by a user" modification):

an independently-modifiable e-mail is "***a copy of an e-mail capable of being modified by a user***

***independent of the e-mail.  The copy of the e-mail does not have to be in the same format as***

***the e-mail.***"  *See* Seven CC Order at 16-17.  This is the construction that makes sense in the

context of the other claim language and is also consistent with the specification.  The

'679 patent, like the '192 patent, is concerned with synchronizing an e-mail in one store with an

independently-modifiable copy of an e-mail in another store.  '679, col. 2:57-3:6.  It makes no

sense whatsoever to synchronize e-mails that are not copies—the point is to synchronize the

same data accessible from multiple sites to preserve data consistency.  *See, e.g.,* '679, col. 2:14-

21.  Synchronizing non-copies would result in the ***loss*** of data.

Nonetheless, this is what Visto appears to have proposed for its construction of

independently-modifiable e-mail(s).  It suggests that an independently-modifiable e-mail is one

capable of being modified independent of "another version of the e-mail."  Visto Br. at 12.  Now, if by "another version of the e-mail," Visto means a copy, then perhaps there is no real dispute. However, what Visto really appears to be suggesting is that there could be an e-mail and another version of it (such as a version that has been forwarded and replied to) and that these should be synchronized.  Nowhere in the '679 patent, however, is this described—that patent only talks about synchronizing workspace elements (e.g., e-mails) and their independently-modifiable copies.  '679, *Abstract,* col. 2:58-62.  Judge Folsom agreed in his recent claim construction order in the *Microsoft* case, noting that "emails cannot be unrelated."  Ex. 5 at 16.  Good is not arguing that a copy must be an exact copy of the e-mail—indeed its construction specifically provides that "the copy of the e-mail does not have to be in the same format as the e-mail"—but the copy of the e-mail does have to be the same e-mail and not some other unrelated e-mail.

Whatever construction is adopted should also include the clarification that independent-modifiable e-mail is "modifiable" ***by a user***, for the same reasons set forth above.

## 2.     "general synchronization module" ('679: 1, 12, 13 & 15)

The differences in the parties' constructions of "general synchronization module" largely track the differences in their constructions of "independently-modifiable e-mail."  However, here Visto has further dropped any notion of "version" from its construction.  Indeed, there is no "synchronization" in the synchronization module as construed by Visto.  Instead, Visto simply alleges that the "synchronization module" determines whether one or more independently-modifiable e-mails has or have been modified (regardless of whether these e-mails have any relationship to each other and/or are copies of each other).  Visto also argues that the Court should not read in limitations from other claims in other patents.  This is a *non sequitur*.  This is not claim differentiation—this is construing a claim as it would be understood by a person of

GOOD'S RESP. CL. CONSTR. BR.

ordinary skill in the art in its particular context, which is the specification of the '679 patent.  *See*

*Phillips*, 415 F.3d at 1313, 1316.

### 3.    "normally open LAN firewall port" ('679: 1 & 3)

A normally open LAN firewall port is "***a port that is typically configured to be open for***

***network data to pass through a firewall***."  This construction is consistent with the ordinary

meaning of the claim language.  Visto's objection to the use of "network data" instead of "packet

traffic" is meaningless.[7]  Where the parties do depart is Visto's insistence on including

"exemplars" in its construction and the suggested implication that other normally open LAN

firewall ports—such as ports 110 (POP3), 143 (IMAP4) and 587 (STMP)—somehow do not

qualify.

Visto's proposal is apparently based on limitations in dependent claims of the

'679 patent.  These claims refer to the "HTTP port" and the "HTTPS (SSL) port" as normally

open.  The parties have agreed that an HTTP port is "any port that is used to transfer information

or communicate using [HTTP]."  *See* Ex. 3 (Joint Claim Construction and Pre-Hearing

Statement) at Ex. D, p.1 (also similarly construing SSL port).  Thus, any port that is used to

transfer information or communicate using HTTP or SSL would be encompassed by the broad

language in claim 1 of the '679 patent.  However, claim 1 is not limited to ports that use HTTP

or SSL, and it is certainly not limited to ports 80 and 443 (examples of "well-known" ports that

use HTTP or SSL).  "[T]he presence of a dependent claim that adds a particular limitation gives

rise to a presumption that the limitation in question ***is not present in the independent claim***."

*Phillips*, 415 F.3d at 1314-15.  Nonetheless, Visto proposes that the independent claim 1 be

---

[7] While Good believes that a jury is more likely to understand "network data" than the more technical terminology suggested by Visto, it does not believe that there is any meaningful difference between these constructions.  Indeed, Visto itself uses the term "network data" in the '606 patent to refer to the same type of "packet traffic."  '606, Title & col. 1:40-42 (field of invention).

GOOD'S RESP. CL. CONSTR. BR.

construed to specifically recite limitations in the dependent claims.  This language is not necessary and may mislead the jury to the extent it suggests that only ports 80 and 443 are "normally open."  At a minimum, if any examples are provided, they should also include other normally open ports such as ports 110, 143 and 587.

### 4.    "a first Internet Communications channel" ('679: 1)

Visto here again contends that no construction is necessary other than construction of the individual terms in the abstract, divorced from any context.  *But see On Demand*, 442 F.3d at 1344 (cautioning against "word-by-word" definitions).  Visto's strategy is designed to leave the door open for its experts to propose competing constructions to the jury—including constructions at odds with the alleged "plain meaning" of this phrase.  Such testimony would be improper.  *See Cytologix Corp. v. Ventana Med. Sys.*, 424 F.3d 1168, 1172 (Fed. Cir. 2005) (holding that the district court erred in allowing experts to opine on claim construction before the jury).

