**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| VISTO CORP., | § | |
| | § | |
| vs. | § | Case No. 2:06-CV-039 |
| | § | |
| GOOD TECH., INC. | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

**1.    Introduction**.

In this case, Visto contends that Good infringes various claims of four United States patents.

The patents-in-suit include U.S. Patent Nos. 6,085,192,[1] 6,708,221, 6,151,606, and 7,039,679.  This

opinion and order resolves the material claim construction disputes between the parties.

**2.    Description of the Procedural History of the Patents and the Technology.**

The patents-in-suit are related to one another, and are directed to data synchronization

methods and systems.  The '679 patent is a continuation of the '221 patent, and those patents share

a common written description.[2]  The '221 patent is a distant relative of the '192 patent, which is also

related to the '606 patent.  Two of the patents-in-suit have been previously construed in two separate

litigations by the Honorable T. John Ward, U.S. District Judge for the Eastern District of

Texas–Marshall Division.  *See Visto Corp. v. Seven Networks, Inc.*, No. 2:03-CV-333 (E.D. Tex.

Apr. 20, 2005, Apr. 18, 2006); *Visto Corp. v. Smartner Info. Sys., Ltd.*, No. 2:05-CV-091 (E.D. Tex.

Dec. 29, 2006).  In each of those previous litigations, Judge Ward construed terms from the '192 and

---

[1]    The '192 patent is subject to an Ex Parte Reexamination Certificate, which issued on November 22, 2005.

[2]    The claims of the '221 patent are drawn to a method for synchronizing workspace data, and the claims of the '679 patent are drawn to an email system for providing synchronization of independently modifiable emails.

'221 patents, along with two other patents not at issue in this litigation.  Several claim terms in the '192, '221, and '679 patents have also been construed by the Honorable David Folsom, U.S. District Judge for the Eastern District of Texas.  *See Visto Corp. v. Microsoft Corp.*, No. 2:05-CV-546 (E.D. Tex. Aug. 28, 2007).

The '192 patent is directed to methods and systems for synchronizing multiple copies of a workspace element in a secure network environment.  '192 patent at 1:52-54.  The secure network environment includes a global server connected to multiple clients.  *Id.* at 1:54-55.  Clients using the system and method can automatically synchronize workspace data between multiple sites independent of whether the sites are protected by site firewalls.  *Id.* at 1:56-59.

The system described in the '192 patent includes a general synchronization module at the client site for operating within a first firewall and for examining first version information to determine whether a first workspace element has been modified.  The system further includes a synchronization agent at the global server for operating outside the first firewall and for forwarding to the general synchronization module second version information which indicates whether an independently modifiable copy of the first workspace element has been modified.  The system includes means for generating a preferred version from the first workspace element and from the copy by comparing the first version information and the second version information, and means for storing the preferred version at the first store and at the second store.  *Id*. at 1: 60-67, 2:1-15.

Figure 1 depicts an overall system and includes a remote terminal linked to a global server protected by a global firewall.  The global server, in turn, is linked via a communications channel to a corporate LAN protected by a corporate firewall.  One copy of workspace data, such as e-mail information, file information, and calendar information, is stored on the global server and may be

2

modified through the remote terminal by accessing the global server.  The global server stores version information which indicates the date and time that the workspace data has been modified.

Figure 3 of the patent depicts a desktop computer on the LAN, with workspace data (called "user data" in the drawing) as well as corresponding version information.  In the drawing, the version information is depicted as a component of the user data stored in memory.  The computer includes a base system loaded into RAM along with the operating system and the desktop service engine.  Figure 4 describes the base system as including various software modules.  The base system includes a communications module for communicating through the communications interface shown in Figure 3.  The base system also includes a user interface module with routines for communicating with a user such as through a graphical user interface.  A locator module is also a component of the base system.  That module includes code for determining the location in memory of workspace elements (subsets of workspace data).