Good's proposed construction is based on the ordinary meaning of this phrase in the context of the claim in which it appears and of the specification.  Good's construction is consistent with the agreed construction of the term "communications channel" but includes the additional context this claims adds to the term.  Here, the term "Internet" qualifies "communications channel," making it a specific type of communications channel, "***an Internet Protocol (IP) connection for transferring data through the Internet***."  The contextual reading of claim 1 further indicates that this "first" Internet communication channel is the connection ***between the global server and the LAN server***, i.e., "coupling said LAN server to said global server."  In addition, because the patentee used the capitalized version of the word "Internet," the claim refers to the ***public Internet***.  The term Internet, is not defined in the intrinsic record, but is understood in the art to refer to "***the worldwide collection of networks and gateways that use the TCP/IP suite of protocols to communicate with one another***."  Ex. 9 at 258.

GOOD'S RESP. CL. CONSTR. BR.

Visto's "Internet" construction is explicitly based on the wrong claim construction standard.  *See* Visto Br. at 21 (relying on "broadest reasonable interpretation" standard from PTO).  Still further, Visto abandons the dictionary it uses to support its other constructions and instead turns to current "Wikipedia" websites of questionable authority or relevance.[8]  Visto's construction is also contrary to the specification.  Indeed, Visto itself cites language indicating that the Internet "currently interconnects about 100,000 computer networks and several million computers."  '679, col. 1:59-60.  This is the public Internet, what makes the Visto systems "accessible using any connected terminal… over any distance."  '679, col. 4:22-26; *see also* Seven CC Order at 14-15 (construing "firewall").

> **5.     "a plurality of second Internet communication channels, each coupling said global server to a respective one of said smartphone devices" ('679: 1)**

The parties' dispute with respect to this phrase is the same as the prior phrase.  The terms "Internet" and "Internet communications channel" should be construed consistently throughout the claims.  Moreover, the claim language here makes clear that, in contrast to the "first Internet communications channel," the "*second* Internet communications channels" are coupled between the global server and two or more smart phones.

> **6.     "server" ('679: 4, 8, 12 & 16)**

A "server" is "*a computer in a network that responds to commands from a client*."  Both parties agree that this is a term well-understood in the art.  Both parties also agree that technical dictionaries may be useful—indeed, Good's definition of a "server" is based on the very same definition of "server" that Visto itself quoted in the Joint Statement:  "**server** n.2.  On the Internet or other network, a computer or program that responds to commands from a client."  Ex. 9 at 430; *see also* Ex. 3 at Ex. F, p. 22.  However, Visto in its brief switches dictionaries to

---

[8] Visto never identified this extrinsic evidence in its Joint Statement.  Ex. 3 at Ex. F, p. 25-26.

find the broadest (and most vague) construction of the term "server," taking the flawed approach that the Federal Circuit condemned in *Phillips*. *Phillips*, 415 F.3d at 1319-24.

Moreover, the specification shows that the term "server" is used according to the construction offered by Good. For example, in all the cites to the specification Visto provides, the server performs the "services" (such as authentication) in response to commands from a client. *See, e.g.,* '679, *Abstract*. That is how servers work, in response to commands from a user seeking access from a client. Good's construction is also consistent with Judge Folsom's in the *Microsoft* case: "a computer or program that responds to commands or requests from a client." Ex. 5 at 18. Good has no objection to specifying that a server responds to "requests" as well as "commands" although there is no real difference between this terminology (a client makes a "request" by sending a "command" to the server).

**E.      Good's Constructions of the Means-Plus-Function Terms Should Be Adopted**

Visto's means-plus-function constructions suffer from the same basic defect. They ignore the context provided by the claim language and specification. *Phillips*, 415 F.3d at 1314; *see also Gobeli Research, Ltd. v. Apple Computer Inc.*, 384 F. Supp. 2d 1016, 1022 (E.D. Tex. 2005). The claims recite functions that must be performed at a specific location—for example, a server behind a corporate firewall or the global server or the smart phone. *See, e.g.*, '192, cl. 10 ("within the first firewall" and "outside the first firewall"); cl. 21 ("within a firewall," "on a smart phone outside the firewall"); '221, cl. 8 ("at the global server," "on a first device," "to the second device"). The specifications of these patents identify particular structures in each specific location, using different reference numbers for similarly named elements in different locations.

Visto, however, ignores the claim language and improperly identifies structures from all over the system that allegedly correspond to the recited function requiring a specific location. For example, Visto points to components of the global server as corresponding structure for a

means element that functions on a smart phone.  Visto Br. at 34.  This faulty approach permeates

Visto's constructions for the means-plus-function terms.  The Court should reject these

constructions because Visto is "improperly broadening the function [of the means elements] by

ignoring clear limitations contained within the claim language."  *Gobeli Research,*

384 F. Supp. 2d at 1022.

### 1.    "means for updating the first version information whenever the first workspace element is modified" ('192: 17)

The corresponding structures disclosed in the specification that perform the claimed

function are the "***Desktop service engine 345 or the service engine 245***."  The function claimed

requires updating ***first*** version information.  Claim 10 (from which claim 17 depends) shows that

the ***first*** version information is for the first workspace element ***within the first firewall***.  '192,

cl. 10.  Desktop service engine 345 and service engine 245 perform the recited function within

the first firewall.  '192, col. 4:31-38.  Desktop service engine 345 is on the Desktop Computer

160 and service engine 245 is on the corporate service servers 200.  '192, col. 4:7-49 & Figs. 1-

2, 5.