The data synchronization process is initiated by the synchronization-start module.  The '192 patent explains, through its description of the preferred embodiment, that synchronization may occur at predetermined times, such as start-up, shut-down, or timed intervals.  The process begins when the general synchronization module issues a request from inside the LAN to a synchronization agent on the global server outside the LAN.  The synchronization agent examines version information of an independently modifiable copy of workspace data stored on the global server and forwards back to the general synchronization module inside the LAN the version information of that data determined to be modified after the last synchronization.  The general synchronization module has routines for examining version information from the workspace data stored inside the LAN and comparing it to the version information forwarded by the synchronization agent to determine,

ultimately, a preferred version of the data.  The software has routines which then store the preferred version in memory in both locations.

To handle the situation where both the version information stored on the LAN and the independently modifiable copy of the version information stored on the global server have been modified since the last synchronization sequence, the base system includes a content-based synchronization module.  This module includes routines which may, for example, prompt the user to select a preferred version, integrate the content of both changes, or store both versions at both memory locations.

The '192 patent refers to a global server protected by a global firewall.  The global server stores an independently modifiable copy of workspace data.  In the invention described in the '221 and '679 patents, a user can gain secure access from a remote terminal to a global server using any terminal coupled through a communications channel (such as the Internet) to the global server.  The global server, in turn, is coupled through a communications channel to a LAN.

In the description of the preferred embodiment of the '221 and '679 patents, a remote user seeks to access a service available on the global server.  The global server might provide, for example, an email service accessible from a remote terminal located outside the LAN.  To access the e-mail service, the remote user initiates a communications link with the global server.  The server downloads a security applet to the remote terminal.[3]  '221 Patent at 8:47-49.  The applet polls the remote user for information and responds back to the global server, which examines the response and uses the information to identify and authenticate the user.  *Id.* at 8:50-54.  Once the user is "in," so-to-speak, he or she may then securely access the services provided on the global server.

---

[3]      An applet is a small, self-contained program designed to be executed from within another application.

Depending on the level of security clearance enjoyed by the remote user, the system also describes an optional procedure for using the global server as a proxy to access the various services.

The global server incorporates a translator to aid in synchronizing multiple copies of workspace data.  The patent refers to the translator as a "global translator."  By using the global translator, the global server is able to store certain workspace data in a "global format" and may also determine the differences between workspace data stored on the LAN and the data stored in memory on a remote access device, such as a smart phone.  Using the synchronization routines provided by software, clients on the system are able to synchronize data maintained on the remote device, the global server and the storage on the LAN.

The '606 patent describes a system for using a single interface, *i.e.* the workspace data manager, to access, manipulate, and synchronize workspace data, such as from a remote location. *Id.* at 2:9-11, 2:54-59.  The workspace data manager may include a personal information manager (PIM) or any application program that enables manipulation of workspace data.  *Id.* at 2:11-16.  The system generally includes a communications module for downloading workspace data from a remote site, an application program interface for communicating with a workspace data manager, and a general synchronization module for synchronizing the manipulated data with the workspace data stored at the remote site.  *Id.* at 2:21-29.   An instantiator requests the workspace data manager to provide an interface for enabling manipulation of the workspace data that downloaded to a remote client.  *Id.* at 29-31.  Upon logout from the remote client, a de-instantiator initiates synchronization and deletes the locally stored data and interfaces from the local client, so that no traces are left on the local client for unprivileged users to review.  *Id.* at 2:40-42, 3:7-9.

3.       **General Principles Governing Claim Construction**.

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). Claim construction is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. Under the patent law, the specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. A patent's claims must be read in view of the specification, of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's claims. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). And, although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048,

6

1054 (Fed. Cir. 1994).

This court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).  In *Phillips*, the court set forth several guideposts that courts should follow when construing claims.  In particular, the court reiterated that "the *claims* of a patent define the invention to which the patentee is entitled the right to exclude."  *Id.* at 1312 (emphasis added) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  To that end, the words used in a claim are generally given their ordinary and customary meaning.  *Id.*  The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.* as of the effective filing date of the patent application."  *Id.* at 1313.  This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention.  The patent is addressed to and intended to be read by others skilled in the particular art.  *Id.*

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*  Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument."  *Id.* at 1315 (quoting *Markman*, 52 F.3d at 978).  Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims.  *Id.* at 1314-17.  As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the

7

claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878).  In addressing the role of the specification, the *Phillips*

court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per*

*Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and
> confirmed with a full understanding of what the inventors actually invented and
> intended to envelop with the claim.  The construction that stays true to the claim
> language and most naturally aligns with the patent's description of the invention will
> be, in the end, the correct construction.