Visto agrees that the service engines are corresponding structures.  However, it further

identifies "general synchronization modules 425 or 510."  General synchronization module 425

is part of Base system 190 (on the remote terminal) and general synchronization module 510 is

part of the synchronization agent 126 (on the global server).  '192, Figs. 1, 4, 5.  Neither is

located within the first firewall.  *See id.*  Accordingly, they cannot be corresponding structures.

In addition, Visto is conflating updating of version information with updating the

workspace element.  While version information may be part of a workspace element, it is a

distinct component from that element—indeed, the recited function provides for updating version

information whenever the first workspace element is modified.  The citations Visto provides in

its brief describe how the general synchronization module 425 or 510 "update the outdated

workspace element" not the version information.  Visto Br. at 30.  The specification does not

disclose the general synchronization modules 425 or 510 updating version information.

Accordingly, there is nothing to indicate that these structures perform the claimed function.

> 2. **"means for updating the first version information whenever the first workspace element is modified or updating the second version information whenever the copy is modified" ('192: 21)**

The specification of the '192 patent does not disclose any structure that performs the

function of "updating the ***second*** version information whenever the copy is modified."  Claim 21

provides that the second version information is for the independently-modifiable copy of the first

workspace element "***on a smart phone*** outside the firewall."  '192, cl. 21.[9]

The '192 patent only describes smart phones as examples of the remote terminal 105.

'192, col. 3:58-60.  The specification states that "the remote terminal 105 may include a second

base system," which is described in Fig. 4.  '192, col. 3:60-63; *see also id.*, col. 3:63- 4:6.

Figure 4 depicts base system 190, which, as shown, does not include any service engine.  In fact,

as Figure 3 (the Desktop Computer within the firewall) shows, the service engine and the base

system are separate components:

 

'192, Figs. 3-4.  The specification does not describe that remote terminal 105 may also include a

service engine.  Accordingly, the specification does not disclose any structure on a smart phone

---

[9] This smart phone limitation was added by amendment during reexamination of the '192 patent. *See* '192, *Reexam Cert.,* col. 5:5.

that performs the function of "updating second version information whenever the copy [on the smart phone] is modified."  *See Gobeli Research*, 384 F. Supp. 2d at 1023 ("if the specification is not clear as to the structure that the patentee intends to correspond to the claimed function, then the patentee is impermissibly attempting to claim in functional terms unbounded by any reference to structure in the specification") (citing *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003)).[10]

>    3.    **"first means for generating first examination results from first version information which indicates whether a first workspace element stored at a first store within a firewall has been modified" ('192: 21)**

The corresponding structure disclosed in the specification for this means element is "***the general synchronization module 425 of base system 190 in desktop computer 160 within the firewall***."  The claimed function requires that this means element generate examination results from the version information of the workspace element stored ***within a firewall***.  The general synchronization module 425 of base system 190 in desktop computer 160 is the only structure for performing the recited function that is also located "within the firewall."  There is also no description of any structure performing the examination of version information to determine whether a workspace element (or a copy) has been modified at any location other than the location where the workspace element (or copy) is stored.  *See e.g.*, '192, col. 5:52-55 (determining which versions have been modified at the Desktop) and 6:3-6 (determining which versions have been modified at the global server).  Thus, the recited function necessarily occurs "within a firewall"—the location where the workspace element is stored.

---

[10]  Thus, the amendment introduced new matter not supported or enabled by the specification. *See, Automotive Technologies International v. BMW, et al.*, No. 2006-1012, -1037 2007 U.S. App. LEXIS 21271, at *16-17, *28 (Fed. Cir. Sept. 6, 2007) (specification must enable each embodiment:  "in order to fulfill the enablement requirement, the specification must enable the full scope of the claims").

While Visto agrees that the general synchronization module 425 of base system 190 in desktop computer 160 performs the recited function, it further seeks to avoid this specificity to allow for structures not located within the firewall.  As discussed above, a remote terminal 105 may include a second base system (with a general synchronization module 425).  But the remote terminal 105 is outside the firewall, and therefore, its modules cannot perform the recited function.  *See* Fig. 1.  Thus, simply identifying "general synchronization module 425" is inadequate—only the general synchronization module 425 of base system 190 in desktop computer 160 (within the firewall) corresponds to the recited function.

Visto also identifies general synchronization module 510.  But this is in the synchronization agent 126 of the global server 100—outside the firewall.  '192, Figs. 1 & 5.  The specification describes the generation of examination results exclusively at the location where the workspace element (or copy) is stored.  Thus, even if it were theoretically possible for the general synchronization module 510 in the global server to generate examination results of version information of a workspace element stored within the firewall, the specification contains no such disclosure.  Accordingly, the general synchronization module 510 is not a proper corresponding structure.  *See Unidynamics Corp. v. Automatic Prods. Int'l*, 157 F.3d 1311, 1319 (Fed. Cir. 1998) (holding that "[s]tructure disclosed in the specification, however, is only 'corresponding' structure to the claimed means under § 112, P 6 if the structure is ***clearly linked*** by the specification or the prosecution history to the function recited in the claim.").