Consequently, *Phillips* emphasized the important role the specification plays in the claim

construction process.

The prosecution history also continues to play an important role in claim interpretation.  The

prosecution history helps to demonstrate how the inventor and the PTO understood the patent.

*Phillips*, 415 F.3d at 1317.  Because the file history, however, "represents an ongoing negotiation

between the PTO and the applicant," it may lack the clarity of the specification and thus be less

useful in claim construction proceedings.  *Id.*  Nevertheless, the prosecution history is intrinsic

evidence.  That evidence is relevant to the determination of how the inventor understood the

invention and whether the inventor limited the invention during prosecution by narrowing the scope

of the claims.

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor

of extrinsic evidence, such as dictionary definitions or expert testimony.  The *en banc* court

condemned the suggestion made by *Tex. Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed.

Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries

or otherwise) before resorting to the specification for certain limited purposes.  *Id*. at 1319-24.  The

approach suggested by *Tex. Digital*–the assignment of a limited role to the specification–was

rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term. *Id.* at 1320-21. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of the claim terms within the context of the patent." *Id.* at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id.* What is described in the claims flows from the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented. *Id.* The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word. *Id.* at 1321-22.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id.* at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

**4.      Discussion**

      **1.      order of the steps of method claims**

The parties dispute whether the steps of the '192 method claims must be performed in any particular sequence. Visto contends that there is no requirement regarding the order of steps in claims 1, 2, 8, and 22 of the '192 patent, except as set forth in the claims. Good contends that the plain language of the claims requires the steps to occur in a specific order. Because the claimed

steps explicitly require an order of operation, the court concludes that imposing an order to the steps is proper. *See Interactive Gift Exp., Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001) ("Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one.") (citation omitted). With respect to claim 1, the order of steps is: step A occurs first, followed by step D, followed by steps B or C in interchangeable order, followed by steps E or F in interchangeable order. With respect to claim 2, step C occurs first, followed by steps A or B in interchangeable order, followed by steps D or E in interchangeable order. The steps of claim 8 occur in the same order as the steps in claim 2. With respect to claim 22, step C occurs first, followed by steps A or B in interchangeable order, followed by steps D or E in interchangeable order.

### 2.      the firewall; the first firewall

These terms appear in various claims of the '192 patent. Judge Ward previously construed the term "firewall" to mean "software and/or hardware for protecting an organization's network against external threats, such as hackers, coming from another network, such as the Internet." *See Visto Corp. v. Seven Networks, Inc.*, No. 2:03-CV-333, slip op. at 14-15 (E.D. Tex. Apr. 20, 2005). Visto urges the court to adopt Judge Ward's previous construction. Good contends that the construction of the term "firewall" should vary with its contextual use within the '192 patent. Visto contends that the contextual terms do not need separate construction. The court rejects Good's proposal, and adopts Judge Ward's previous construction. The court construes the term "firewall" to mean "software and/or hardware for protecting an organization's network against external threats, such as hackers, coming from another network, such as the Internet."

3.      **examination results; first examination results; second examination results**

These terms appear in claims 1, 2, 8, 21, and 22 of the '192 patent.  In *Seven Networks*, Judge Ward construed the term "examination results" to mean "information regarding one or more workspace elements obtained by examining those workspace elements.    Judge Ward also determined that the terms "first" and "second" require no construction.  *See Visto Corp. v. Seven Networks, Inc.*, No. 2:03-CV-333, slip op. at 13-14 (E.D. Tex. Apr. 20, 2005).  Visto urges the court to adopt Judge Ward's construction.  Good's proposed construction is "information regarding one or more workspace elements obtained by examining the version information of those workspace elements."  The court adopts Judge Ward's construction as recited above.