4.    **"second means for generating second examination results from second version information which indicates whether an independently-modifiable copy of the first workspace element has been modified, the copy being stored at a second store on a smart phone outside the firewall" ('192: 21)**

The corresponding structure disclosed in the specification for this means element is "***the general synchronization module 425 of second base system in smartphone 105***."  As described

above, the specification discloses that the general synchronization module 425 in the base system

190 generates examination results from version information.  However, base system 190 is

located on desktop computer 160 within the firewall—not on "*a second store on a smart phone*

*outside the firewall*."  '192, Fig. 3.  Thus, it cannot be the structure that performs the claimed

function.  The remote terminal 105 may be a smart telephone, which "may include a second base

system similar to the base system 190."  Therefore, at best, the only structure described in the

specification that performs the generating function with respect to a copy stored on a smart

phone outside the firewall is the general synchronization module 425 of this second base system.

Visto's inclusion of a general synchronization module 510 on the global server is

improper because, as discussed above, the examination of version information is only described

as taking place in the same location where the workspace element is stored, in this case, on a

smart phone.  Therefore, the Court should reject Visto's construction.

### 5.        "means for initiating the first and second means from within the firewall when predetermined criteria have been satisfied" ('192: 21)

The corresponding structure disclosed in the specification for performing the claimed

function is "*synchronization-start module 420 of base system 190 in desktop computer 160*

*within the firewall*."  The parties agree that the synchronization-start module 420 is the proper

corresponding structure.  '192, col. 5:35-49.  However, Visto's construction is wrong because it

would include the synchronization-start module 420 in the second base system on remote

terminal 105, which is not within the firewall as the claim requires.  '192, col. 3:41-57 & Fig. 1.

Nowhere does the patent disclose a synchronization start module outside the firewall initiating

anything "from within the firewall."  Therefore, Good's accurate construction should be adopted

by the Court.

6.      **"means for generating a preferred version from the first workspace element and from the copy based on the first and second examination results" ('192: 21)**

The corresponding structure disclosed in the specification for this means element is the

"*general synchronization module 425 of base system 190 in desktop computer 160*."  The

claimed function, when read in context with the rest of the claim language, requires generating a

preferred version from a workspace element stored inside the firewall and from a copy stored on

a smart phone outside the firewall.

The specification describes the general synchronization module 425 in desktop computer

160 generating a preferred version from version information received from the global server

outside the firewall and version information of the workspace element stored within the firewall.

'192, col. 5:61-65 & col. 7:27-30.  The specification also states that "although not described in

great detail, the remote terminal 105 [(e.g., smart phone)] can synchronize copies of workspace

elements stored on it with workspace elements of workspace data 123 stored on the global server

120." '192, col. 7:65- 8:1.  Accordingly, while not described in detail, there is a possibility that

the version information the desktop computer 160 receives from the global server corresponds to

a copy stored on a remote terminal (smart phone).[11]  Thus, at best, the general synchronization

module 425 on desktop computer 160 is the only possible corresponding structure for this means.

Visto improperly identifies the general synchronization module 510 and the content-

based synchronization module 430 as structures corresponding to the claimed means.  These

structures do not correspond to the claimed means element because the specification does not

describe these elements performing the claimed function.  The general synchronization module

510 is located on the global server.  While the specification discloses the general synchronization

---

[11] The '192 patent does not describe synchronizing directly from a remote terminal (smart phone) to a computer inside the corporate firewall.

GOOD'S RESP. CL. CONSTR. BR.

module 510 forwarding version information to the general synchronization module 425 (inside the firewall) so that it can generate the preferred version, the specification does not disclose the reverse—i.e., nothing indicates that general synchronization module 425 inside the firewall forwards version information to the one on the global server.  *See* '192, col. 6:42-46 ("[t]he general synchronization module 510 includes … routines for forwarding to the general synchronization module 425 version information 124 determined to be modified") & col. 7:8-15 ("the general synchronization module 510 … forwards the version information 124 … to the general synchronization module 425").)  Accordingly, there is no disclosure in the specification of the general synchronization module 510 performing the claimed function.

The content-based synchronization module also an improper structure.  The claimed function is limited to generating a preferred version "***based on*** the first and second ***examination results***" obtained from first and second ***version information***.  As disclosed in the specification, when the general synchronization module 425 is unable to generate a preferred version based on the examination results of the version information, only then does it instruct the content-based synchronization module 430 to reconcile the two modified versions.  '192, col. 5:65- 6:2.  The content-based synchronization module 430 "may request a user to select the preferred one of the modified versions" or may respond by "storing both versions in both stores or by integrating the changes into a single preferred version."  But none of these functions are "***based on*** the first and second ***examination results***."  Therefore, the content-based synchronization module 430 is not a structure that corresponds to the claimed means.

### 7.    "means for storing first workspace data on a first device" & "means for storing second workspace data on a second device" ('221: 8)

The corresponding structures disclosed in the specification for these two means elements are the "***data storage devices 250, 350 and 720***."  '221, Figs. 2, 3 & 7.  As the Court noted in its

prior constructions in the *Seven* case, "the patentee used the word 'storing' to refer to the act of passively maintaining data" on the device in memory.  Seven CC Order at 32.  The specification makes clear that the passive storing of workspace data on the client 165 is the data storage device 720.  '221, col. 10:12-13 & Fig. 7 ("workspace data 180 may be stored in the data storage device [720].").[12]  Figure 3 shows that the global server stores "workspace data 163" in its data storage device 350.  '221, Fig. 3.  The corresponding structure in the other "device" disclosed in the specification, the remote terminal 105, is data storage device 250.  '221, Fig. 2.  These are the only structures described in the specification as "storing workspace data."