4.      **version information; version indicating information**

These terms appear in claims 1, 2, 8, 10, 17, 18, 21, and 22 of the '192 patent.  In *Seven Networks*, Judge Ward construed this term to mean "information that can be used to determine the version of a workspace element."  *See Visto Corp. v. Seven Networks, Inc.*, No. 2:03-CV-333, slip op. at 26 (E.D. Tex. Apr. 20, 2005).  Visto urges the court to adopt Judge Ward's construction. Good's proposed construction is "information identifying a version of a workspace element or independently modifiable copy that can be used to determine whether the workspace element or copy has been modified without examining the content of the modifications."  The court agrees with Judge Ward's construction and construes these terms to mean "information that can be used to determine the version of a workspace element."

5.      **independently modifiable copy; the copy**

These terms are found in claims 1, 2, 8, 10, 21, and 22 of the '192 patent.  In *Seven Networks*, Judge Ward construed the term "independently modifiable copy" to mean "a copy of a

workspace element capable of being modified independent of the workspace element.  The copy of the workspace element does not have to be in the same format as the workspace element."  *See Visto Corp. v. Seven Networks, Inc.*, No. 2:03-CV-333, slip op. at 16-17 (E.D. Tex. Apr. 20, 2005).  Good's proposed construction is "a copy of a workspace element capable of being modified by a user independent of the workspace element.  The copy of the workspace element does not have to be in the same format as the workspace element."  Visto urges the court to adopt Judge Ward's construction.  The court agrees with Visto and adopts Judge Ward's construction as recited above.

### 6.    **independently modifiable email(s)**

This term appears in claim 1 of the '679 patent.  Judge Folsom has previously construed this term to mean "emails that are capable of being modified independent of each other.  The emails cannot be unrelated and do not have to be in the same format."  *See Visto Corp. v. Microsoft Corp.*, No. 2:05-CV-546, slip op. at 14-16 (E.D. Tex. Aug. 28, 2007).  Visto's proposed construction is "an email capable of being modified independent of another version of the email.  The emails do not have to be in the same format."  Good's counter-proposal is "a copy of an email capable of being modified by a user independent of the email.  The copy of the email does not have to be in the same format as the email."  The court adopts Judge Folsom's above-recited construction for this term.

### 7.    **initiating . . . from within the firewall [through the communication channel] when predetermined criteria have been satisfied**

This term appears in claims 1, 2, 8, 10, 21, and 22 of the '192 patent.  When evaluating Visto's '708 patent, Judge Ward previously construed the term "communications channel" to mean "a medium for transferring information.  A communications channel can be a physical or wireless link."  *See Visto Corp. v. Seven Networks, Inc.*, No. 2:03-CV-333, slip op. at 11-12 (E.D. Tex. Apr. 20, 2005).  In *Microsoft*, Judge Folsom construed the term "initiating" to mean "to cause or facilitate

the beginning of," and construed the term "Internet" to mean "a network that connects other networks, such as corporate, university, and government networks." *See Visto Corp. v. Microsoft Corp.*, No. 2:05-CV-546, slip op. at 14, 18-20 (E.D. Tex. Aug. 28, 2007).  Visto contends that in light of the previous three constructions, combined with the court's construction of the term "firewall," as adopted above, the term "initiating . . . from within the firewall [through the communication channel] when predetermined criteria have been satisfied" needs no construction. Good proposes a construction of "starting the generating first examination results step and sending a command from within the firewall [through an Internet/the established communication channel] to star the generating second examination results step when predetermined criteria have been satisfied."  The court is persuaded that the terms "communications channel," "initiating," and "Internet," have the same scope with respect to the '192 patent, and adopts the above constructions for these terms.  The court concludes no further construction of the above term is warranted.

## 8.    storing

This term appears in claims 1, 2, 8, 10, and 22 of the '192 patent.  The parties agree that no construction of this term is necessary.