While Visto asserts that it is adopting the Court's prior construction of these elements, it actually incorporates language into its construction that was not there before, including the generic reference to "the physical memory structure on a [first or second] device."  Visto Br. at 38.  The Court used those words in explaining its construction of one of the means elements, but did not mention those words in its construction of the other, and in neither case did the Court incorporate this explanation as the corresponding structure of these terms, which it identified as "the data storage devices 250, 350, and 720."  Seven CC Order at 32.

This explanatory language in Visto's constructions makes them wrong.  For example, the specification describes RAM 260, RAM 370, and RAM 730, which could arguably be "physical memory structures."  However, there is no description in the specification of any of these structures "storing workspace data" and therefore these structures cannot correspond to the claimed means.  Accordingly, the Court should reject Visto's overbroad construction.

---

[12] A typographical error in the specification indicates that data storage device is element 330 but Figure 3 reveals that element 330 is the "Output Device" on the global server.  Therefore, the correct reference number is 720, which is the data storage device in the client shown in Figure 7.

GOOD'S RESP. CL. CONSTR. BR.

IV.     **THE '606 PATENT**

A.     **The '606 Patent Is Directed Toward Technology for Preventing Unauthorized Access to Private Data on a Shared, Public Computer**

As amended in prosecution, the claims of the '606 patent focus on a security mechanism for protecting user data downloaded onto a shared, public computer.  The claimed system is designed to allow a user to log on at a shared computer "kiosk" while ensuring that the user's downloaded data does not remain on the shared computer, where other later users could access it after the first user is finished.

Accordingly, in the prosecution history, Visto stated that the '606 patent describes a system for allowing a "traveling user" to "log on" to an appropriately configured "client site" to access, download and manipulate data from a remote site and to synchronize the downloaded data on the client site with the data on the remote site.  Ex. 7 ('606 Prosecution History, 2/14/00 Amendment and Response) at 6.  It became clear during prosecution that performing these steps alone was not sufficient to convince the examiner that the claims were novel and non-obvious. So Visto twice amended all claims to additionally require the specific security mechanism described in the patent.  *Id.; see also id.* (3/9/00 Supplemental Amendment) at 9.

The issued claims therefore require the "client site" where the traveling user logs on to be "untrusted," and require the system to "automatically" disable the client site from accessing the downloaded data "after a user has finished using the data."  During prosecution, Visto made clear that the claimed technique required the system to "delete[] the data stored locally" on the untrusted computer "[u]pon logout" from that computer.  *Id.* (3/9/00 Supplemental Amendment) at 10.

In order to succeed on its infringement claim in this case, however, Visto must distort the scope of these claims to cover a system that is nothing like the claimed security mechanism.  The

GOOD'S RESP. CL. CONSTR. BR.

accused Good Mobile Defense feature of Good's system permits a system administrator to remotely wipe the data off a user's handheld device if that device is lost or stolen.  In order to do so, the administrator – a human being – must enter commands on the GoodLink server, which are then transmitted to the handheld device.  Thus, Visto's infringement assertion depends, *inter alia*, on a construction of "untrusted client site" that includes a user's own, typically password-protected handheld device, a construction of "automatically disabling" that encompasses a conscious act by a human administrator, and a construction of "after a user has finished using the data" that is untethered to any triggering act indicating that the user is finished and that the downloaded data should, therefore, be deleted.  Such illogical constructions find no support in the intrinsic record, and should be rejected and replaced by Good's proposed constructions.[13]

**B.**    **Good's Constructions of Terms in the '606 Patent Should Be Adopted**

**1.**    **"workspace data manager" ('606: 10, 11 & 19-21)**

The correct construction for "workspace data manager" is ***"a program that allows a user to manipulate workspace data."***  Visto's proposal is similar, but omits the requirement that the user of the untrusted client site is who the workspace data manager allows to manipulate the data.  It is clear from the context of the patent's specification, however, that the user of the untrusted client site manipulates the workspace data.

---

[13] Significantly, more than five years after applying for the '606 patent, Visto filed U.S. Patent Application No. 10/637,267 ("the '267 application"), entitled "System and Method for Preventing Access to Data on a Compromised Remote Device."  Ex. 8.  Although it shares a named inventor with the '606 patent, the '267 application does not claim priority to the '606 patent or make any other reference to it.  The '267 application discloses a system and method for a "user in charge of data at an establishment" to "prevent misuse of data" on a "compromised remote device" by "transmitting an order to erase data to the remote device via the network."  *Id.* at ¶¶ 8-9.  That Visto sought a different patent for such a system in 2003 further belies its current attempt to stretch the claims of the earlier '606 patent.  *See Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) ("Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim.")