## 9.    general synchronization module

This term appears in claims 1, 12, 13, and 15 of the '679 patent.  When evaluating the '192 patent, Judge Ward construed this term to mean "software routines or code that perform the task of determining whether a workspace element and/or an independently modifiable copy thereof has (or have) been modified, based on one or more criteria."  *See Visto Corp. v. Seven Networks, Inc.*, No. 2:03-CV-333, slip op. at 15-16 (E.D. Tex. Apr. 20, 2005).  With respect to the '679 patent, the court construes the term "general synchronization module" to mean "software routines or code that perform the task of determining whether one or more independently modifiable emails has (or have)

13

been modified, based on one or more criteria."

### 10.    server

This term appears in claims 4, 8, 12, and 16 of the '679 patent.  The specification of the '679 patent states that "a server can be any computer which is polled by a client."  '679 patent at 16:63-64.  When evaluating the '221 patent, Judge Ward construed the term "global server" to mean "a server accessible from remote locations which stores independently modifiable copies of selected portions of workspace data."  *See Visto Corp. v. Seven Networks, Inc.*, No. 2:03-CV-333, slip op. at 22-23 (E.D. Tex. Apr. 20, 2005).  When evaluating the '192 and '221 patents, Judge Folsom construed the term "server" to mean "a computer or program that responds to commands or requests from a client.  A client is a computer or program that sends commands or requests to the server."  *See Visto Corp. v. Microsoft Corp.*, No. 2:05-CV-546, slip op. at 17-18 (E.D. Tex. Aug. 28, 2007).  Visto's proposed construction is "a computer that provides services to another computer."  Good's counter-proposal is "a computer in a network that responds to commands from a client."  Unlike *Microsoft*, neither party here contends that the term "server" includes a "program."  *See id.*  The court concludes that the balance of Judge Folsom's construction is consistent with the specification of the '679 patent, and defines "server" to mean "a computer that responds to commands or requests from a client."

### 11.    normally open LAN firewall port

This term appears in claims 1 and 3 of the '679 patent.  Judge Folsom construed this term to mean "a port that is typically configured to be open for packet traffic in a firewall.  Ports 80 and 443 are examples of normally open ports."  *See Visto Corp. v. Microsoft Corp.*, No. 2:05-CV-546, slip op. at 21-22 (E.D. Tex. Aug. 28, 2007).  Visto's proposed construction is "a port that is typically configured to be open for packet traffic in a firewall, such as ports 80 and 443."  Good's counter-

proposal is "a port that is typically configured to be open for network data to pass through a firewall."  The court adopts Judge Folsom's construction as recited above.

### 12.     a first Internet communication channel

This term appears in claim 1 of the '679 patent.  This term needs no construction in light of the court's previous construction of the terms "Internet" and "communication channel."

### 13.     a plurality of second Internet communication channels, each coupling said global server to a respective one of said smart phone devices

This term appears in claim 1 of the '679 patent.  In *Seven Networks*, Judge Ward construed the term "smart phone" to mean "a telephone device that integrates computing capabilities and telephone capabilities."  *See Visto Corp. v. Seven Networks, Inc.*, No. 2:03-CV-333, slip op. at 1 (E.D. Tex. Apr. 18, 2006).  Judge Ward also construed the term "global server" to mean "a server accessible from remote locations which stores independently modifiable copies of selected portions of workspace data."  *See Visto Corp. v. Seven Networks, Inc.*, No. 2:03-CV-333, slip op. at 22-23 (E.D. Tex. Apr. 20, 2005).  The court adopts Judge Ward's constructions for the terms "smart phone" and "global server" and concludes that no further construction of this term is necessary in light of the court's previous construction of "Internet" and "communication channel."

### 14.     workspace data manager

This term appears in claims 10, 11, and 19-21 of the '606 patent.  Visto contends that the term means "a program that allows workspace data to be manipulated."  Good contends the term means "a program that allows a user to manipulate workspace data."  The difference is whether the claim term requires manipulation of workspace data by a user.

The specification states that "[a] workspace data manager may include a Personal Information Manager (PIM), a word processing program, a spreadsheet program, or *any application*

15

*program that enables manipulation of workspace data*."  '606 patent, 2:11-15 (emphasis added).

This passage of the specification contemplates that the workspace data manager is an application

program–the definition of which is a program that performs tasks for an end user.  As a result, the

court adopts Good's proposed construction and defines this term to mean "a program that allows a

user to manipulate workspace data."