The specification discloses that the workspace data manager may include applications such as a Personal Information Manager (PIM), a word processing program or a spreadsheet program.  '606, col. 2:12-16.  All of these are programs that enable a ***user*** to manipulate data. The specification further defines the "manipulation" of data to refer to such tasks as "adding new data, deleting workspace data 135, editing workspace data 135, etc."  '606, col. 10:67-11:2.  For example, according to the specification, "the user can depress the email button 515 in interface 500 to select, review and manipulate email in interface 600, and then can depress the calendar button 530 in interface 500 to select, review and manipulate calendar information (not shown) in an interface similar to the e-mail interface 600."  '606, col. 11:2-7.  All descriptions relate to manipulation of data by the user; none refer to manipulation by anyone or anything else.  Thus, Good's proposed construction should be adopted.

### 2.    "untrusted client site" ('606: 10, 20 & 21)

The correct construction for "untrusted client site" is ***"a computer expected to be shared by users who are not authorized to access data from the remote site."***  The specification discloses that the claimed system and method "delete downloaded data and all interfaces from the local client, so that no traces are left on the client *for unprivileged users to review*."  '606, col. 3:6-9.  During prosecution, Visto specifically stated that this passage supports the claim amendment specifying "the client as 'untrusted.'"  Ex. 7 (3/9/00 Supplemental Amendment) at 9. Thus, the claimed client site is "untrusted" ***because it is expected to be shared by other users***, requiring the automatic deletion mechanism in order to avoid the possibility that "unprivileged" users of the same computer may be exposed to another user's data.

Visto's proposed construction makes far less sense.  That construction is clearly designed to read on a user's own handheld device, as long as the device can exist outside the corporate firewall and could theoretically fall into the hands of individuals who are not permitted to access

the data on it.  If such a construction were correct, however, the mechanism for "automatically"

deleting "the downloaded data and all interfaces" from the device whenever the user logs off

would result in a handheld email device that had all useful data and interfaces wiped from it over

and over.  The security might be fantastic, but it appears unlikely anyone would ever want to use

such a self-erasing device.

Even though the '606 specification lacks any such disclosure, Visto improperly injects

the words "or mobile device" into its construction.  This attempt to gerrymander a construction

that reads on the accused technology improperly reads the word "site" out of the claim term

"untrusted client site."  *See Unique Concepts*, 939 F.2d at 1563 (where claim language is clear

and a different interpretation would "render meaningless express claim limitations, we do not

resort to speculative interpretation based on claims not granted.").  The plain language of the

claim indicates that the drafter contemplated a physical place where a computer is located, not a

user's own handheld device.

### 3. "access data temporarily" ('606: 20 & 21)

The correct construction for the phrase "access data temporarily" is ***"obtain data for***

***temporary use but not for permanent storage."***  This construction is consistent with the entire

purpose of the system and method that is claimed in the '606 patent and described in the

specification and prosecution history.  *See, e.g., Ormco Corp.,* 2007 U.S. App. LEXIS 20185, at

*18 (narrowly construing claims to orthodontic appliances, noting that "[a]lthough their claim

language does not expressly recite automatic control of the finish tooth positioning, that is what

they mean, and that is all that the specification describes; the specification does not support

operator positioning.")  The claimed system and method "delete downloaded data" from the

untrusted client site when the user logs out "so that no traces are left on the client for

unprivileged users to review."  '606, col. 3:6-9; *see also* Ex. 7 (3/9/00 Supplemental

Amendment) at 9.  Obviously, since the data will inevitably be deleted from the client computer, it must be obtained only for temporary use, not for permanent storage.

### 4.   "automatically disabling" ('606: 10 & 21)

The correct construction for the term "automatically disabling" is *"disabling without a request to do so."*  The specification of the '606 patent discloses that in the patented system, a software module called the de-instantiator "deletes the workspace data on the client" and "deletes all records of the matter" as part of its function when the user ends its session on the untrusted client site.  '606, col. 11:11-20.  There is no request to disable the untrusted site; there is only a request to end the session.  The system handles the task of disabling access to the data "automatically."

The prosecution history is consistent with this interpretation.  During prosecution, Visto provided support for adding the "automatically disabling" limitation to the claims by pointing to the following quote from the specification:  "Upon logout, a de-instantiator initiates synchronization and deletes the data stored locally."  Ex. 7 (3/9/00 Supplemental Amendment) at 10.  Good's proposed construction for this term is therefore fully consistent with the intrinsic record and with the common understanding of the word "automatically,"  without a request to do so.

By contrast, Visto's proposed construction for "automatically disabling" improperly distinguishes among human participants, i.e., "users" and "administrators," based on nothing in the claim or intrinsic evidence.  That construction – "Preventing further access without user intervention" – would be satisfied if any one of the estimated 6.7 billion human beings on the planet intervened to perform the step of "automatically" disabling the untrusted client site – *except* the site's user.  In other words, a system administrator or any other person could practice this "automatic" step, even if they had to spend all day punching buttons on a computer keyboard

to do so, as long as they are not the user of the untrusted client site that is to be disabled.  While

such a construction is necessary if Visto is to have a prayer of showing infringement, it cannot

possibly be right.

Nor does Visto's construction find any support in the intrinsic or extrinsic record.  Visto

cites nothing from the specification or prosecution history that could reasonably be interpreted as

supporting Visto's position.  Even the dictionary definition on which Visto relies contradicts

Visto's own proposed construction.  Visto cites a dictionary that defines "automatically" as "(of

a device or process) working by itself with little or no direct **human** control."  Visto Br. at 26.

As noted above, operation without "human control" is a far cry from operation "without user

intervention."  The former excludes control by the entire population of the Earth; the latter by a

single individual – the user.  Thus, Visto's proposed construction should be rejected, and Good's

should be adopted.