### 15.    untrusted client site

This term appears in claims 10, 20, and 21 of the '606 patent.  Visto contends that the term

means "a computer or mobile device that is outside the firewall and has the possibility of being used

by an unauthorized person."  Good contends that the term means "a computer expected to be shared

by users who are not authorized to access data from the remote site."  The court's review of the

specification reveals that the untrusted client site is a site that is outside the firewall which is

accessible to unprivileged users.  '606 patent, 3:6-9 ("The system and method also advantageously

delete downloaded data and all interfaces from the local client, so that no traces are left on the local

client for unprivileged users to review."); '606 patent, 7:61-64 ("The communications module 705

may apply Secure Socket Layer technology to establish a secure communication channel."); '606

patent, 8:56-59 ("The security module 725 performs identification and authentication techniques to

confirm authorization by the user to access the workspace data 135 stored on the global server

105.").  As a result, the court defines "untrusted client site" to mean "a computer that is outside the

firewall which is accessible to unprivileged users."

### 16.    access data temporarily

This term appears in claims 20 and 21 of the '606 patent.  The court determines that this term

needs no construction.

### 17. automatically disabling

This term appears in claims 10 and 21 of the '606 patent.  Visto contends the term means "preventing further access without user intervention."  Good argues the term means "disabling without a request to do so."  The specification explains that "[t]he system and method also advantageously delete downloaded data and all interfaces from the local client, so that no traces are left on the local client for unprivileged users to review."  '606 patent, 3:6-9.  In describing one of the embodiments, the patent states that "[u]pon receiving an "end session" or "unborrow me" request, the de-instantiator 745 initiates the general synchronization module 715 in step 855 . . . . The de-instantiator 745 in step 860 deletes the workspace data on the client 110, 115 or 120, and deletes all records of the matter."  '606 patent, 11:11-19.  The language of the patent indicates that the automatic disabling may occur when the user logs out or the session ends.  Based on the language of the claims, read in light of the specification, the court construes the claim language "automatically disabling the untrusted client site from accessing at least a portion of the downloaded data" to mean "preventing, without a user request to do so, the untrusted client site from accessing at least a portion of the downloaded data after a user has finished using the data."

### 18. after a user has finished using the data

This term appears in claims 10, 20, and 21 of the '606 patent.  The court determines that this language needs no further construction.

### 19. instantiator

This term appears in claim 11 of the '606 patent.  The patent states that "[t]he instantiator 730 is an application program interface 730 that creates a window for displaying and enabling manipulation of the workspace data 135 downloaded from the global server 105."  '679 patent at 8:62-65.  Although this language appears in the description of the preferred embodiment, it provides

a definition consistent with the use of the term throughout the specification and does not unduly limit the claims to the preferred embodiment.  As such, the court defines "instantiator" as "an application program interface that creates a window for displaying and enabling the manipulation of the workspace data."

### 20.    Means-plus-function limitations.

### A.    means for updating the first version information whenever the first workspace element is modified[4]

This limitation is found in claim 17 of the '192 patent.  Visto contends that the corresponding structure is "service engine 245, desktop service engine 345, or general synchronization modules 425 or 510."  Good contends that the corresponding structure is "desktop service engine 345 or service engine 245."  The claimed function is updating "first version information."  The specification states "[t]he service engine 245 operates to update the version information 255 whenever modifications are made. . . .  A desktop service engine 345 (*i.e.*, a particular service engine 245, FIG. 2) includes a service program for managing user data 180 (*i.e.*, particular service data 250, FIG. 2) which includes version information 350 (*i.e.*, particular version information 255, FIG. 2)."  '192 patent at 4:33-35, 4:47-51.  The court therefore concludes that the corresponding structure is the "service engine 245 and desktop service engine 345."