### 5.    "after a user has finished using the data" ('606: 10, 20 & 21)

The correct construction for the phrase "after a user has finished using the data" is ***"when***

***the user of the workspace data manager at the shared computer gives an indication that he/she***

***is done using the downloaded data."***  This construction finds support in the intrinsic record of

the patent.  When Visto amended its claims to require that the process of "automatically

disabling" the untrusted client site occur "after a user has finished using the data," Visto referred

the examiner to the portion of the patent's specification that states, "***Upon logout***, a de-

instantiator initiates synchronization and deletes the data stored locally."  Ex. 7 (3/9/00

Supplemental Amendment) at 10.  The examiner allowed the amended claims immediately after

Visto made the remarks, identifying them in the "examiner's statement of reasons for allowance"

as distinguishing the claimed invention from the prior art, including on the claim limitation at

issue here.  Ex. 7 (4/10/00 Office Action) at 2-3.  Visto did not respond to this statement.  Thus,

in light of the statements by Visto and the examiner's reaction to them, the process of disabling

the untrusted client site occurs when the user "logs out" – i.e., when the user "gives an indication

that he/she is done using the downloaded data."  *See ACCO Brands, Inc. v. Micro Sec. Devices,*

*Inc.,* 346 F.3d 1075, 1079 (Fed. Cir. 2003) (relying on comments made in an Examiner's

Statement for Reasons of Allowance to limit claim scope where examiner repeated patentee's

arguments).

The patent's specification is consistent with this interpretation.  In addition to the "[u]pon

logout" language, the specification further describes the de-instantiator's performance of the

"disabling" task as occurring "upon receiving an 'end session' or 'unborrow me' request."  '606,

col. 11:11-20.  Again, the user indicates that he or she is done using the data, and the system

automatically deletes the data from the untrusted client site.

As with "automatically disabling," Visto's proposed construction for the phrase "after a

user has finished using the data" cannot possibly be correct.  Visto contends that no construction

is necessary and that the plain meaning of this phrase should control.  But under Visto's "plain

meaning" construction, there is no connection between any act ending the user's session with the

data and the automatic deletion of the data – the deletion merely has to occur after the user has

finished using the data.  Visto's vague construction thus deprives the system of the necessary

trigger for performing the "automatically disabling" step.  As discussed above, the intrinsic

record supports Good's interpretation, where such a trigger must exist.

### 6.    "instantiator" ('606: 11)

The correct construction for the term "instantiator" is ***"a software routine that creates an***

***operating system window on the display of the shared computer for displaying and enabling***

***the manipulation of the workspace data."***  This construction is a classic example of a patentee's

acting as its own lexicographer and providing an explicit definition of a claim term.  *See Boss*

*Control, Inc. v. Bombardier Inc.*, 410 F.3d 1372, 1379 (Fed. Cir. 2005) (holding that "the intrinsic evidence binds [patentee] to a narrower definition of 'interrupt' than the extrinsic evidence might support" because specification gave a special definition to "interrupt" term).  The specification of the '606 patent states, in concrete terms, "The instantiator 730 is an application program interface that creates a window for displaying and enabling the manipulation of the workspace data downloaded from the global server."  '606, col. 8:62-64.  Good's proposed construction adopts this language, with the indisputable clarifications that an "application program interface" is a software routine, that a window is created by an operating system, and as discussed above, that the "untrusted client site" where all of this occurs is a shared computer.

### C.   Good's Construction of the Means-Plus-Function Terms From the '606 Patent Should Be Adopted

#### 1.   "means for executing a workspace data manager on an untrusted client site" ('606: 20)

The corresponding structure for the "means for executing" limitation is ***processor 405, internal storage 435[14] and operating system 440 on the remote client 120***.  The parties therefore agree on portions of the corresponding structure for this limitation, but disagree in two respects: (1) whether internal storage is part of the structure for performing the recited function (Good contends it is; Visto contends it is not), and (2) whether analogous components on the home and work clients may be part of the corresponding structure (Good contends that only the remote client 120 is an "untrusted client site"; Visto disagrees).

The specification explicitly states that internal storage 435 is a required structure for execution of software:  "An operating system 440 controls processing by processor 405, and is typically stored in data storage 430 and loaded into internal storage 435 (as illustrated) ***for***

---

[14] Good previously incorrectly identified internal storage 430, instead of internal storage 435, as part of the corresponding structure.  Internal storage 435 is correct.

*execution*." '606, col. 6:3-5.  Concerning the second point of disagreement, the correct

construction of "untrusted client site" – a computer expected to be shared by users who are not

authorized to access data from the remote site – precludes the corresponding structure for the

"means for executing" on the "untrusted client site" from appearing on the user's own home or

work computers (i.e., the home or work clients).  Indeed, Visto's position concerning the home

or work clients fails even under Visto's construction of "untrusted client site," which requires the

untrusted client site to exist outside the firewall, thus excluding the work client which is behind

the corporate firewall.  Thus, the corresponding structure for the "means for executing" can only

be on the "remote client," with is the only disclosed "untrusted client site."