### B.    means for updating the first version information whenever the first workspace element is modified or updating the second version information whenever the copy is modified

This limitation is found in claim 21 of the '192 patent.  Good contends that the specification of the '192 patent fails to disclose corresponding structure for performing the function of updating

---

[4]    By statute, the court construes all of the means plus function claim limitations to cover the structure identified in the specification and equivalents.

the second version information whenever an independently-modifiable copy of a workspace element stored in a second store on a smart phone is modified.  Visto responds that the corresponding structure for this means-plus-function limitation is "service engine 245, desktop service engine 345, or general synchronization modules 425 or 510."  Visto's position is that these structures are "capable of performing the claimed function."  Visto's Brief at 32.  The correct inquiry, however, is whether these structures are clearly linked to performing the claimed function.  *See Gobeli Research Ltd. v. Apple Computer, Inc.*, 384 F. Supp. 2d 1016, 1023 (E.D. Tex. 2005) (citing *Med. Instrumentation & Diagnostics Corp. v. Elekta AG*, 344 F.3d 1205, 1210 (Fed. Cir. 2003)).  Visto's reply brief is silent on this issue.  Accordingly, the court is inclined to recommend that this limitation, and claim 21, are indefinite for lacking corresponding structure.  Visto is granted leave to supplement its briefing with any argument on this issue within 7 calendar days of this opinion.

C.      **first means for generating first examination results from first version information which indicates whether a first workspace element stored at a first store within a firewall has been modified**

This limitation is found in claim 21 of the '192 patent.  Visto contends the corresponding structure is "general synchronization modules 425 or 510."  Good contends that the corresponding structure is "the general synchronization module 425 of base system 190 in desktop computer 160 within the firewall."  The court rejects Good's attempt to impose location-based restrictions, and concludes that the corresponding structure for the above limitation is the "general synchronization module 425."

D.      **second means for generating second examination results from second version information which indicates whether an independently modifiable copy of the first workspace element has been modified, the copy being stored at a second store on a smart phone outside the firewall**

This limitation is found in claim 21 of the '192 patent.  Visto contends that the corresponding

structure is "general synchronization modules 425 or 510.  Good contends that the corresponding structure is "the general synchronization module 425 of second base system in smart phone 105.  The court concludes that the corresponding structure of the above limitation is the "general synchronization module 425."

> **E.     means for initiating the first and second means from within the firewall when predetermined criteria have been satisfied**

This means-plus-function limitation is found in claim 21 of the '192 patent.  Visto contends that the corresponding structure is "synchronization-start module 420."  Good contends that the corresponding structure is "synchronization start module 420 of base system 190 in desktop computer 160 within the firewall."  The court concludes that the corresponding structure for the above means-plus-function limitation is the "synchronization-start module 420."  *See, e.g.*, '192 patent at 5:42-45 ("The synchronization-start module 420 initiates data synchronization by instructing the general synchronization module 425 to begin execution of its routines.").

> **F.     means for generating a preferred version from the first workspace element and from the copy based on the first and second examination results**

This limitation is also found in claim 21 of the '192 patent.  Visto contends that the corresponding structure is "general synchronization modules 425 or 510 or content based synchronization module 430."  Good contends that the corresponding structure is "general synchronization module 425 of base system 190 in desktop computer 160."  The court concludes that the corresponding structure for the above means-plus-function limitation is the "general synchronization module 425."  *See Visto Corp. v. Seven Networks, Inc.*, No. 2:03-CV-333, slip op. at 30 (E.D. Tex. Apr. 20, 2005) (construing similar term).

**G.     means for storing first workspace data on a first device**

This limitation is found in claim 8 of the '221 patent.  Judge Ward previously construed this means plus function limitation in the *Seven Networks* litigation.  The court adopts his construction, and concludes that the corresponding structures for this limitation are "data storage devices 250, 350, and 720."  *See Visto Corp. v. Seven Networks, Inc.*, No. 2:03-CV-333, slip op. at 31-32 (E.D. Tex. Apr. 20, 2005).

**H.     means for storing second workspace data on a second device**

This limitation is found in claim 8 of the '221 patent.  Judge Ward previously construed this means plus function limitation in the *Seven Networks* litigation.  The court adopts his construction, and concludes that the corresponding structures for this limitation are the "data storage devices 250, 350, and 720."  *See Visto Corp. v. Seven Networks, Inc.*, No. 2:03-CV-333, slip op. at 32 (E.D. Tex. Apr. 20, 2005).