        **2.**        **"means for requesting the workspace data manager to access data
temporarily from a remote site" ('606: 20)**

The only corresponding structure for the "means for requesting" limitation is the ***"borrow***

***me" button 545 in the user interface of the workspace data manager.***  This button is shown in

Figure 5 of the patent:



As described in the specification, invoking this button causes a software component called the

assistant, among other things, "to communicate with the global server 105 to provide user

identification and authorization information to the global server 105, [and] to download

workspace data 135 from the global server."  '606, col. 6:36-41.  In other words, the user

requests access to the remote data from the global server by clicking the button.

      Visto skips to a later phase in the process when it tries to place the corresponding

structure for this limitation in the instantiator 730.  As stated in a portion of the specification that

                GOOD'S RESP. CL. CONSTR. BR.

Visto quotes, the instantiator 730 "creates a window for displaying and enabling manipulation of the workspace data *downloaded* from the global server 105." '606, col. 8:62-9:3.  Note the use of the past tense:  The workspace data has *already been downloaded* (and therefore has already been requested) by the time the instantiator gets involved.  Similarly, as described in another Visto-quoted portion of the specification, the instantiator 730 "stores the *received* global data in a file." *Id.* at 9:59-61.  Again, the instantiator 730 is not concerned with requesting access to the data on the global server, but with doing something with it once it has been requested and "received."  Visto's construction is therefore unsupported.

### 3.     "means for downloading data from the remote site" ('606: 20)

The corresponding structure for the "means for downloading" limitation is the *communications module 705.*  The very first line of the Abstract of the '606 patent identifies the communications module (later labeled communications module 705 in Figure 7) as performing the function of "downloading workspace data from a remote site."  '606, Abstract.  The patent's Summary of the Invention section contains virtually identical language:  "The system includes a communications module for downloading workspace data from a remote site...."  '606, col. 2:22-23.  Thus, the specification clearly discloses the communications module 705 as the corresponding structure for performing the "downloading" function.

By asserting that the assistant 175, 180, 185, 260 or 700 is instead the corresponding structure, Visto improperly attempts to identify far more structure than is necessary for performing the recited function.  *See Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1370 (Fed. Cir. 2001) ("Structural features that do not actually perform the recited function do not constitute corresponding structure and thus do not serve as claim limitations.").

**4.    "means for placing the data in temporary storage on the untrusted client site" ('606: 20)**

The corresponding structure for the "means for placing the data in temporary storage" limitation is *the instantiator 730*.  The '606 patent specification discloses this structure in several places, including one passage that Visto quotes in support of its incorrect assertion that the instantiator is the corresponding structure for the "means for requesting" limitation.  That passage states, "The instantiator 730 on the client 110, 115 or 120 creates a new instance, e.g., a new window of PIM API 740 and *stores the received global data into another file*, i.e., global.org." '606, col. 10:28-31 & 9:59-61.  No other component is identified as performing this function.  Thus, there can be no question that the instantiator 730 is the correct corresponding structure.[15]

**5.    "means for using the workspace data manager to present the downloaded data" ('606: 20)**

The corresponding structure for the "means for using the workspace data manager to present the downloaded data" limitation is the *PIM 160, 165 or 170*.  The PIM, or Personal Information Manager, is an application such as Microsoft Outlook or Lotus Organizer. '606, col. 4:21-28.  According to the specification, an application program interface module called the PIM API (which is one component of the assistant 700, shown in its entirety in Figure 7 of the patent) "translates and transfers the workspace data 135 received from the global server 105 to the PIM 160, 165 or 170 *for display* and enabling manipulation thereto."  Accordingly, the PIM is what displays or "presents" the downloaded data to the user.

---

[15] Visto includes in its construction operating system 240 or 440 and assistant 175, 180, 185, 260 or 700 purportedly disclosed as performing the claimed placing the data in temporary storage in the quoted passages of the specification.  *See* Visto Br. at 42 (quoting col. 4:53-55 and 63-66).  However, the quoted passages bear no relation to "placing the downloaded data in temporary storage."

## V.    CONCLUSION

Good's proposed constructions most closely reflect the ordinary and customary meaning

of the terms and phrases in dispute—as those terms are understood by a person of ordinary skill

in the art in the context of the claims, the specification, the prosecution history and the extrinsic

evidence.  Accordingly, Good respectfully requests that the Court interpret these terms and

phrases as proposed herein.

Dated: September 10, 2007                    Respectfully submitted,

                                             By: _/s/J. David Hadden_____
                                                 J. David Hadden, Calif. Bar No. 176148
                                                     (Admitted *Pro Hac Vice*)
                                             FENWICK & WEST LLP
                                             Silicon Valley Center, 801 California Street
                                             Mountain View, CA  94041
                                             Tel: (650) 988-8500
                                             Fax: (650) 938-5162
                                             E-mail: dhadden@fenwick.com

                                             Attorneys for Defendant
                                             GOOD TECHNOLOGY, INC.

*Of counsel:*
Blake C. Erskine, Bar No. 06649000
ERSKINE & MCMAHON, LLP
Post Office Box 3485
Longview, TX  75606-3485
Tel: (903) 757-8435
Fax: (903) 757-9429
E-mail: BlakeE@erskine-mcmahon.com

Attorneys for Defendant
GOOD TECHNOLOGY, INC.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 10, 2007, a true copy of the

foregoing DEFENDANT GOOD TECHNOLOGY, INC.'S RESPONSIVE CLAIM

CONSTRUCTION BRIEF  was served upon counsel of record for Plaintiff Visto Corporation by

electronic mail and/or the court's CM/ECF system.

By:  */s/J. David Hadden*
 J. David Hadden