**I.     means for executing a workspace data manager on an untrusted client site**

This limitation appears in claim 20 of the '606 patent.  The claimed function is "executing a workspace data manager on an untrusted client site."  The specification explains that "[a]n operating system 440 controls processing by processor 405, and is typically stored in data storage 430 and loaded into internal storage 435 (as illustrated) for execution.  The PIM 170 and assistant 185 may be stored in data storage 430, and loaded into internal storage 435 (as illustrated) for execution by the processor."  '606 patent, 6:3-8.  Although Good suggests that the internal storage is corresponding structure, the court disagrees.  Likewise, although Visto suggests that the specification includes alternative structures, the patent clearly links the operating system 440 and the processor 405 to the claimed function.  The corresponding structure is therefore the "processor 405 and the operating system 440."

**J.      means for requesting the workspace data manager to access data temporarily from a remote site**

This limitation also appears in claim 20 of the '606 patent.  The parties agree on the claimed function, but disagree on the corresponding structure.  Visto suggests it is the instantiator 730.  Good contends that it is the "borrow-me" button 545 depicted in the user interface of the workspace data manager.  Although the court rejects both of these proposals, Good's proposal is closer to correct. By using the "borrow me" button 545, a user may use a PIM for viewing and manipulating workspace data.  Invoking the "borrow me" button causes the corresponding assistant 175, 180 or 185 to communicate with the global server 105 and to provide user identification and authentication information to the global server 105, among other things.  '606 patent, 6:34-44.  It is, however, the "borrow me" software operations, rather than the button itself, that causes the request to be made. Fig. 8 depicts the "borrow me" functionality.  Those portions relevant to the present inquiry are included at the top of the flow diagram.  The court identifies the corresponding structure as "software routines performing steps 810 and 815 of the 'borrow me' functionality depicted in Fig. 8."

**K.      means for downloading data from the remote site**

Visto contends the corresponding structure is the assistant 175, 180, 185, 260 or 700.  Good argues that the corresponding structure is the communications module 705.  Although Visto points to passages in the specification which state that selecting a button causes the assistant to download the corresponding workspace data, *see* '606 patent, 7:10-16, Good correctly notes that the assistant performs many functions in addition to downloading data.  Elsewhere in the specification, the patent states specifically that the communications module downloads the workspace data from the remote site.  '606 patent, 2:22-23.  The communications module is part of the assistant.  *See* '606 patent,

22

Fig. 7.  The court is persuaded that identifying the entire assistant would include structure far beyond what is necessary to perform the recited function.  As a result, the court identifies the "communications module 705" as the corresponding structure.

**L.     means for placing the data in temporary storage on the untrusted client site**

Visto contends that the corresponding structure is the operating systems 240 or 440 or the assistant 175, 180, 185, 260 or 700.  Good contends that the corresponding structure is the instantiator 730.  The specific function claimed is placing data in temporary storage on the untrusted client site.  The patent specification provides two examples of the operation of the instantiator: one from Outlook and one from Lotus Organizer.  In each example, the instantiator performs the function of placing the data received from the global server into storage on the remote site.  '606 patent, 9:59-60; 10:28-31.  Accordingly, the court identifies the "instantiator 730" as the corresponding structure for the claimed function.

**M.     means for using the workspace data manager to present the downloaded data**

This limitation also appears in claim 20 of the '606 patent.  Visto contends that the corresponding structure is the assistant 175, 180, 185, 260 or 700.  Good argues that the corresponding structure is the PIM 160, 165 or 170.  For essentially the reasons identified in Visto's brief, the court agrees that the assistant is the means for using the workspace data manager to present the downloaded data.  '606 patent, 4:63-66 (noting that the PIM includes an assistant which, among other things, enables a user "to use the PIM 255 for displaying and manipulating the workspace data 135.").  The court identifies the corresponding structure as the "assistant 175, 180, 185, 260 or 700."

**4.     Conclusion**

The court adopts the above constructions.  The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury.

Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the constructions adopted by the court.

SIGNED this 16th day of January, 2008.

CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE